JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

In re:

**PACIFIC METRO, LLC**
A California Limited Liability Company,
fka The Thomas Kinkade Company,
LLC, fka Media Arts Group, Inc.

    Debtor.

900 Lightpost Way
Morgan Hill, CA 95037

Employer Tax I.D. No.: 26-3534146

Case No. 10-55788-RLE-11

Chapter 11

Date: *Subject to order shortening time*
Time:
Place: United States Bankruptcy Court
   280 S. First St., Room 3099
   San Jose, CA 95113
Judge: Honorable Roger L. Efremsky

**MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING POST-PETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) GRANTING ADEQUATE PROTECTION; (4) MODIFYING AUTOMATIC STAY; AND (5) GRANTING RELATED RELIEF**

RAF
R:\Pacific Metro\BK\Pld\Mot\StPay\CashColl.ple.doc

Case: 10-55788  Doc# 16  Filed: 06/08/10  Entered: 06/08/10 13:49:12  Page 1 of 16

MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING POST-PETITION FINANCING....

# TABLE OF CONTENTS

|   |     |                                                              | Page |
|---|-----|--------------------------------------------------------------|------|
| I.   |     | JURISDICTION                                              | 1    |
| II.  |     | BANKRUPTCY RULE 4001 CONCISE STATEMENT                    | 2    |
|      | A.  | Relief Requested                                          | 2    |
|      | B.  | Proposed Use of Cash Collateral                           | 2    |
|      | C.  | Adequate Protection                                       | 3    |
|      | D.  | Events of Default                                         | 4    |
|      | E.  | Notice of this Motion and the Hearings                    | 5    |
| III. |     | MOTION                                                    | 5    |
|      | A.  | Bankruptcy Petition                                       | 5    |
|      | B.  | History and Events Leading to the Debtor's Bankruptcy Case| 5    |
|      | C.  | Assets and Debt Structure                                 | 9    |
|      | D.  | Necessity For Use Of Cash Collateral                      | 10   |
|      | E.  | The Pre-Petition Secured Indebtedness                     | 10   |
|      | F.  | The Debtor's Chapter 11 Business Plan                     | 11   |
|      | G.  | Use Of Cash Collateral And Adequate Protection            | 12   |
|      | H.  | Interim Approval Should Be Granted                        | 13   |

1  Pacific Metro, LLC, a California Limited Liability Company, fka The Thomas Kinkade Company, LLC, fka Media Arts Group, Inc. the debtor and debtor in possession herein, (the "<u>Debtor</u>" or the "<u>Company</u>"), hereby submits its MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING POST-PETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) GRANTING ADEQUATE PROTECTION; (4) MODIFYING AUTOMATIC STAY; AND (5) GRANTING RELATED RELIEF (the "<u>Motion</u>") in which it moves, pursuant to Section 364 of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure and Rule 9014-1 of the Bankruptcy Local Rules, for entry of interim and final orders approving the use of cash collateral and the terms and conditions of the Debtor's secured financing facility to be extended by the Debtor's affiliated senior secured creditor, LPA Properties, L.P. (the "<u>Lender</u>"). The Motion will be made on the grounds that such borrowings and use of cash collateral are necessary for the Debtor's operations and that the entities with an interest in such cash collateral are or will be adequately protected under the terms of the proposed order granting the Motion. The Motion is based on the Memorandum of Points and Authorities set forth herein, the DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS ("<u>Omnibus Declaration</u>")[1] filed concurrently herewith, the pleadings and papers on file herein, and on such other oral or documentary evidence as may be submitted at the hearing before the Court.

In support of the Motion, the Debtor respectfully represents the following:

## I. JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein is §§ 364(b) and 503(b)(1) of the Bankruptcy Code.

/ / /

---

[1] In addition to this Motion, the Debtor is concurrently filing other "first day" motions, including motions pursuant to which the Debtor is seeking authority to pay its employees all pre-petition wages up to the amount of the priority allowed under Section 507(a) of the Code, to establish a procedure to deem its utilities adequately assured of payment under Section 366 of the Code, and to reject a burdensome real property lease to reduce administrative expenses of this case.

