JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**PACIFIC METRO, LLC**<br>A California Limited Liability Company,<br>fka The Thomas Kinkade Company,<br>LLC, fka Media Arts Group, Inc.<br><br>Debtor.<br><br>900 Lightpost Way<br>Morgan Hill, CA 95037<br><br>Employer Tax I.D. No.: 26-3534146 | Case No. 10-55788-RLE-11<br><br>Chapter 11<br><br>Date:<br>Time:<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3099<br>San Jose, CA 95113<br>Judge: Honorable Roger L. Efremsky |

**OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS**

I, Frank Teruel, declare:

1. I am the Chief Financial Officer of the parent company of Pacific Metro, LLC, a California limited liability company ("Pacific Metro" or the "Debtor"), formerly known as The Thomas Kinkade Company, LLC ("TKC"), the successor in interest to Media Arts Group, Inc. ("MAGI") and have been authorized to make this declaration on the Debtor's behalf. I have personal knowledge of the facts set forth in this Declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called upon as a witness,

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx    1    OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788   Doc# 20   Filed: 06/08/10   Entered: 06/08/10 14:14:59   Page 1 of 15

I could and would competently testify as follows.

2. On June 2, 2010 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code and is presently operating its business as a debtor in possession pursuant to the provisions of Bankruptcy Code Sections 1107 and 1108.

## I. GENERAL FACTUAL BACKGROUND AND HISTORY OF THE DEBTOR

### A. CORPORATE STRUCTURE

1. MAGI was founded in 1990 with the express mission of manufacturing, distributing, and selling the art and art based products of various artists including Thomas Kinkade. MAGI became a public company listed on the NASDAQ stock market exchange on August 2, 1994 and conducted its retail business primarily through a network of owned and operated retail galleries. Subsequently, MAGI changed its business model allowing independently owned and operated galleries to license the Thomas Kinkade name and sell product through a tiered gallery system. Accordingly, MAGI undertook efforts to sell or phase out most of its corporately owned galleries. During this phase, MAGI significantly expanded its corporate and manufacturing facilities, entering into a series of long-term leases of real property for its Morgan Hill, California campus, and conducted several lines of business including, licensing, publishing, manufacturing, and distribution. Publishing processes prevalent at that time required significant on site square footage and factory personnel to accommodate manufacturing needs.

2. During MAGI's tenure as a public company, Mr. Kinkade was a significant yet minority shareholder. On January 29, 2004, Mr. Kinkade, through an indirectly owned acquisition entity, acquired all of the outstanding shares of MAGI. MAGI thereafter changed its name to The Thomas Kinkade Company, ceased to be a publically traded company, and subsequently reincorporated from Delaware to California. Upon the consummation of the "going private" transaction, The Thomas Kinkade Company became a wholly owned subsidiary of Lightpost Holdings, LLC, a California limited liability company ("Lightpost"). In order to effectuate the "going private" transaction, the Debtor incurred approximately $25,000,000 of bank debt, a portion of which was personally guaranteed by Mr. Kinkade, and which was subsequently paid down to approximately $4,100,000.

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx   2   OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788   Doc# 20   Filed: 06/08/10   Entered: 06/08/10 14:14:59   Page 2 of 15

3. On December 27, 2006, the Debtor, Lightpost and other affiliated entities entered into an agreement (the "Master Agreement") to effect a tax free reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "'F' Reorganization") to better reflect the operational realities of the business and to allow the management team of each of the licensing and production sides of the business to better focus on their own specific goals and responsibilities. Pursuant to the "F" Reorganization, Lightpost and the Debtor caused the formation of Windermere Holdings, LLC, a California limited liability company ("Windermere") and Morning Glory Licensing, LLC ("Morning Glory"), a California limited liability company. Pursuant to the Master Agreement, (a) Lightpost caused Windermere to elect to be taxed as a corporation, (b) Lightpost contributed to Windermere all of the outstanding stock of the Debtor, and (c) the Debtor converted from a corporation to a California limited liability company.