## II. BANKRUPTCY RULE 4001 CONCISE STATEMENT

### A. Relief Requested

3. Prior to the filing of the case, the Debtor met its working capital needs through a secured credit facility originally extended to the Debtor and certain of its affiliates (the "Pre-Petition Credit Facility") including Morning Glory Licensing, LLC ("Morning Glory"), by Bank of America, N.A. through a REVOLVING CREDIT NOTE, which note has been purchased by the Lender, which is a financing entity owned by Thomas Kinkade. Pursuant to this Motion, the Debtor seeks authority to incur further borrowings to the extent necessary and to use the cash collateral of the Lender in accordance with an agreement which will fund continuing operations pursuant to a 13-week rolling budget (the "Budget") prepared by the Debtor and attached as **Exhibit "A"** to the Omnibus Declaration. The use of cash collateral is necessary to fund continuing operations, pay employees, generate further inventory and accounts receivable and thereby maintain the going concern value of the Debtor's business, pending the confirmation of a plan of reorganization.

4. The Debtor requests entry of an order or orders (a) approving the use of cash collateral and post-petition secured financing for the weeks ending June 11, June 18, and June 25 (the "Interim Period") pending the conclusion of a final hearing on this Motion (assuming a final hearing is held on or before July 2, 2010) to the extent necessary to avoid immediate and irreparable injury, (b) scheduling a final hearing on the Motion for a date on or before July 2, 2010, and (c) at the final hearing, approving post-petition secured financing and use of cash collateral through the confirmation of a Chapter 11 Plan (the "Cash Collateral Period") to be filed herein.

### B. Proposed Use of Cash Collateral

5. At the time the Lender purchased the note from Bank of America, the principal amount of the obligation was approximately $4,100,000. Since that time, the principal amount has not changed, but approximately $126,000 in interest has accrued. Prior to the commencement of the case, the Debtor and Morning Glory in the ordinary course of business would collect their accounts receivable through a lockbox account. The Lender would sweep each respective lockbox account and deposit the funds into two separate "cash collateral" accounts controlled by the Lender for each respective borrower. The Lender would in turn advance further sums as needed to the Debtor and

Morning Glory for operations. The Lender holds approximately $250,000 in the cash collateral account of the Debtor.

6. The Debtor requests interim approval for use of cash collateral in the amounts of and for the purposes described under the line items and time periods set forth in the Budget to the extent necessary to prevent immediate and irreparable harm to the Estate, pending a final hearing on this Motion. Thereafter, the Debtor proposes to continue to use cash collateral as described in the Budget. In addition, the Lender has agreed to transfer additional amounts (the "<u>Post-Petition Advances</u>") from the Morning Glory cash collateral account held by the Lender to the extent necessary to supplement funding required for the Debtor's operations at the same non-default interest rate provide in the Pre-Petition Credit Facility. The amount of Post-Petition Advances is anticipated to be approximately $50,000 for the Interim Period. In both situations, the Debtor requests authority to (a) exceed and pay any expense line item by 20% provided that it does not exceed the aggregate budgeted expenditures for any period by more than 10%, and (b) carry over unused funds budgeted in any period for use in future periods.

**C.     Adequate Protection**

7. The Debtor further requests that as security for the Post-Petition Advances (together with the Pre-Petition Obligations (as defined in Paragraph 28 herein) the "<u>Adequate Protection Obligations</u>") and decrease in the value of the property securing the Lender's prepetition claims resulting from the use of Cash Collateral by the Debtor, the Debtor be allowed to grant to the Lender a replacement lien ("<u>Replacement Lien</u>") on all property of the Debtor acquired after the commencement of this case of the same types and description as the collateral securing the Lender's prepetition lien, if any, but excluding claims for relief arising under the Bankruptcy Code (including claims arising under §§ 506(c), 544, 545, 547, 548, and 549 thereof). Such Replacement Lien shall have the same priority, validity and extent as each of the Lender's prepetition liens, but shall be subordinate to the (i) compensation and expense reimbursement (including professional fees and expenses to the extent allowed in the Court's Guidelines for Cash Collateral and Financing Motions) allowed to a Trustee in any successor Chapter 7 case; (ii) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (iii) fees of the Debtor's professionals and any counsel that is

appointed to represent any committee of unsecured creditors in this case (the "Carve-Out").