4. Morning Glory was initially formed as a subsidiary of the Debtor. After converting to a limited liability company, the Debtor made a capital contribution to Morning Glory of all of its assets and liabilities specifically relating to the licensing division other than intellectual property rights. Thereafter, the Debtor distributed to Windermere its membership interest in Morning Glory and certain intellectual property rights. Windermere then sublicensed to the Debtor the right to use Windermere's intellectual property rights in a manner consistent with the historical use of those rights in its licensing and production business. Since that time, all of the licenses that were transferred by the Debtor to Windermere have expired.

5. On October 1, 2009, the Debtor changed its name to Pacific Metro, LLC. The Debtor is presently wholly owned by Windermere, which is wholly owned by Lightpost, which is wholly owned by the Kinkade Family Trust. The Debtor also has two wholly-owned subsidiaries, Pacific Metro International, LLC and Pacific Metro Retail, Inc., as reflected on the following organizational chart of the affiliated entities:

/ / /

/ / /

/ / /

/ / /

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx 3 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 3 of 15

```
           Thomas
           Kinkade
              │
        Kinkade
        Family Trust
              │
        Lightpost
        Holdings, LLC
              │
        Windermere
        Holdings, LLC
         /          \
   Pacific         Morning Glory
   Metro, LLC      Licensing, LLC
    /      \
Pacific Metro    Pacific Metro Retail,
International,   Inc.
LLC
```

**B.   THE DEBTOR'S OPERATIONS AND EVENTS LEADING TO THE FILING OF THE BANKRUPTCY CASE**

6.   The Debtor has operated its Thomas Kinkade line of business by producing, distributing, selling and licensing art works pursuant to a License Agreement between Mr. Kinkade and the Debtor dated December 3, 1997 (the "1997 License Agreement").  The 1997 License Agreement includes a grant to Windermere of the rights to reproduce and sell reproductions of certain artworks created by Mr. Kinkade as well as an acknowledgement of Windermere's rights to use trademarks containing Mr. Kinkade's name.  Windermere entered into a Master Sublicense Agreement with the Debtor whereby the Debtor was granted certain publishing rights to reproduce Thomas Kinkade imagery. While Mr. Kinkade has fulfilled all of his obligations to supply art work under the 1997 License Agreement, the Debtor continues to generate revenue from the art works licensed to it. The Debtor is in default under the Master Sublicense Agreement for failure to pay royalties.  On April 7, 2010, Mr. Kinkade notified Windermere of its default under the 1997 License Agreement and of his intent to exercise his termination rights.

7. On or about January 1, 2007, Mr. Kinkade and Windermere executed a Master License Agreement (the "2007 License Agreement") whereby Mr. Kinkade licensed to Windermere rights in certain intellectual property. Windermere in turn sublicensed these rights to the Debtor. Mr. Kinkade has fully performed all of his obligations under the 2007 License Agreement which expired by its terms on January 1, 2010. Windermere's sublicense with the Debtor expired on December 29, 2009.

8. Despite the default status of the 1997 License Agreement and the expiration of the 2007 License Agreement, the Debtor has continued to publish images under both agreements and to date, Mr. Kinkade, while preserving all of his rights and remedies, has not exercised those rights or remedies.

9. With recent advances in digital technology, the Debtor has been able to outsource a significant portion of its manufacturing process thus significantly reducing its manufacturing workforce and need for leased commercial space. Through the reorganization process, the Debtor intends to reject its burdensome real property leases and move into space that better satisfies its present needs. Resulting rejection claims against the bankruptcy estate by the landlords will be limited by Bankruptcy Code Section 502(b)(6).

10. On January 29, 2007, the Debtor and certain of its affiliates, including Morning Glory, entered into an AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (the "Loan Agreement") with Bank of America, N.A. In connection therewith, the Debtor executed a REVOLVING CREDIT NOTE (the "Note") in the principal amount of $22,000,000. The Note is secured by all of the Debtor's assets and certain assets of certain of its affiliates, and guaranteed by certain of the Debtor's affiliates. On December 30, 2009, the interest of Bank of America, N.A. in the Note and other loan documentation was acquired by LPA Properties, L.P., ("LPA" or the "Lender"), a financing entity owned by Thomas Kinkade. At the time of the acquisition, the outstanding balance on the Note was $4,069,771. Since that time, the principal balance has not changed but $126,000 of interest has accrued (together with associated fees and costs provided for in the Pre-Petition Credit Facility, the "Pre-Petition Obligations"). On January 29, 2010, the Amended and Restated Loan and Security Agreement expired and accordingly the Note plus accrued interest became due and payable

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx 5 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 5 of 15

in full. In February 2010, LPA entered into the Forbearance and Cash Collateral Agreement ("Pre-Petition Cash Collateral Agreement") with the Debtor and certain of its affiliates, pursuant to which the Debtor was permitted to use the cash collateral under certain terms and conditions and solely with the approval of LPA. The Pre-Petition Cash Collateral Agreement has expired. As of the Petition Date, LPA has not exercised its rights and remedies.