8. The Replacement Lien shall be perfected by operation of law upon entry of the interim and final orders by the Bankruptcy Court granting this Motion. The Lender may but shall not be required to file or record any financing statements, mortgages, or other documents in any jurisdiction or to take any other action in order to validate or perfect the Replacement Lien granted hereunder. The Court's order shall be deemed sufficient and conclusive evidence of the security interest and liens granted herein. If the Lender, in its sole discretion, chooses to file financing statements or record mortgages or other documents, or otherwise confirm perfection of such security interests and liens, the Lender is hereby authorized to effect such filings and recordations, and all such financing statements, mortgages, or similar documents shall be deemed to have been filed, recorded, or made on the date of entry of the orders granting this Motion.

9. As additional adequate protection to secure the Post-Petition Advances and to the extent that any Diminution reduces the value of the Replacement Lien below the outstanding balance of the Prepetition Claims, then the Lender will be granted, to the extent of the amounts advanced and the net decrease, a superpriority claim under section 507(b) of the Bankruptcy Code (the "Superpriority Claim"), and the Superpriority Claim shall have priority in payment over any and all administrative expense claims of any kind under the Bankruptcy Code subject to the Carve-Out.

10. As additional adequate protection, the Debtor is also agreeable to reasonable reporting requirements.

**D. Events of Default**

11. Unless the Lenders shall have provided their prior written consent, or all Adequate Protection Obligations shall have been indefeasibly paid in full in cash, each of the following shall constitute an "Event of Default"

    a. issuance of an order staying, reversing, modifying or vacating any order entered pursuant to this Motion;

    b. the entry of an order dismissing the case, converting the case to a case under Chapter 7 of the Bankruptcy Code, or appointing a Chapter 11 trustee or an examiner with expanded powers in the case;

  c. the breach by the Debtor of any term or provision of any order entered pursuant to this Motion, subject to written notice to the Debtor and any Committee and an opportunity to cure, in each case only to the extent such notice and opportunity to cure are provided for;

  d. the acquisition by any post-petition lender to the Debtor of a post-petition security interest in or lien upo`n any property of the Debtor having parity with or priority over the security interest and liens in such property held by the Lender (other than a statutory lien arising in the ordinary course of business); and/or

  e. the automatic stay is terminated with respect to any of the collateral of the Lender having an aggregate book value in excess of $250,000.

### E. Notice of this Motion and the Hearings

12. Copies of this Motion and the related papers were served upon the following parties: (1) the Lender; (2) counsel to the Lender; (3) the Debtor's twenty largest unsecured creditors; (4) the United States Trustee; (4) and all parties who have requested special notice. After the preliminary hearing, the Debtor will give notice of any subsequent hearing in the manner as ordered by the Court.

## III. MOTION

### A. Bankruptcy Petition

13. On June 2, 2010, (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor is presently operating its business as a debtor in possession pursuant to the provisions of §§ 1107 and 1108 of the Bankruptcy Code.