11. Prior to the Petition Date, the Debtor and Morning Glory in the ordinary course of business would collect their receivables through a lockbox account. The Lender would sweep each respective lockbox account each day and deposited the funds into two separate "cash collateral" accounts for each respective borrower. The Lender would in turn advance further sums as needed to the Debtor and Morning Glory for operations. The Lender holds approximately $250,000 in the cash collateral account of the Debtor.

12. The Debtor has also entered into multiple transactions with CIT Technology Financing Services, Inc., IBM Credit LLC and General Electric Capital Corporation for the lease or purchase of specific equipment used in the Debtor's business.

13. The Debtor maintains dealer agreements with the authorized members of its independent gallery network based on their participation in the respective strata of the gallery network. Additionally, the Debtor and/or Windermere have licensed the intellectual property of a number of affinity partners that allow the Debtor to incorporate such intellectual property into published images.

14. As of the Petition Date, the Debtor had no employment agreements with any personnel and all employment is "at will" employment. Prior to the Petition Date, the Debtor through a reduction-in-force laid off certain employees, two of which had employment agreements and four of which had severance agreements. The severance obligations specified in those agreements remain unpaid.

15. The Debtor also has a sharing agreement with Lightpost whereby Lightpost acts a service bureau for all legal, finance, information technology, and administrative functions to all group companies. The Debtor expects to assume this sharing agreement throughout the Chapter 11 process. From time to time, the Debtor enters into purchase orders with supply chain partners that

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx 6 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 6 of 15

are necessary for its continued operations. The Debtor expects to assume those purchase orders throughout the Chapter 11 process.

16. In 2008 and 2009, the Debtor lost $15,488,000 and $3,345,000 on revenues of $19,293,000 and $21,352,000, respectively. The Debtor expects to generate a modest profit in 2010 based on the culmination of its restructuring efforts which include the transfer of manufacturing to outsourcing partners, the economic benefit of facilities more appropriate to its size and financial resources, its burgeoning sales through television venues, its use of technology to identify and cultivate customers, and most significantly, the success of new imagery with an expanded genre that includes popular cultural images, sports imagery, as well as traditional Thomas Kinkade interpretations. Through these initiatives, the Debtor projects increased revenues and profitability for 2010 and beyond.

### C. ASSETS AND DEBT STRUCTURE

17. As of the Petition Date, the Debtor had $1,233.00 in cash, $2,936,367 in net realizable accounts receivable, $6,444,543 in net inventory value and other assets, collectively aggregating $14,527,578 in total assets. In addition to the Pre-Petition Obligations which LPA asserts are secured by all of the Debtor's assets, the Debtor's liabilities consist of accounts payable, accrued liabilities and other obligations aggregate $19,018,976.

18. As of the Petition Date, the Debtor had thirty (30) employees across sales, customer service, assembly, and highlighting functions.

19. Over the past eight (8) years, the Debtor has been subject to a number of lawsuits/arbitrations brought by approximately twenty-five (25) former dealers. The Debtor has successfully defended itself in all but one of these actions. On October 4, 2006, an arbitration panel entered an award against the Debtor and a former executive of the Debtor in favor of Karen Hazelwood, Jeffrey Spinello and Thomas Kinkade at the Downtown Mall, LLC in the approximate sum of $2,100,000. In 2007, the United States District Court for the Northern District of California (the "District Court") vacated the arbitration panel's decision. On June 16, 2009, the United States Court of Appeals for the Ninth Circuit reversed the District Court and reinstated the arbitration award. The Debtor's writ of certiorari to the United States Supreme Court was denied. On January

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx  7  OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788  Doc# 20  Filed: 06/08/10  Entered: 06/08/10 14:14:59  Page 7 of 15

29, 2010, the District Court entered its judgment against the Debtor and the former executive in the sum of $2,866,499.54.