14. No official committee of unsecured creditors (the "Committee") has been appointed in the bankruptcy case to date.

### B. History and Events Leading to the Debtor's Bankruptcy Case

#### 1. Corporate Structure

15. The Debtor was formerly known as The Thomas Kinkade Company, LLC ("TKC"), and is the successor in interest to Media Arts Group, Inc. ("MAGI"). MAGI was founded in 1990

with the express mission of manufacturing, distributing, and selling the art and art based products of various artists including Thomas Kinkade. MAGI became a public company listed on the NASDAQ stock market exchange on August 2, 1994 and conducted its retail business primarily through a network of owned and operated retail galleries. Subsequently, MAGI changed its business model allowing independently owned and operated galleries to license the Thomas Kinkade name and sell product through a tiered gallery system. Accordingly, MAGI undertook efforts to sell or phase out most of its corporately owned galleries. During this phase, MAGI significantly expanded its corporate and manufacturing facilities, entering into a series of long-term leases of real property for its Morgan Hill, California campus, and conducted several lines of business including, licensing, publishing, manufacturing, and distribution. Publishing processes prevalent at that time required significant on site square footage and factory personnel to accommodate manufacturing needs.

16. During MAGI's tenure as a public company, Mr. Kinkade was a significant yet minority shareholder. On January 29, 2004, Mr. Kinkade, through an indirectly owned acquisition entity, acquired all of the outstanding shares of MAGI. MAGI thereafter changed its name to The Thomas Kinkade Company, ceased to be a publically traded company, and subsequently reincorporated from Delaware to California. Upon the consummation of the "going private" transaction, The Thomas Kinkade Company became a wholly owned subsidiary of Lightpost Holdings, LLC, a California limited liability company ("Lightpost"). In order to effectuate the "going private" transaction, the Debtor incurred approximately $25,000,000 of bank debt, a portion of which was personally guaranteed by Mr. Kinkade, and which was subsequently paid down to approximately $4,100,000.

17. On December 27, 2006, the Debtor, Lightpost and other affiliated entities entered into an agreement (the "Master Agreement") to effect a tax free reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "'F' Reorganization") to better reflect the operational realities of the business and to allow the management team of each of the licensing and production sides of the business to better focus on their own specific goals and responsibilities. Pursuant to the "F" Reorganization, Lightpost and the Debtor caused the formation of Windermere Holdings, LLC, a California limited liability company ("Windermere") and Morning

Case: 10-55788    Doc# 16    Filed: 06/08/10    Entered: 06/08/10 13:49:12    Page 8 of 16

RAF/
R:\Pacific Metro, LLC\Pld\M&O 1st Day\CashColl Mo.docx    6    MOTION FOR INTERIM AND FINAL ORDERS APPROVING USE OF CASH COLLATERAL

Glory. Pursuant to the Master Agreement, (a) Lightpost caused Windermere to elect to be taxed as a corporation, (b) Lightpost contributed to Windermere all of the outstanding stock of the Debtor, and (c) the Debtor converted from a corporation to a California limited liability company.

18. Morning Glory was initially formed as a subsidiary of the Debtor. After converting to a limited liability company, the Debtor made a capital contribution to Morning Glory of all of its assets and liabilities specifically relating to the licensing division other than intellectual property rights. Thereafter, the Debtor distributed to Windermere its membership interest in Morning Glory and certain intellectual property rights. Windermere then sublicensed to the Debtor the right to use Windermere's intellectual property rights in a manner consistent with the historical use of those rights in its licensing and production business. Since that time, all but one of the licenses that were transferred by the Debtor to Windermere have expired.

19. On October 1, 2009, the Debtor changed its name to Pacific Metro, LLC. The Debtor is presently wholly owned by Windermere, which is wholly owned by Lightpost, which is wholly owned by the Kinkade Family Trust. The Debtor also has two wholly-owned subsidiaries, Pacific Metro International, LLC and Pacific Metro Retail, Inc., as reflected on the following organizational chart of the affiliated entities:



## 2. The Debtor's Operations

20. The Debtor has operated its Thomas Kinkade line of business by producing, distributing, selling and licensing art works pursuant to a License Agreement between Mr. Kinkade and the Debtor dated December 3, 1997 (the "<u>1997 License Agreement</u>"). The 1997 License Agreement includes a grant to Windermere of the rights to reproduce and sell reproductions of certain artworks created by Mr. Kinkade as well as an acknowledgement of Windermere's rights to use trademarks containing Mr. Kinkade's name. Windermere entered into a Master Sublicense Agreement with the Debtor whereby the Debtor was granted certain publishing rights to reproduce Thomas Kinkade imagery. While Mr. Kinkade has fulfilled all of his obligations to supply art work under the 1997 License Agreement, the Debtor continues to generate revenue from the art works licensed to it. The Debtor is in default under the Master Sublicense Agreement for failure to pay royalties. On April 7, 2010, Mr. Kinkade notified Windermere of its default under the 1997 License Agreement and of his intent to exercise his termination rights.