## II. THE DEBTOR'S CHAPTER 11 BUSINESS PLAN AND FIRST DAY MOTIONS

20. LPA has committed to enter into a cash collateral arrangement to fund the Debtor during the course of the Chapter 11 case. The Debtor intends to propose a plan of reorganization for the restructuring of its debt and intends to emerge from Chapter 11 with a confirmed plan of reorganization. To facilitate this plan and maintain its value as a going concern, the Debtor has agreed with the Lender regarding the extension of post-petition and use of cash collateral (the "Cash Collateral") which will allow the Debtor to fund operations. In addition, the Debtor is seeking authority to pay its employees all pre-petition wages, up to the amount of the priority allowed under Section 503(b) of the Code, establish a procedure to deem its utilities adequately assured of payment under Section 366 of the Code and to reject a burdensome real property lease to reduce administrative expenses of this case.

### A. THE CASH COLLATERAL MOTION

21. The Debtor is unable to obtain unsecured financing from any source. Use of the Cash Collateral and Post-Petition Advances to continue operations will preserve the going concern value of the Debtor and thus provide adequate protection to the Lender.

22. Under my supervision and direction, the Debtor has prepared a 13-week rolling budget (the "Budget") as a cash operating budget reflecting the anticipated receipt of revenues and operating expenses of the Debtor during the Chapter 11 period (the "Cash Collateral Period") prior to the confirmation of a plan of reorganization. The Debtor has analyzed the immediate cash needs for the next 15 to 30 days (the "Interim Period"), pending the final hearing on the Motion and has identified those expenditures that the Debtor anticipates will be necessary to make during the Interim Period prior to the final hearing and without which the Debtor will be irreparably harmed. The Debtor requests authorization to use Cash Collateral during the Interim Period to the extent necessary to prevent immediate and irreparable harm to the Estate. The balance of the Budget reflects anticipated revenues and the Debtor's operating needs through the remainder of the Cash Collateral Period. The Budget reflects the Debtor's efforts to continue operations and maintain its

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx     8     OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 8 of 15

going concern value. The Budget will "roll over" with each successive week as agreed upon between the Debtor and the Lender such that the Budget will always show budgeted expenses and anticipated revenues for 13 weeks for each successive budget. The ability of the Debtor to obtain sufficient working capital and liquidity through the use of cash collateral is vital to the preservation and maintenance of the going concern value of the Debtor. A copy of the Budget for the first 13 weeks following the Petition Date is attached hereto as **Exhibit "A"** and incorporated herein by reference.

23. The Debtor requests interim approval for use of cash collateral in the amounts of and for the purposes described under the line items and time periods set forth in the Budget to the extent necessary to prevent immediate and irreparable harm to the Estate, pending a final hearing on this Motion. Thereafter, the Debtor proposes to continue to use cash collateral as described in the Budget. In addition, the Lender has agreed to transfer additional amounts (the "Post-Petition Advances") from the Morning Glory cash collateral account held by the Lender to the extent necessary to supplement funding required for the Debtor's operations at the same non-default interest rate provide in the Pre-Petition Credit Facility. The amount of Post-Petition Advances is anticipated to be approximately $50,000 for the Interim Period. In both situations, the Debtor requests authority to (a) exceed and pay any expense line item by 20% provided that it does not exceed the aggregate budgeted expenditures for any period by more than 10%, and (b) carry over unused funds budgeted in any period for use in future periods.

24. The Debtor further requests that as security for the Post-Petition Advances (together with the Pre-Petition Obligations, the "Adequate Protection Obligations") and decrease in the value of the property securing the Lender's prepetition claims resulting from the use of Cash Collateral by the Debtor, the Debtor be allowed to grant to the Lender a replacement lien ("Replacement Lien") on all property of the Debtor acquired after the commencement of this case of the same types and description as the collateral securing the Lender's prepetition lien, if any, but excluding claims for relief arising under the Bankruptcy Code (including claims arising under §§ 506(c), 544, 545, 547, 548, and 549 thereof) and excluding property acquired by the Debtor post-petition through the use of intercompany transfers. Such Replacement Lien shall have the same priority, validity and extent as

RAF/K:\Pacific Metro, LLC\Pld\Mot 1st Day\OmibusDec v3.docx    9    OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 9 of 15

each of the Lender's prepetition liens, but shall be subordinate to the (i) compensation and expense reimbursement (other than for professional fees and expenses) allowed to a Trustee in any successor Chapter 7 case; (ii) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (iii) the fees of the Debtor's professionals and any counsel that is appointed to represent any committee of unsecured creditors in this case.