21. On or about January 1, 2007, Mr. Kinkade and Windermere executed a Master License Agreement (the "<u>2007 License Agreement</u>") whereby Mr. Kinkade licensed to Windermere rights in certain intellectual property. Windermere in turn sublicensed these rights to the Debtor. Mr. Kinkade has fully performed all of his obligations under the 2007 License Agreement which expired by its terms on January 1, 2010. Windermere's sublicense with the Debtor expired on December 29, 2009.

22. Despite the default status of the 1997 License Agreement and the expiration of the 2007 License Agreement, the Debtor has continued to publish images under both agreements and to date, Mr. Kinkade, while preserving all of his rights and remedies, has not exercised those rights or remedies.

23. In 2008 and 2009, the Debtor lost $15,488,000 and $3,345,000 on revenues of $19,293,000 and $21,352,000, respectively. The Debtor expects to generate a modest profit in 2010 based on the culmination of its restructuring efforts which include the transfer of manufacturing to outsourcing partners, the economic benefit of facilities more appropriate to its size and financial resources, its burgeoning sales through television venues, its use of technology to identify and

cultivate customers, and most significantly, the success of new imagery with an expanded genre that includes popular cultural images, sports imagery, as well as traditional Thomas Kinkade interpretations. Through these initiatives, the Debtor projects increased revenues and profitability for 2010 and beyond.

24. Over the past eight (8) years, the Debtor has been subject to a number of lawsuits/arbitrations brought by approximately twenty-five (25) former dealers. The Debtor has successfully defended itself in all but one of these actions. On October 4, 2006, an arbitration panel entered an award against the Debtor and a former executive of the Debtor in favor of Karen Hazelwood, Jeffrey Spinello and Thomas Kinkade at the Downtown Mall, LLC in the approximate sum of $2,100,000. In 2007, the United States District Court for the Northern District of California (the "District Court") vacated the arbitration panel's decision. On June 16, 2009, the United States Court of Appeals for the Ninth Circuit reversed the District Court and reinstated the arbitration award. The Debtor's writ of certiorari to the United States Supreme Court was denied. On January 29, 2010, the District Court entered its judgment against the Debtor and the former executive in the sum of $2,866,499.54.

### C. Assets and Debt Structure

25. As of the Petition Date, the Debtor had $1,233.00 in cash, $2,936,367 in net realizable accounts receivable, $6,444,543 in net inventory value and other assets, collectively aggregating $14,527,578 in total assets. In addition to the amounts subject to the Note and which LPA asserts are secured by all of the Debtor's assets, the Debtor's liabilities consist of accounts payable, accrued liabilities and other obligations aggregate $19,018,976.

26. Recent searches of the records of the California Secretary of State disclose the following liens and security interests on the following pre-petition property under the search name Pacific Metro, LLC:

/ / /

/ / /

/ / /

/ / /

| NAME | FILING NUMBER | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|---|
| Bank of America | 097190220646 | March 11, 2009 | Blanket Lien |
| LPA Properties, L.P. | Amendment to change identity of secured party | January 5, 2010 | Blanket Lien |

### D. Necessity For Use Of Cash Collateral

27. The Debtor has prepared a 13-week rolling Budget as a cash operating budget reflecting the anticipated receipt of revenues and operating expenses of the Debtor during the Chapter 11 period prior to the confirmation of a plan of reorganization. The ability of the Debtor to obtain sufficient working capital and liquidity through the use of cash collateral is vital to the preservation and maintenance of the going concern value of the Debtor.