25. As additional adequate protection, the Debtor is also agreeable to reasonable reporting requirements.

26. Interim relief is requested. As set forth in the Budget, the Debtor anticipates that it will request amounts sufficient to fund necessary expenses during the first three (3) weeks following the Petition Date. These expenses include payroll (approximately $12,000 of which constitutes pre-petition wages payable and for which the Debtor is seeking authority to pay), utility deposits, and payments and advance deposits to workers for inventory, supplies and services.

**B. EMPLOYEE OBLIGATIONS MOTION**

**The Debtor's Workforce**

27. The Debtor's workforce currently includes thirty-one (31) full-time employees across sales, customer service, assembly, and highlighting functions, located generally in three sites throughout Northern California. As set forth above, prior to the Petition Date, the Debtor through a reduction-in-force laid off certain employees. As of the Petition Date, the Debtor had no employment agreements with any personnel, and all employment is "at will" employment.

28. The Debtor's workforce is critical to its business operations. Each of the Debtor's employees is essential not only to the continued, uninterrupted operation of the Debtor's business, but to effectuating the orderly administration of the Debtor's bankruptcy case and a successful plan of reorganization. The Debtor's remaining employees have distinct experience and expertise that are vital to the Debtor's operations.

29. Amongst other things the Debtor requires its remaining employees to execute the development, marketing, manufacturing and customer service functions associated with its unique products. Failure to meet commitments and to maintain relationships with customers and suppliers will open the door to competitors and will eliminate revenue and growth. As a result, the Debtor's

RAF/K:\Pacific_Metro_LLC\Pld\Mot_1st_Day\OmibusDec.v3.docx 10 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788   Doc# 20   Filed: 06/08/10   Entered: 06/08/10 14:14:59   Page 10 of 15

business will lose its going concern value, and its assets, including its customer relations, will be harmed.

30. The Debtor believes that its failure to satisfy outstanding obligations to its employees will create concern and discontent among its employees, and adversely affect the employees' esprit de corps. Moreover, it would undermine the Debtor's ability to retain its employees. If the Debtor cannot promptly assure its employees that their wages will be paid and their accrued PTO will be honored, immediate and irreparable harm may result due to the employees' relocating or resigning prior to the consummation of a successful reorganization. The Debtor's ability to honor payroll and accrued PTO is integral to maintaining continuity and order to the Debtor's business activities through the retention of its employees. This is especially critical in this case because the Debtor business model requires significant interaction with suppliers and customers. Employee dissatisfaction would quickly and negatively impact production and sales, as well as business relationships that have been developed over many years. At this critical state of the case, the Debtor cannot risk a significant disruption in its operations caused by low employee morale.

31. The Debtor believes that under the Budget, it will have sufficient operating cash to satisfy its obligations to employees, including both the Pre-Petition Wages and post-petition salaries, as they come due in the ordinary course of the Debtor's business. Moreover, under the Budget, the Debtor will be able to honor Pre-Petition Wages and accrued PTO for all employees up to the $11,725.00 per employee limit in the ordinary course of business.

### Pre-Petition Wages

32. Prior to the Petition Date, the Debtor funded payroll through its payroll processor, Automatic Data Processing, Inc. Due to the Debtor's bankruptcy filing in the middle of a pay period, pre-petition wages accrued prior to the Petition Date. Payroll for the Debtor's exempt employees were paid through May 31, 2010, and payroll for its non-exempt employees was paid through May 24, 2010. The Debtor typically pays its employees on a bi-monthly basis, and its next payroll is scheduled on June 14, 2010. The Debtor distributes payroll through checks.