28. The emergency interim relief requested is critical to the success of this case. As set forth in the Budget, the Debtor anticipates that it will require up to $405,000 to fund necessary expenses during the first three (3) weeks following the Petition Date. These expenses include payroll (of which the Debtor is also seeking to pay the approximate aggregate amount of $12,000 in wages that accrued prior to the Petition Date), utility deposits, and payments and advance deposits to vendors for inventory and supplies.

### E. The Pre-Petition Secured Indebtedness

29. On January 29, 2007, the Debtor and certain of its affiliates entered into an AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (the "Loan Agreement") with Bank of America, N.A. In connection therewith, the Debtor executed a REVOLVING CREDIT NOTE (the "Note") in the principal amount of $22,000,000. The Note is secured by all of the Debtor's assets and certain assets of certain of its affiliates, and guaranteed by certain of the Debtor's affiliates. On December 30, 2009, the interest of Bank of America, N.A. in the Note and other loan documentation was acquired by the Lender, a financing entity owned by Thomas Kinkade. At the time of the acquisition, the outstanding balance on the Note was $4,069,771. Since that time, the principal balance has not changed but $126,000 of interest has accrued. On January 29, 2010, the Loan Agreement expired and accordingly the Note plus accrued interest became due and payable in full. In February 2010,

LPA entered into the FORBEARANCE AND CASH COLLATERAL AGREEMENT ("Pre-Petition Cash Collateral Agreement") with the Debtor and certain of its affiliates, pursuant to which the Debtor was permitted to use the cash collateral under certain terms and conditions and solely with the approval of LPA. The Pre-Petition Cash Collateral Agreement has expired. As of the Petition Date, LPA has not exercised its rights and remedies. From January 29, 2010 through the Petition Date, the Company's sole source of capital has been the use of the cash collateral. (The Loan Agreement, Note and Pre-Petition Cash Collateral Agreement are collectively referred to hereinafter as the "Pre-Petition Credit Facility")

30. The Pre-Petition Obligations were secured by a blanket security interest in substantially all of the personal property of the Debtor. Interest is accruing at the non-default rate of prime plus 3.5% or approximately 6.5%

31. The Lender also assert that its security interest in the above collateral is perfected with the filing of appropriate UCC-1 Financing Statements and amendments thereto with the California Secretary of State.

**F.      The Debtor's Chapter 11 Business Plan**

32. During this Chapter 11 Case, the Debtor intends to maintain the going concern value of its business by continuing its operations and to propose and confirm a plan of reorganization. With recent advances in digital technology, the Debtor has been able to outsource a significant portion of its manufacturing process thus significantly reducing its manufacturing workforce and need for leased commercial space. Through the reorganization process, the Debtor intends to reject its burdensome real property leases and move into space that better satisfies its present needs. Resulting rejection claims against the bankruptcy estate by the landlords will be limited by Bankruptcy Code Section 502(b)(6).

33. The Debtor has also entered into multiple transactions with CIT Technology Financing Services, Inc., IBM Credit LLC and General Electric Capital Corporation for the lease or purchase of specific equipment used in the Debtor's business.

34. The Debtor maintains dealer agreements with the authorized members of its independent gallery network based on their participation in the respective strata of the gallery

network. Additionally, the Debtor and/or Windermere have licensed the intellectual property of a number of affinity partners that allow the Debtor to incorporate such intellectual property into published images.

35. As of the Petition Date, the Debtor had no employment agreements with any personnel and all employment is "at will" employment. Prior to the Petition Date, the Debtor through a reduction-in-force laid off certain employees, two of which had employment agreements and four of which had severance agreements. The severance obligations specified in those agreements remain unpaid.

36. The Debtor also has a sharing agreement with Lightpost whereby Lightpost acts a service bureau for all legal, finance, information technology, and administrative functions to all group companies. The Debtor expects to assume this sharing agreement through the Chapter 11 process. From time to time, the Debtor entered into purchase orders with supply chain partners that are necessary for its continued operations. The Debtor expects to assume those purchase orders through the Chapter 11 process.