33. The Debtor believes that the aggregate amount of the Pre-Petition Wages is $12,343.00. The Debtor believes there are no employees who are owed more than $11,725 in wages

RAF/K:\Pacific_Metro_LLC\Pld\Mot_1st_Day\OmibusDec.v3.docx 11 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 11 of 15

which was earned within 180 days of the Petition Date. In any event, if applicable, any amount owed above the limit of $11,725 will not be paid, but will instead be treated as a general unsecured claim in the Debtor's bankruptcy case. All post-petition employee wages shall be paid in the ordinary course.

**Pre-Petition PTO**

34. In the ordinary course, the Debtor provides allotted PTO, including vacation, to its employees. Through the Employee Obligations Motion, the Debtor requests authority to continue to honor PTO earned by current employees and to allow such employees to use pre-petition accrued PTO in the ordinary course of business. Accrued PTO which remains unused, expires. Through the Petition Date, the Debtor's employees have accrued PTO which in aggregate amounts to approximately $46,260.00 in value.

35. The Debtor does not intend to "cash out" PTO benefits to current employees at this time but only intends to honor such benefits by allowing employees to use PTO in the ordinary course. The Debtor does not believe that any current employee has accrued PTO within 180 days of the bankruptcy filing which exceeds in amount the $11,725 limit.[1] In the event of a post-petition termination, if applicable, employees will be entitled to a pre-petition priority claim up to $11,725.00, earned within 180 days of the bankruptcy filing, with the balance being a general unsecured claim.

C. **THE UTILITIES MOTION**

36. Preserving the Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations, and, therefore, to the success of its reorganization. Indeed, any disruption of the Utility Services, even for a brief period of time, would disrupt the Debtor's ability to operate and maintain its business. The Debtor manufactures, develops and sells unique visual artwork. Therefore, its operations require the appropriate environment by which its employees, including artists, may thrive. Not only does the Debtor rely on telecommunications to communicate with customers and suppliers, it requires the other basic utilities such as electricity, gas and water

---

[1] Even when combined with Pre-Petition Wages, the Debtor believes that no current employee exceeds the $11,725 limit. In any event, the Debtor seeks authority only to honor, and not to pay, PTO in the ordinary course.

RAF/K:\Pacific_Metro_LLC\Pld\Mot.1st.Day\OmibusDec.v3.docx 12 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788   Doc# 20   Filed: 06/08/10   Entered: 06/08/10 14:14:59   Page 12 of 15

necessary to provide a suitable workplace. Any interruption in its utilities would severely and negatively impact the Debtor's operations. Such a result could seriously jeopardize the Debtor's reorganization efforts, and ultimately, the Debtor's value and creditors' recoveries. It is therefore critical that the Utility Services continue uninterrupted during this Chapter 11 case

### The Utility Companies

37. In connection with the operation of its business, the Debtor uses the Utility Services, which include electricity, gas, water, garbage and telephone services, from four (4) various Utility Companies which are vital to its operations.

38. Historically, the Debtor has consistently paid all invoices to the Utility Companies when due in the ordinary course of its business and is current on all amounts due to the Utility Companies. To the best of the Debtor's knowledge, there are no defaults or arrearages of any significance with respect to any invoices with the Utility Companies.

### Adequate Assurance

39. If the Cash Collateral Motion is approved, with the continuing access to the Lender's cash collateral, the Debtor will have sufficient cash resources to meet its post-petition obligations in the ordinary course of business, including payments to the Utility Companies as they become due.

40. The Debtor proposes to make the Adequate Assurance Deposits with each of the Utility Companies identified in the below table, equal to two weeks of the average utility cost incurred by the Debtor with respect to each respective Utility Company, for the twelve (12) month service period immediately prior to the Petition Date:

| *Provider* | *Service* | *Proposed Deposit* |
|---|---|---|
| Pacific Gas & Electric | Electric & Gas (Three locations) | $4,181 |
| City Of Morgan Hill | Waste & Water (Morgan Hill location) | $131 |
| South Valley Disposal | Waste & Water (Gilroy location) | $956 |
| Verizon California | Business Phone (Morgan Hill location) | $364 |
| **Total** | | $5,632 |

41. The Debtor submits that the Adequate Assurance Deposits, in conjunction with the

RAF/K:\Pacific_Metro_LLC\Pld\Mot_1st_Day\OmibusDec.v3.docx 13 OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 13 of 15

Debtor's ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional assurance is required, it may request such assurance pursuant to the procedures set forth in the Utilities Motion.