### G. Use Of Cash Collateral And Adequate Protection

37. Frank Teruel is the Chief Operating Officer of the Debtor's parent company and has been authorized to sign and submit the Omnibus Declaration in support of the Motion and other first day motions. As set forth therein, the Debtor has developed the 13-week rolling Budget which provides for that period commencing on the Petition Date and continuing through the Cash Collateral Period. The Budget is divided into weekly periods. The Debtor has analyzed the immediate cash needs for the next 15 to 30 days (the "Interim Period"), pending the final hearing on this motion and has identified those expenditures that the Debtor anticipates will be necessary to make during the Interim Period prior to the final hearing and without which the Debtor will be irreparably harmed. The Debtor requests authorization to use Cash Collateral and post-petition secured financing during the Interim Period to the extent necessary to prevent immediate and irreparable harm to the Estate. The balance of the Budget reflects anticipated revenues and the Debtor's operating needs through the remainder of the Cash Collateral Period. The Budget reflects the Debtor's efforts to continue operations and maintain its going concern value. The Budget will

"roll over" with each successive week as agreed upon between the Debtor and the Lender such that the Budget will always show budgeted expenses and anticipated revenues for 13 weeks for each successive budget.

38. The Omnibus Declaration and Exhibits thereto demonstrate that the Debtor is unable to obtain unsecured financing from any source, that the use of Cash Collateral and post-petition secured financing to continue the ongoing operations will preserve the going concern value of the Debtor and thus provide adequate protection to the Lender, and that the Debtor is prepared to provide additional adequate protection in the form of the Replacement Lien, Superpriority Claim and reasonable reporting requirements.

### H. Interim Approval Should Be Granted

39. Bankr. R 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

40. The Debtor has agreed with the Lender on the terms for further advances to the Debtor, continued use of cash collateral and post-petition secured financing. The Debtor requests that the Court approve the use of Cash Collateral during the Interim Period in accordance with the Budget pending final approval of the Motion. The Budget and the Omnibus Declaration have identified those expenses which are required to be paid during the Interim Period in order to avoid immediate and irreparable harm to the Debtor. The Debtor believes that failure to pay these expenses before the final hearing will cause immediate and irreparable harm to the estate, making it impossible for the Debtor to continue to operate its business, and will undermine the Debtor's chances of a successful reorganization. The Debtor requests approval for use of cash collateral and post-petition secured financing to pay those expenses before the final hearing on this Motion and that this Court authorize the Debtor to provide the additional adequate protection as requested.

WHEREFORE, the Debtor requests that this Court:

1. Conduct a preliminary hearing on this motion at the earliest possible date;

| | |
|---|---|
| 1 |     2.    Following said preliminary hearing, make and enter its order or orders; |
| 2 |           a.    Finding that notice of the preliminary hearing was adequate under the |
| 3 |               circumstances of this case; |
| 4 |           b.    Authorizing the Debtor to use cash collateral and obtain post-petition secured |
| 5 |               financing pursuant to the Budget pending the final hearing on this Motion; |
| 6 |           c.    Authorizing the Debtor to take such acts and executes such documents as are |
| 7 |               necessary to carry out said order; and |
| 8 |     3.    Fix the date and time for the final hearing to approve the Debtor's use of cash |

collateral and at such hearing enter its final order authorizing the Debtor's secured post-petition financing and use of cash collateral pursuant to the terms described herein.

Dated: June 8, 2010

                              **MURRAY & MURRAY**
                              A Professional Corporation

                              By:  */s/ Robert A. Franklin*
                                    Robert A. Franklin
                                    Attorneys for Debtor

Case: 10-55788   Doc# 16   Filed: 06/08/10   Entered: 06/08/10 13:49:12   Page 16 of 16

RAF/...Pacific Metro, LLC\Pld\Mot Use Dty\CashColl v10.docx   14   MOTION FOR INTERIM AND FINAL ORDERS APPROVING USE OF CASH COLLATERAL