42. The Debtor believes that providing the Utility Companies a cash deposit, equivalent to two weeks of the average utility cost incurred by the Debtor with respect to each respective Utility Company, is consistent with what a Utility Company would expect from any similarly situated non-debtor entity who has failed to pay its utility bills. In consideration with (a) the historical absence of any material pre-petition defaults or arrearages and (b) the inclusion in the Budget for the Adequate Assurance Deposits as well as ongoing monthly charges for Utility Services, the Utility Companies should be assured that the Debtor has the capacity to meet its post-petition obligations.

### Objection Procedures

43. The Debtor believes that the Adequate Assurance Procedures detailed in the Utilities Motion are not prejudicial to the rights of any Utility Company and are in the best interest of the Debtor's estate and its creditors. The Debtor submits that the Adequate Assurance Procedures, if approved, will ensure that the Debtor's business operations are not jeopardized by any disruption in Utility Service while promoting judicial economy.

D. **THE REJECTION MOTION**

44. On December 20, 1999, the Debtor entered into a lease with TBI-Mission West, LLC ("Landlord") for a commercial building commonly known as 925 Lightpost Way in Morgan Hill, California, consisting of approximately 155,520 square feet of commercial space. Pursuant to the Third Lease Amendment, dated November 11, 2004, the 925 Lightpost Lease expires on May 31, 2018.

45. On July 17, 2008, the Debtor entered in a sublease of the Leased Location with Flextronics International USA, Inc ("Flextronics"). The Flextronics Sublease terminates on July 13, 2015. Under the terms of the Flextronics Sublease, Flextronics pays a monthly rent of $88,102,

/ / /

/ / /

RAF/K:\Pacific_Metro_LLC\Pld\Mot_1st_Day\OmibusDec.v3.docx    14    OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 14 of 15

payable directly to the Landlord.[2]  The Landlord consented to the Flextronics Sublease, and the Debtor and Landlord entered into the Fourth Amendment to Lease, which amended the monthly rent for the Leased Location to $132,954.05 for the period from August 1, 2009 through July 31, 2010.[3]

46. Thus, because the monthly rent payment under the Flextronics Sublease is less than the monthly rent payment under the 925 Lightpost Lease, the Debtor continues to be responsible for $44,852.05 each month until August 1, 2010, when this rent difference will increase to $46,197.67.

47. As of the date of the Flextronics Sublease, the Debtor ceased operations at the Leased Location and vacated the premises. The Debtor has no further need for the 925 Lightpost Lease and the Flextronics Sublease and seeks to minimize the impact of administrative rent on the bankruptcy estate. The Debtor is currently responsible for approximately $44,852 per month under the 925 Lightpost Lease. The Debtor believes that the 925 Lightpost Lease and the Flextronics Sublease have no value to the estate. To minimize administrative costs, the Debtor seeks to reject the 925 Lightpost Lease and the Flextronics Sublease, effective as of the Petition Date.

### E. THE EXTENSION MOTION

48. To prepare the Schedules and Statement of Financial Affairs, the Debtor has numerous contracts and approximately one thousand creditors that will require review.

49. While the Debtor is working diligently to assemble the information needed to complete its Schedules and Statement of Financial Affairs, the considerable amount of information necessary to provide a complete perspective of the Debtor's financial situation will require significant effort and more time than is provided by F.R.C.P. 1007(c).

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this Declaration is executed on June 8, 2010.

*/s/ Frank Teruel*
Frank Teruel

---

[2] The monthly rent increases to $90,745 on August 1, 2010 and increases each subsequent year pursuant to the terms of the Flextronics Sublease.

[3] The monthly rent increases to $136,942.67 on August 1, 2010 and increases each subsequent year pursuant to the terms of the Fourth Amendment to Lease.

RAF/K:\Pacific_Metro_LLC\Pld\Mot_1st_Day\OmibusDec.v3.docx    15    OMNIBUS DECLARATION OF FRANK TERUEL IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-55788    Doc# 20    Filed: 06/08/10    Entered: 06/08/10 14:14:59    Page 15 of 15