JOHN WALSHE MURRAY (074823)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

In re:                                                  )
                                                        )
**PACIFIC METRO, LLC**                                  )
A California Limited Liability Company,                 )   Case No. 10-55788-SLJ-11
fka The Thomas Kinkade Company,                         )
LLC, fka Media Arts Group, Inc.                         )   Chapter 11
                                                        )
                          Debtor.                       )   _Plan Confirmation Hearing_
                                                        )
         900 Lightpost Way                              )   Date:    July 18, 2011
         Morgan Hill, CA 95037                          )   Time:    3:00 p.m.
                                                        )   Place:   United States Bankruptcy Court
    Employer Tax I.D. No.: 26-3534146                   )            280 S. First St., Room 3099
                                                        )            San Jose, CA 95113
                                                        )   Judge:   Honorable Stephen L. Johnson
                                                        )

**DISCLOSURE STATEMENT**
**FOR DEBTOR'S PLAN OF REORGANIZATION**
(DATED JUNE 13, 2011)

JWM/TTH
...pacific metro...Disclosure Plan...262...11\v4...

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION (DATED JUNE 13, 2011)

Case: 10-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11    Page 1
of 115

# **TABLE OF CONTENTS**

Page

ARTICLE I.   INTRODUCTION ...........................................................................................1

ARTICLE II.  DEFINITIONS ................................................................................................2

ARTICLE III.  OVERVIEW OF CHAPTER 11 AND PLAN ...............................................3
    3.1    The Chapter 11 Process. .............................................................................3
    3.2    Creditors to be Paid in Full Pursuant to Plan. ...........................................3
    3.3    Overview of the Plan. ..................................................................................4
    3.4    Confirmation Hearing. .................................................................................7

ARTICLE IV.   HISTORY AND PRESENT POSTURE OF THE BANKRUPTCY
              CASE .............................................................................................................8
    4.1    History and Description of the Business. ....................................................8
          4.1.1    Corporate Structure. .....................................................................8
          4.1.2    The Debtor's Operations. ............................................................10
          4.1.3    Events Precipitating the Bankruptcy Filing. ..............................11
    4.2    Summary of Events During The Bankruptcy Case. ..................................12
          4.2.1    Commencement of the Bankruptcy Case. ...................................12
          4.2.2    Official Unsecured Creditors' Committee. ..................................12
          4.2.3    Appointment of Responsible Person. ..........................................12
          4.2.4    Retention of Professionals. ..........................................................12
          4.2.5    Allowance of Fees of Court-Appointed Professionals...............13
          4.2.6    Use of Cash Collateral. ...............................................................13
          4.2.7    Disposition of Real Property Leases. ..........................................14
          4.2.8    Tolling Agreement. .....................................................................16
          4.2.9    Bankruptcy Administration Matters. ..........................................16
    4.3    Assets. ........................................................................................................16
    4.4    Liabilities. .................................................................................................17
          4.4.1    Secured Claims. ...........................................................................18
                4.4.1.1.  Bank of America, N.A. ("BofA"). ...............................18
                4.4.1.2.  LPA Properties. ..........................................................19
                4.4.1.3.  IBM Credit LLC ("IBM Credit")...............................19
                4.4.1.4.  CIT Technology Financing Services, Inc. ("CIT")......19
                4.4.1.5.  Caltronics Business Systems, Inc. ("Caltronics")........20
                4.4.1.6.  Los Angeles County Treasurer and Tax Collector
                        ("L.A. County"). ........................................................20
          4.4.2    The Debtor's Unsecured Debts. ...................................................21
                4.4.2.1.  The White-Lighthouse Parties. ...................................21
                4.4.2.2.  The Hazelwood Parties. ..............................................22
                4.4.2.3.  Barnett's Claims. .......................................................23
                4.4.2.4.  Yatooma. .....................................................................24
                4.4.2.5.  Claims of Former Management. .................................25
                4.4.2.6.  TBI Mission. ..............................................................25

ARTICLE V.  CLAIMS AND EQUITY INTERESTS AND TREATMENT UNDER
              THE PLAN ...................................................................................................26
    5.1    Administrative Claims. ..............................................................................26
          5.1.1    Description. ..................................................................................26
          5.1.2    Administrative Claims – Estimate. .............................................26
          5.1.3    Administrative Claims – Treatment. ...........................................28
          5.1.4    Administrative Claims – Deadline for Requests for Payment. ...28

Case 2:10-bk-55789-BR Doc 262-5 Filed 06/13/11 Entered 06/13/11 Page 2 of 115

| | | |
|---|---|---|
| 5.2 | Professional Fee Claims. | 29 |
| | 5.2.1 Description. | 29 |
| | 5.2.2 Professional Fee Claims – Treatment. | 29 |
| 5.3 | Priority Tax Claims. | 29 |
| | 5.3.1 Description. | 29 |
| | 5.3.2 Priority Tax Claims – Treatment. | 30 |
| 5.4 | Allowed LPA Properties Claim. | 31 |
| | 5.4.1 Description (Class 1 Under the Plan). | 31 |
| | 5.4.2 Allowed LPA Properties Claim – Treatment. | 31 |
| 5.5 | Other Secured Claims (other than LPA Properties). | 33 |
| | 5.5.1 Description (Class 2 Under the Plan). | 33 |
| | 5.5.2 Other Secured Claims – Treatment. | 33 |
| 5.6 | Priority Claims. | 34 |
| | 5.6.1 Description (Class 3 under the Plan). | 34 |
| | 5.6.2 Priority Claims – Treatment. | 35 |
| 5.7 | Class 4 (Current Employee Vacation Claims). | 35 |
| | 5.7.1 Description (Class 4 under the Plan). | 35 |
| | 5.7.2 Current Employee Vacation Claims – Treatment. | 35 |
| 5.8 | Administrative Convenience Claims. | 36 |
| | 5.8.1 Description (Class 5 Under the Plan). | 36 |
| | 5.8.2 Administrative Convenience Claims – Treatment | 36 |
| 5.9 | Timely Filed Unsecured Claims (Excluding Creditors Electing Administrative Convenience Option Provided by Class 5 and Early Cash-Out Option Provided by Class 7). | 37 |
| | 5.9.1 Description (Class 6 under the Plan). | 37 |
| | 5.9.2 Timely Filed Unsecured Claims Excluding Creditors Electing Administrative Convenience Option and Early Cash-Out Option – Treatment. | 37 |
| 5.10 | Class 7 Timely Filed Unsecured Claims (Creditors Electing Early Cash-Out Option). | 39 |
| | 5.10.1 Description (Class 7 under the Plan). | 39 |
| | 5.10.2 Class 7 Timely Filed Unsecured Claims (Creditors Electing Early Cash-Out Option). | 39 |
| 5.11 | Allowed Kinkade Pre-Petition Claims, Allowed Windermere Pre-Petition Claims and Allowed Pre-Petition Intercompany Claims. | 40 |
| | 5.11.1 Description (Class 8 under the Plan). | 40 |
| | 5.11.2 Allowed Kinkade Pre-Petition Claims, Allowed Windermere Pre-Petition Claims and Allowed Pre-Petition Intercompany Claims – Treatment. | 40 |
| 5.12 | Interests (Ownership of Interests in the Debtor). | 41 |
| | 5.12.1 Description (Class 9 under the Plan). | 41 |
| | 5.12.2 Holder of Interests (Ownership of Interests in the Debtor) – Treatment. | 41 |
| ARTICLE VI. | IMPLEMENTATION OF THE PLAN | 41 |
| 6.1 | Company Roadmap. | 41 |
| 6.2 | Operations of Reorganized Company. | 44 |
| 6.3 | New License Agreement. | 45 |
| 6.4 | Replacement of the LPA Properties Pre-Petition Secured Credit Facility. | 45 |
| 6.5 | Grant of Security Interest in Inventory to Plan Agent for the Benefit of Holders of Allowed Unsecured Claims; Limited License to Liquidate Inventory. | 46 |
| 6.6 | Financial Information. | 48 |
| 6.7 | Distributions. | 48 |
| | 6.7.1 Funding of the Plan. | 48 |

| | | | |
|---|---|---|---|
| | 6.7.2 | Funding of the Plan Agent Account. | 49 |
| | | 6.7.2.1. Initial Funding into Plan Agent Account. | 49 |
| | | 6.7.2.2. Subsequent Funding of Plan Agent Account. | 50 |
| | 6.7.3 | Plan Agent. | 51 |
| | 6.7.4 | Distributions. | 52 |
| | 6.7.5 | Distribution Account. | 52 |
| | 6.7.6 | Distribution Addresses; Undeliverable Distributions. | 52 |
| | 6.7.7 | Withholding Taxes. | 53 |
| | 6.7.8 | Fractional Amounts. | 53 |
| | 6.7.9 | De Minimis Distributions. | 53 |
| | 6.7.10 | Time Bar to Cash Payments. | 54 |
| | 6.7.11 | Modification of Payment Terms. | 54 |
| 6.8 | Corporate Matters. | | 54 |
| | 6.8.1 | Articles of Organization/Operating Agreement. | 54 |
| | 6.8.2 | Reorganized Company's Managers. | 55 |
| | 6.8.3 | Authority of Reorganized Company. | 55 |
| 6.9 | Responsible Person. | | 56 |
| 6.10 | Employees. | | 57 |
| 6.11 | Disbursing Agent. | | 57 |
| 6.12 | Tax Returns, Payments and Refunds. | | 58 |
| 6.13 | Post-Confirmation Employment of Personnel. | | 58 |
| 6.14 | Post-Confirmation Compensation and Reimbursement of Plan Agent and Other Professionals. | | 58 |
| 6.15 | Post-Confirmation Notice. | | 59 |
| 6.16 | Committee. | | 60 |
| 6.17 | Post-Confirmation Fees, Reports and Final Decree. | | 60 |
| | 6.17.1 | U.S. Trustee Fees. | 60 |
| | 6.17.2 | Post-Confirmation Reports. | 60 |
| | 6.17.3 | Final Decree. | 61 |
| 6.18 | Executory Contracts and Unexpired Leases. | | 61 |
| | 6.18.1 | Introduction. | 61 |
| | 6.18.2 | Treatment of Executory Contracts and Unexpired Leases. | 62 |
| | 6.18.3 | Assumption of Executory Contracts and Unexpired Leases. | 62 |
| | 6.18.4 | Adding and Removing. | 62 |
| | 6.18.5 | Defaults. | 63 |
| | 6.18.6 | Rejection of Executory Contracts and Unexpired Leases. | 63 |
| | 6.18.7 | Rejection Claims. | 63 |
| 6.19 | Proofs of Claim; Objections. | | 64 |
| | 6.19.1 | Time for Filing Proofs of Claim. | 64 |
| | 6.19.2 | Ownership and Transfers of Claims. | 64 |
| | 6.19.3 | Amendments to Claims. | 64 |
| | 6.19.4 | Time for Filing Objections. | 65 |
| | 6.19.5 | Who May File Objections to Claims. | 65 |
| | 6.19.6 | Disallowance of Claims. | 65 |
| | | 6.19.6.1. LATE FILED CLAIMS FILED BEFORE THE EFFECTIVE DATE. | 65 |
| | | 6.19.6.2. LATE FILED CLAIMS FILED AFTER THE EFFECTIVE DATE. | 65 |
| | 6.19.7 | Disputed Claims. | 66 |
| | 6.19.8 | Distributions. | 66 |
| | 6.19.9 | Termination of Claims Agent. | 67 |

/ / /

ARTICLE VII.  RESERVATION OF RIGHTS AND PRESERVATION OF CLAIMS;
             RELEASE OF AVOIDANCE ACTIONS; TOLLING AGREEMENT...................67
   7.1  Preservation of Claims and Rights.........................................67
   7.2  Release of Avoidance Actions (Excluding Tolled Claims).................67
   7.3  Extension of Tolling Agreement; Forbearance of Pursuing Tolled Claims;
        Termination of Tolling Agreement..........................................67

ARTICLE VIII.  REQUEST FOR CONFIRMATION .........................................70

ARTICLE IX.  RETENTION OF JURISDICTION ..........................................71

ARTICLE X.  EFFECT OF CONFIRMATION ..............................................71
   10.1  Binding Effect of Plan..................................................71
   10.2  Revesting...............................................................71
   10.3  Discharge...............................................................72
   10.4  Certain Judgments Null and Void.........................................72
   10.5  Exculpation.............................................................72
   10.6  Injunction..............................................................73
   10.7  Preservation of Insurance...............................................73
   10.8  Reservation of Powers...................................................73

ARTICLE XI.  CONDITIONS PRECEDENT ...............................................73

ARTICLE XII.  OTHER PLAN PROVISIONS .............................................75

ARTICLE XIII.  RISK FACTORS .....................................................75
   13.1  Certain Bankruptcy Considerations.......................................75
   13.2  Potential Effects of a Prolonged Chapter 11 Proceeding..................76
   13.3  Risks Relating to the Projections.......................................76
   13.4  Claims Estimates and Distributions Risks................................76
   13.5  Competitive Conditions..................................................77
   13.6  Reduced Revenues and General Economic Risks.............................77
   13.7  Economic Downturn.......................................................78
   13.8  Dependence on Dealer Network............................................78
   13.9  Risks of Inability to Expand its Sales and Distribution Channels........78
   13.10  Risks of Delays or Difficulties in Product Development.................78
   13.11  Risks of Implementing Outsourcing Plan................................78
   13.12  Risks Related to Dependence on One Artist.............................79
   13.13  Risks Associated with Expansion of Current Distribution Channels......80
   13.14  Risks Associated with Expansion into New Distribution Channels........80
   13.15  Risks Related To Introduction of New Product Lines....................81
   13.16  Difficulties Managing Expansion.......................................81
   13.17  Risks Related to Dependence On Consumer Preferences...................82
   13.18  Risks Related to Product Revenue Derived Through Third Parties.........82
   13.19  Changes in Economic Conditions and Consumer Spending Could
         Adversely Impact Revenue..............................................83
   13.20  Risks Due to Reliance on Third Parties................................84
   13.21  Pending or Future Litigation..........................................84
   13.22  Seasonality in Product Sales..........................................85
   13.23  Fluctuation in Operating Results......................................85
   13.24  The Debtor Faces Significant Competition..............................86
   13.25  Reliance on Intellectual Property Rights and Risk of Infringement and
         Unauthorized Sales....................................................87
   13.26  Affinity Program Risks................................................87
   13.27  Return Privileges.....................................................87

ATTY: ...
ACIFIC M... nd Plan.docx#262-5 ...11\v4 Final ...

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION, DATED JUNE 13, 2011

13.28 Critical Personnel May Be Difficult to Attract, Assimilate and Retain.......................87
13.29 Risks Associated With Current Real Property Lease. .........................................88
13.30 Collection Risks. .................................................................................88

ARTICLE XIV.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
                 PLAN .......................................................................................88
14.1 Introduction. .......................................................................................88
14.2 Federal Income Tax Consequences. ...........................................................90
     14.2.1 Carryover and Availability of Net Operating Losses. .........................90
            14.2.1.1. General Discussion. ............................................................90
            14.2.1.2. Internal Revenue Code Section 382. ....................................90
     14.2.2 Reduction of the Debtor's Indebtedness. .......................................91
14.3 Tax Consequences to Creditors. ................................................................92
     14.3.1 Claims Constituting Tax Securities. ..............................................92
     14.3.2 Claims Not Constituting Tax Securities. ........................................93
            14.3.2.1. Gain/Loss on Exchange. ....................................................93
            14.3.2.2. Tax Basis and Holding Period of Items Received. ..................93
     14.3.3 Receipt of Interest. ..................................................................93
     14.3.4 Withholding. ..........................................................................94

ARTICLE XV.      VOTING PROCEDURES AND REQUIREMENTS .............................94
15.1 Creditors and Interest Holders Entitled to Vote. ..........................................94
15.2 Definition of Impairment. ......................................................................94
15.3 Classes Impaired Under the Plan. .............................................................95
15.4 Vote Required for Class Acceptance. .........................................................95
15.5 Procedures. ........................................................................................96

ARTICLE XVI.     CONFIRMATION PROCEDURES; OBJECTIONS TO
                 CONFIRMATION .......................................................................97
16.1 Confirmation Hearing. ..........................................................................97
16.2 Requirements for Confirmation of the Plan. ................................................98
16.3 Compliance with Confirmation Requirements. .............................................99
16.4 Cramdown. ........................................................................................100

ARTICLE XVII.    BEST INTERESTS TEST .....................................................101
17.1 Liquidation Under Chapter 7. .................................................................101
17.2 Liquidation Analysis. ...........................................................................104

ARTICLE XVIII.   FEASIBILITY ....................................................................105

ARTICLE XIX.     POST-CONFIRMATION MANAGEMENT ...................................107

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATTY:
O:\Pacific Metro\Disclosure\Pln Discl\DS 2nd\1\v4                    v                    DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
                                                                                          REORGANIZATION DATED JUNE 13, 2011

Case 1:05-57788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11 17:19:19    Page 6
                                                    of 115

# <u>TABLE OF EXHIBITS</u>

EXHIBIT A        MONTHLY OPERATING REPORT FOR THE MONTH ENDING APRIL 2011

EXHIBIT B        SUMMARY OF TERMS – NEW LICENSE AGREEMENT

EXHIBIT C        DEBTOR'S PROJECTIONS

EXHIBIT D        LIQUIDATION ANALYSIS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vi   DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED JUNE 13, 2011

# ARTICLE I.

## INTRODUCTION.

This Disclosure Statement (the "Disclosure Statement") has been prepared by Pacific Metro, LLC, a California Limited Liability Company, formerly known as The Thomas Kinkade Company, LLC, formerly known as Media Arts Group, Inc., the debtor and debtor in possession herein (the "Debtor" or the "Company"). This Disclosure Statement is provided in connection with the solicitation of acceptances of the DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011) (the "Plan"). The purpose of the Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of Claims[1] and Interests to make an informed judgment about the Plan. An acceptance or rejection of the Plan must be in writing and may only be made by completing the Ballot that accompanies the Plan. In order for your vote to be counted, it must be received no later than **July 11, 2011**. See Section 15.5 below for additional voting instructions.

This Disclosure Statement includes, among other things, a brief history of the Debtor, a summary of its Bankruptcy Case, a description of the Claims against and Interests in the Debtor, a summary of the Plan, a discussion of the Plan's feasibility and a liquidation analysis setting forth what holders of a Claim against or Interest in the Debtor would recover if the Debtor was immediately liquidated under Chapter 7 of the Bankruptcy Code.

**UPON BANKRUPTCY COURT APPROVAL OF THE PLAN, THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS. THEREFORE, IT IS IMPORTANT THAT CREDITORS AND INTEREST HOLDERS READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN.**

The Debtor requests that you vote promptly for the Plan upon carefully reviewing the accompanying materials. The Debtor believes that the restructuring contemplated by the Plan will yield a recovery to Creditors greater than the return that could be achieved through other restructuring alternatives or a liquidation under Chapter 7 of the Bankruptcy Code. The Official Committee of Unsecured Creditors (the "Committee") appointed in the Bankruptcy Case supports

---

[1] Terms not defined herein shall have the meaning ascribed to them in the Plan.

the Plan.

If you have any questions regarding the procedures for voting, or any questions concerning your treatment under the Plan, please contact the Debtor's bankruptcy counsel whose contact information is provided at the top of the first page of this Disclosure Statement.

The Debtor reserves the right to amend, modify, or supplement the Plan at any time before confirmation (approval) of the Plan, provided that such amendments or modifications do not materially alter the treatment of, or Distributions to, Creditors and the Interest holder under the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION CONCERNING YOUR CLAIMS OR INTERESTS. PLEASE READ THIS DOCUMENT WITH CARE. FOR THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF CONTROLS OVER THIS SUMMARY. IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. IN ADDITION, BECAUSE OF THE DEBTOR'S FINANCIAL DIFFICULTIES, THE INFORMATION CONTAINED HEREIN MAY BE INCOMPLETE OR INACCURATE. FOR THE FOREGOING REASONS, THE DEBTOR AND ITS PROFESSIONALS ARE UNABLE TO WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.**

**THE PROFESSIONALS REPRESENTING THE DEBTOR HAVE RELIED ON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED THE FACTUAL INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. YOU SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING YOUR CLAIMS OR INTERESTS.**

**THE SECURITIES AND EXCHANGE COMMISSION HAS NOT APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, OR DETERMINED IF IT IS TRUTHFUL OR COMPLETE.**

## ARTICLE II.

### DEFINITIONS.

All capitalized terms used but not defined herein, but defined in the Plan, have the meaning given in the Plan. If a term is not defined herein or in the Plan, but is defined in the Bankruptcy Code, such term has the meaning given to that term in the Bankruptcy Code unless the context of the

2 — DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

Disclosure Statement clearly requires otherwise. References to a code section are references to the Bankruptcy Code, except as otherwise stated.

## ARTICLE III.

## OVERVIEW OF CHAPTER 11 AND PLAN.

3.1 **The Chapter 11 Process.**

The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprised of all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court (no trustee has been appointed in this Bankruptcy Case), a debtor remains in possession and control of all of its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course without Bankruptcy Court approval. The filing of the bankruptcy petition operates as an "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can, however, grant relief from the automatic stay under certain specified conditions or for cause.

A Chapter 11 debtor may propose a plan providing for the liquidation and administration of the assets of the bankruptcy estate or, as the Debtor's Plan contemplates, for the reorganization of the debtor's financial affairs and eventual emergence from bankruptcy. A plan may either be consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of equity holders.

This Disclosure Statement and the accompanying Plan constitute the Debtor's proposal to effect a reorganization of its financial affairs and to satisfy, discharge and/or cancel the Claims asserted against the Debtor, in accordance with the relevant provisions of the Bankruptcy Code.

3.2 **Creditors to be Paid in Full Pursuant to Plan.**

The Plan provides for payment in full, with interest, to Creditors holding Allowed Claims over a period not to exceed six (6) years. Distributions to most Creditors will occur quarterly, commencing after the expiration of a full calendar quarter following the Effective Date (i.e., the first Distribution will not occur earlier than ninety (90) days following the Effective Date). A Creditor with an Allowed Claim who elects treatment in Class 5 or Class 7 will receive payment sooner in the

percentage afforded to each such Class pursuant to the Plan. LPA Properties is a fully secured Creditor that is entitled to immediate payment in full as of the Effective Date; however, pursuant to the Plan, LPA Properties is deferring its treatment to benefit unsecured Creditors. Most Creditors are treated in Class 6. See Article V below for a specific discussion of the terms of payment to Creditors.

### 3.3 **Overview of the Plan.**

A copy of the Plan accompanies this Disclosure Statement. The following summary of the material provisions of the Plan is qualified in its entirety by the specific provisions of the Plan, including the Plan's definitions of certain terms used below. The following is intended only to provide a general description of the Plan. For more specific information concerning the Plan, refer to the Plan.

Because Kinkade's, Windermere's and LPA Properties' involvement in and contributions to the Plan are imperative to its success, the Debtor has engaged them in the Plan preparation process. Kinkade, Windermere and LPA Properties have considered whether they should make the significant financial commitments necessary to support a Chapter 11 reorganization of the Debtor and enter into new license agreements concerning Kinkade's existing works as well as new works, or alternatively, whether they should form and support a new business for purpose of exploiting Kinkade's artwork. At some price, the reorganization of the Debtor is simply too costly and forming a new business makes more economic sense. Although the far more expensive alternative, LPA Properties and Kinkade have elected to fully support a reorganization of the Debtor based on the terms set forth in the Plan to more easily maintain the existing dealer network and licensee relationships, with the hope that a Plan can be confirmed that will result in the resolution of a number of disputes in a single forum such that, once the Plan is confirmed, all parties can focus on the business going forward for the benefit of all constituents of the Debtor.

The Plan provides for the Company to continue to operate under a reduced cost structure pursuant to actions taken by the Company both prior to and during the Bankruptcy Case. For example, during the Bankruptcy Case, the Company has utilized a provision of the Bankruptcy Code which allows the Company to reject burdensome real property leases. The Company has provided

projections with this Disclosure Statement (see **Exhibit "C"** hereto) demonstrating its ability to perform the Plan. The Company has utilized what it believes are conservative revenue projections based on current revenues, performance over the past several quarters, and projections for future operations. Article XIII of this Disclosure Statement provides a discussion of potential risks that could impact the Reorganized Company's ability to meet these projections.

The terms of the Plan are the result of extensive good-faith negotiations between the Debtor, Kinkade, LPA Properties and the Committee. In order to address certain concerns of the Committee and to ensure the Plan is feasible, the Debtor, Kinkade and LPA Properties have agreed to several provisions which provide assurances of, and security for, the Debtor's performance of the Plan. Some of these provisions (which are described in greater detail in this Disclosure Statement) are summarized as follows:

- New License Agreement - The license agreements pursuant to which the Company sold Kinkade's art either expired or were in breach as of the Petition Date, and the Company does not currently have a license for the use of intellectual property of Windermere and Kinkade or an agreement for the generation of new artwork. Accordingly, a new license agreement is critical to the Company's ability to propose a Plan. The previous license held by the Company was a license agreement with the Company's sole member (the owner in a limited liability company), Windermere. Pursuant to the New License Agreement to be executed on the Effective Date of the Plan, Kinkade will continue to create artwork, including new imagery with an expanded genre that includes popular cultural images and sports imagery, as well as traditional Kinkade interpretations. The material terms of the New License Agreement are summarized on **Exhibit "B"** attached hereto.

- Security Agreement – To secure its performance of the Plan, the Reorganized Company will enter into the Security Agreement which will grant a senior security interest in the Plan Agent Collateral (i.e., the Debtor's and the Reorganized Company's right, title and interest in Inventory, as further defined in the Security Agreement) to the Plan Agent and will provide the Plan Agent with certain certificate rights and an irrevocable license to sell the inventory in the instance of a default under the Plan.

- Subordination of Lien – LPA Properties will subordinate its first priority security interest on inventory of the Debtor and Reorganized Company (i.e., the Plan Agent Collateral), to the senior security interest granted to the Plan Agent.

- New Secured Credit Facility - Pursuant to the terms of the LPA Properties New Loan And Security Documents, LPA Properties will replace the terms that governed the LPA Properties Pre-Petition Secured Credit Facility and provide a secured credit facility to the Reorganized Company up to $3.0 million, to provide the Reorganized Company with cash that may be needed to fund the Plan and business operations. In connection therewith, LPA Properties will subordinate its lien on the Plan Agent Collateral, to the security interest granted by the Reorganized Company to the Plan Agent.

- Tolling Agreement – The Tolled Period under the Tolling Agreement between the Kinkade Entities, the Debtor and the Committee, which tolls certain statutes of limitations and repose as

to certain claims that the Committee may be capable of asserting, including on behalf of the Estate, will be extended.

- Plan Agent Account – Pursuant to the Plan, an independent third-party Plan Agent will be appointed, and the Plan Agent Account will be opened (and funded by the Debtor) for the purposes of (a) managing quarterly Distributions to the holders of Allowed Unsecured Claims in Class 6 (i.e., the Plan Agent Account Distribution Beneficiaries), (b) succeeding to the rights of the Committee under the Tolling Agreement, and (c) receiving the security interest and license rights granted pursuant to the Plan.

- Sharing of Proceeds From Sale of Inventory – In the event of the sale by the Reorganized Company of more than $7.5 million of Existing Inventory, the Reorganized Debtor will then make payment to the Plan Agent of one-half of the proceeds received by the Reorganized Company for the sale of that portion of the Existing Inventory over $7.5 million, to further fund Distributions to the Plan Agent Account Distribution Account Beneficiaries.

- Deferral of Claims - Kinkade and Windermere have agreed to defer their significant pre-petition Claims for royalties, loans and other obligations totaling in excess of $8.5 million, to allow other Creditors to be paid first. Post-petition Claims held by Kinkade and Windermere which would otherwise be payable on the Effective Date of the Plan will be deferred beyond the Effective Date so that the Reorganized Company can make other payments pursuant to the Plan. Kinkade will also cause his affiliated company, LPA Properties, to agree to accept payments over a five (5)-year term rather than payment in full as it would otherwise be entitled since the loan is fully-matured and therefore currently due and payable.

Unless a Plan can be confirmed based on terms that make economic sense to Windermere and Kinkade, in addition to the Debtor, the alternative to the Plan is liquidation of the Company. As discussed in more detail at Article XVII below, the Debtor believes a Distribution to Creditors in a Chapter 7 liquidation would be significantly less than the full payment provided by the Plan. In a Chapter 7 case, the trustee appointed by the Court to carry out the liquidation of assets would have no license to liquidate the Company's inventory. Assuming agreeable terms for such a license could be reached, proceeds from the sale of such inventory (together with proceeds from the liquidation of other assets which, excluding litigation claims of unknown realizable value, would include miscellaneous office furniture and equipment, etc. of nominal value) would be used to pay creditors in the order of priority provided by the Bankruptcy Code. Claims senior to those of general Unsecured Creditors would include the following: (1) LPA Properties' Secured Claim, (2) Chapter 7 Administrative Claims (the trustee and professionals hired by the trustee, plus any license fee negotiated to allow the inventory to be sold), (3) Chapter 11 Administrative Claims [Professionals of the Company and the Committee, plus the post-petition Claim of Windermere (royalties of approximately $1,377,000 through April 2011), plus the post-petition Claim of Kinkade (indemnity

Case 10-55788 Doc# 362-5 Filed: 06/13/11 Entered: 06/13/11 16:37:07 Page 13 of 115

claim of approximately $272,000 as of April 30, 2011)], (4) employee wage Claims of up to $11,725 per employee (the Plan treats current employee PTO claims in the ordinary course rather than paying such Claims as would be required in Chapter 7), (5) Priority Tax Claims, and (6) any other Claims determined to have priority status. After payment of these senior Claims, the remaining funds would be paid to holders of Allowed Unsecured Claims pro rata. In a Chapter 7 case, the pre-petition Claims of Kinkade and Windermere in excess of $8.5 million would not be deferred and therefore the total general Unsecured Claim pool would be significantly increased accordingly. Furthermore, if a Chapter 7 trustee does not secure a license agreement to liquidate the Company's inventory, distributions to Creditors will likely be $0.00. Moreover, in the event a license agreement is obtained, it is anticipated that distributions to Creditors would still be negligible in a liquidation scenario compared to payment in full pursuant to the Plan. Additional discussion regarding the Chapter 7 liquidation scenario is set forth below at Article XVII.

*In sum, Creditors can either vote to accept the Plan and receive payment in full on their Claims or vote to reject the Plan and possibly receive nothing. Please carefully consider these alternatives. The Company believes the recoveries under the Plan will far exceed recoveries in a Chapter 7 case and urges all Creditors to vote for the Plan.*

3.4   **Confirmation Hearing.**

The Bankruptcy Court will conduct a hearing to consider confirmation of the Plan. Creditors and parties in interest will receive a notice accompanying this Disclosure Statement identifying the date, time and place of the Confirmation Hearing, and identifying the requirements for filing and serving objections, if any, to confirmation of the Plan.

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

/ / /

/ / /

/ / /

/ / /

**ARTICLE IV.**

**HISTORY AND PRESENT POSTURE OF THE BANKRUPTCY CASE.**

4.1    **History and Description of the Business.**

     **4.1.1    Corporate Structure.**

       The Debtor was formerly known as The Thomas Kinkade Company, LLC ("TKC"), and is the successor in interest to Media Arts Group, Inc. ("MAGI"). MAGI was founded in 1990 with the express mission of manufacturing, distributing, and selling the art and art-based products licensed from various artists including Kinkade. MAGI became a public company listed on the NASDAQ stock market exchange on August 2, 1994 and conducted its retail business primarily through a network of owned and operated retail galleries. Subsequently, MAGI changed its business model allowing independently owned and operated galleries to license the Thomas Kinkade name and sell product through a tiered gallery system. Accordingly, MAGI undertook efforts to sell or phase out most of its corporately owned galleries. During this phase, MAGI significantly expanded its corporate and manufacturing facilities, entering into a series of long-term leases of real property for its Morgan Hill, California campus, and conducted several lines of business including, licensing, publishing, manufacturing, and distribution. Publishing processes prevalent at that time required significant on site square footage and factory personnel to accommodate manufacturing needs.

       During MAGI's tenure as a public company, Kinkade was a significant yet minority shareholder. On January 29, 2004, Kinkade, through an indirectly owned acquisition entity, acquired all of the outstanding shares of MAGI. MAGI thereafter changed its name to The Thomas Kinkade Company, ceased to be a publically traded company, and subsequently reincorporated from Delaware to California. Upon the consummation of the "going private" transaction, TKC became a wholly owned subsidiary of Lightpost Holdings, LLC ("Lightpost"). In order to effectuate the "going private" transaction, TKC incurred approximately $25,000,000 of bank debt, a portion of which was personally guaranteed by Kinkade, and which was subsequently paid down to approximately $4,100,000.

       On December 27, 2006, TKC, Lightpost and other affiliated entities entered into an agreement (the "Master Agreement") to effect a tax free reorganization under Section 368(a)(1)(F)

of the Internal Revenue Code of 1986, as amended (the "'F' Reorganization") to better reflect the operational realities of the business and to allow the management team of each of the licensing and production sides of the business to better focus on their own specific goals and responsibilities. Pursuant to the "F" Reorganization, Lightpost and TKC caused the formation of Windermere Holdings, LLC, a California limited liability company (i.e., "Windermere" as defined in the Plan) and Morning Glory Licensing, LLC ("Morning Glory"). Pursuant to the Master Agreement, (a) Lightpost caused Windermere to elect to be taxed as a corporation, (b) Lightpost contributed to Windermere all of the outstanding stock of TKC and Lightpost then held all equity of Windermere, and (c) TKC converted from a corporation to a California limited liability company.

Morning Glory was initially formed as a subsidiary of TKC. After converting to a limited liability company, TKC made a capital contribution to Morning Glory of all of its assets and liabilities specifically relating to the licensing division other than intellectual property rights. Thereafter, TKC distributed to Windermere its membership interest in Morning Glory and certain intellectual property rights. Windermere then sublicensed to TKC the right to use Windermere's intellectual property rights in a manner consistent with the historical use of those rights in its licensing and production business. Since that time, all but one of the licenses that were transferred by TKC have expired.

On November 1, 2009, TKC changed its name to Pacific Metro, LLC. The Debtor is presently wholly owned by Windermere, which is wholly owned by Lightpost, which is wholly owned by the Kinkade Family Trust. The Debtor also has two wholly-owned subsidiaries, Pacific Metro International, LLC and Pacific Metro Retail, Inc., as reflected on the following organizational chart of the affiliated entities:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### 4.1.2    The Debtor's Operations.

The Debtor has operated its Kinkade line of business by producing, distributing and selling artworks pursuant to a certain license agreement between Windermere and the Debtor dated January 1, 2007 (the "Master Sublicense Agreement"). Since 2008, the Debtor has been in default under the Master Sublicense Agreement for failure to pay royalties. The Master Sublicense Agreement expired on its own terms on December 29, 2009. Since the expiration of the Master Sublicense Agreement, Kinkade and Windermere have granted, without return consideration from the Debtor, short-term extensions of the Master Sublicense Agreement to enable the Debtor to continue its operations and to provide revenue for the Debtor to pay Creditors and emerge from the Chapter 11 process. The last extension expired on February 15, 2011.

Accordingly, despite the default status and expiration of the Master Sublicense Agreement, the Debtor has continued to publish images, Kinkade has continued to supply new images, and, while he has preserved all of his rights and remedies under the Master Sublicense Agreement, Kinkade has chosen not to exercise those rights or remedies, in large part as a good faith effort to assist in the confirmation of a consensual plan and payment to Creditors in a successful reorganization. If the Plan is not confirmed, Windermere will likely enforce the agreement to prevent the further sale of Kinkade artwork.

/ / /

### 4.1.3     Events Precipitating the Bankruptcy Filing.

On January 29, 2007, the Debtor and certain of its affiliates, including Morning Glory, entered into an Amended And Restated Loan And Security Agreement (the "Loan Agreement") with Bank of America, N.A. In connection therewith, the Debtor executed a Revolving Credit Note (the "Note") in the principal amount of $22,000,000. The Note is secured by all of the Debtor's assets and certain assets of certain of its affiliates, and guaranteed by certain of the Debtor's affiliates. In order to prevent Bank of America, N.A. from calling the Note and foreclosing on the Company's assets, on December 30, 2009, LPA Properties, a financing entity owned by Kinkade, acquired the interest of Bank of America, N.A. in the Note and other loan documentation (i.e., the LPA Properties Pre-Petition Secured Credit Facility as collectively defined in the Plan) in exchange for a payment equal to the full amount due on the Note. At the time of the acquisition, the outstanding balance on the Note was $4,069,771. On January 29, 2010, the Loan Agreement expired and accordingly the Note plus accrued interest became due and payable in full. In February 2010, LPA Properties entered into the Forbearance And Cash Collateral Agreement ("Pre-Petition Cash Collateral Agreement") with the Debtor and certain of its affiliates, pursuant to which the Debtor was permitted to use the cash collateral under certain terms and conditions and solely with the approval of LPA Properties. The Pre-Petition Cash Collateral Agreement expired, and, while retaining all of its rights and remedies, LPA Properties did not enforce such rights and remedies. As of the Petition Date, $4,168,850 was owing to LPA Properties on the Note. LPA Properties has consented to the Debtor's use of cash collateral during the Bankruptcy Case as discussed below at Section 4.2.6.

In recent years, the Company's financial condition was negatively impacted due to various factors including the weakened economy and changes in technology, consumer preferences and retail markets. In 2008 and 2009, the Company lost $15,488,000 and $3,345,000 on revenues of $19,293,000 and $21,352,000, respectively. Like many companies, the Company held real property leases with more square footage and overhead cost than operations required. Moreover, the Company was involved in several lawsuits and facing claims by creditors, including a judgment which was soon to be executed upon against the Company. A decision was made to file the

Bankruptcy Case to restructure the Company's debt to reduce and better manage its debt obligations, while streamlining its operations and improving its efficiency in light of technological and market developments.

4.2      **Summary of Events During The Bankruptcy Case.**

4.2.1      **Commencement of the Bankruptcy Case.**

On June 2, 2010 (the "Petition Date"), the Debtor filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code. Presently, the Debtor is operating as a debtor in possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

4.2.2      **Official Unsecured Creditors' Committee.**

The Committee was appointed in the Bankruptcy Case on June 17, 2010 and consists of the following members:

| | | |
|---|---|---|
| Jeff Spinello | Flextronics Int'l. | TBI-Mission West, LLC |
| 4 Lewis Court | Attention: Paul W. Anderson | Attention: Steve Hallgrimson |
| Palmyra, VA 22963 | 847 Gibraltar Dr. | 1960 The Alameda, Suite 20 |
| | Milpitas, CA 95035 | San Jose, CA 95126 |
| DeLaTorre Corp. | Zoom Imaging Solutions, Inc. | |
| Attention: Daniel DeLaTorre | Attention: Jill M. Jurevich | |
| 4955 W. Phillips Blvd. | 200 S. Harding Blvd. | |
| Ontario, CA 91762 | Roseville, CA 95678 | |

The Committee's counsel is as follows:

Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Attn: Keith McDaniels
Tel: (415) 693-2080
Email: kmcdaniels@cooley.com

4.2.3      **Appointment of Responsible Person.**

The Local Rules require in business cases that an individual be designated by the Court as the natural person to act on behalf of the business in the bankruptcy case. Pursuant to an order entered by the Bankruptcy Court on June 3, 2010, Robert Murray was appointed the Responsible Person in the Bankruptcy Case.

4.2.4      **Retention of Professionals.**

During the Bankruptcy Case, the Debtor has employed Murray & Murray, A Professional

Corporation, as its general bankruptcy counsel to assist it in its reorganization efforts. In addition, pursuant to the Debtor's motion, the Court appointed The Garden City Group, Inc. as the noticing and Claims Agent for the Clerk of Court for the United States Bankruptcy Court, Northern District of California in the Bankruptcy Case. The Committee has employed Cooley LLP as its counsel and KPMG LLP as its financial advisor during the Bankruptcy Case.

### 4.2.5    Allowance of Fees of Court-Appointed Professionals.

On January 28, 2011, the Court entered its ORDER RE FIRST APPLICATION FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEYS FOR DEBTORS, thereby approving and allowing attorneys' fees to the Debtors' bankruptcy counsel in the sum of $496,389.00 for services rendered to the Debtor from June 2, 2010 through December 31, 2010, and authorizing payment of $13,460.73 as reimbursement for expenses incurred in representation of the Debtor from June 2, 2010 through December 31, 2010. The Debtor's bankruptcy counsel applied its pre-petition advance retainer in the sum of $331,728.60 to its awarded fees, and the Debtor paid the balance of such fees and expenses in the aggregate of $164,660.39.

On February 2, 2011, the Court entered its ORDER GRANTING FIRST INTERIM APPLICATION FOR COMPENSATION AND EXPENSE REIMBURSEMENT BY COOLEY LLP, COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR THE PERIOD JUNE 23, 2010 TO NOVEMBER 30, 2010 approving and allowing the fees and expenses incurred by the Committee's counsel from June 23, 2010 through November 30, 2010, in the amounts of $303,031.00 and $2,369.63 respectively, which the Debtor subsequently paid.

Also on February 2, 2011, the Court entered its ORDER GRANTING FIRST INTERIM FEE APPLICATION FOR COMPENSATION AND EXPENSE REIMBURSEMENT BY KPMG LLP, FINANCIAL ADVISOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR THE PERIOD JULY 7, 2010 TO NOVEMBER 30, 2010, approving and allowing fees and expenses incurred by the Committee's financial advisor for services rendered from July 7, 2010 through November 30, 2010, in the amounts of $142,495.00 and $356.00, respectively, which the Debtor subsequently paid.

### 4.2.6    Use of Cash Collateral.

Since the Petition Date, the Debtor has been authorized to utilize cash collateral and obtain

1 certain post-petition advances from LPA Properties, pursuant to LPA Properties' consent in

2 accordance with budgets approved by LPA Properties and orders entered in the Bankruptcy Case.[2]

3 The most recent such order entered on July 27, 2010 is the Cash Collateral Order. The Cash

4 Collateral Order sets forth the terms of the Debtor's use of cash collateral and authorizes the Debtor

5 to use cash collateral pursuant to a rolling 13-week forecast of the Debtor's revenue and expenses

6 (the "Cash Collateral Budget") in accordance with the terms and conditions set forth in the Cash

7 Collateral Order, but only so long as the Termination Date (as defined in the Cash Collateral Order)

8 has not occurred. Because LPA Properties is a fully secured Creditor, the Debtor pays its

9 reasonable attorneys' fees pursuant to the LPA Properties Pre-Petition Secured Credit Facility,

10 Section 506(b) of the Bankruptcy Code and the LPA Properties Post-Effective Date Secured Credit

11 Facility. Access to cash collateral has enabled the Debtor to maintain its operations and going

12 concern value and to prevent immediate and irreparable harm to the Estate pending Confirmation of

13 its Plan.[3]

14 ### 4.2.7 Disposition of Real Property Leases.

15 Previously, the Company operated from four (4) locations: its facility at 925 Lightpost Way,

16 Morgan Hill (the "925 Lightpost Site"), its headquarters at 900 Lightpost Way, Morgan Hill (the

17 "900 Lightpost Site"), a warehouse at 198 E 9th Street, Gilroy (the "9th St. Site"), and its

18 manufacturing facility at 5755 Rossi Ln., Gilroy (the "Rossi Ln. Site").

19 On June 21, 2010, the Court entered an order authorizing the Debtor to reject (1) that certain

20 lease agreement (collectively with all amendments thereto, the "TBI Mission Lease") with TBI-

21 Mission West, LLC ("TBI Mission"), and (2) that certain sublease agreement dated July 17, 2008

22 (the "Flextronics Sublease") between TKC and Flextronics International USA, Inc. ("Flextronics"),

23 both related to the 925 Lightpost Site, retroactive to the Petition Date. Pursuant to that certain

24 PERSONAL GUARANTY AGREEMENT dated as of July 17, 2008, Kinkade is the guarantor of the Debtor

---

25 [2] Among other things, LPA Properties has agreed in connection with the Debtor's use of cash collateral to
26 subordinate certain of its rights, claims and liens, to the payment of certain professional fees. Specifically, the Cash
Collateral Order provides, *inter alia*, that certain of LPA Properties' rights, claims and liens shall be subordinated to the
payment of (i) compensation and expense reimbursement allowed to a trustee in the case; (ii) fees payable to the United
27 States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (iii) the fees and expenses of the Debtor's Professionals and the
Committee's counsel.
28 [3] Presently, pursuant to the agreement of LPA Properties, the Debtor's right to use cash collateral will terminate
upon the earlier of (1) the Effective Date and (2) September 1, 2011.

on the TBI Mission Lease for certain amounts of unpaid rent incurred commencing from August 1, 2008 through July 31, 2011, and for a total guaranty obligation of $1,852,806.54. Since the Petition Date, Kinkade has paid $271,514.64 on the Kinkade Guaranty obligation which will be reimbursed to Kinkade as an Allowed Administrative Claim on the basis of indemnification provided by the Company.

On September 16, 2010, the Court entered an order extending the time for the Debtor to assume or reject the lease agreements with TBI-Madrone I, LLC ("TBI-Madrone") (the landlord at the 900 Lightpost Site), 9th Street Gilroy Associates, LLC (the landlord at the 9th St. Site), and E.J. Rossi, LLC (the landlord at the Rossi Ln. Site), respectively, through December 29, 2010. Subsequently, the Debtor entered into two separate stipulations with TBI-Madrone and 9th Street Gilroy Associates, LLC, respectively, to further extend the time for the Debtor to assume or reject its lease agreements with each respective landlord. Pursuant to orders entered by the Court approving each such stipulation, the deadline by which the Debtor must assume or reject its lease agreements with TBI Madrone and 9th Street Gilroy Associates, LLC, is presently June 30, 2011.[4]

With respect to the 9th St. Site, the Debtor is leasing such premises on a month-to-month basis and intends to assume the underlying lease pursuant to the Plan. Accordingly, such lease is designated for assumption on Exhibit "B" to the Plan. With respect to the Rossi Ln. Site, the property was sold by its owner, the Debtor is no longer occupying the premises, and the underlying lease has terminated.

The Debtor entered into a new real property lease with TBI-Madrone (the "TBI Madrone Lease") for approximately 14,000 square foot premises at the 900 Lightpost Site, which is the Debtor's principal place of business. The Debtor and TBI Madrone agreed that the TBI Madrone Lease became effective as of July 16, 2010 and that its predecessor lease dated December 20, 1999 between the Debtor and TBI-Madrone for approximately 61,743 square feet at the same address, is deemed rejected as of that date. Pursuant to its ORDER AUTHORIZING DEBTOR TO ENTER INTO NEW LEASE AND TO REJECT OLD LEASE, entered on December 20, 2010, the Court authorized the Debtor to enter into the TBI Madrone Lease and to reject the predecessor lease, effective as of July 16,

---

[4] The Debtor anticipates that it will request a further extension of the deadline to assume or reject both leases from TBI Madrone and 9th Street Gilroy Associates, LLC, respectively.

Case: 10-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11    Page 22 of 115

2010.

### 4.2.8    Tolling Agreement.

On November 15, 2010, the Debtor, the Kinkade Parties and the Committee entered into the Tolling Agreement pursuant to which the Debtor and the Kinkade Parties agreed to toll all applicable statutes of limitations and repose under California's Uniform Fraudulent Transfer Act, for breach of fiduciary duties or actions subject to California Civil Procedure Section 343 that the Committee is, or may be, capable of asserting, including on behalf of the Estate, through the date of entry of the Confirmation Order. The Bankruptcy Court entered the ORDER APPROVING TOLLING AGREEMENT on November 29, 2010, approving the Tolling Agreement. The Plan provides for modification of the Tolling Agreement to extend the Tolled Period as discussed below at Section 7.3.

### 4.2.9    Bankruptcy Administration Matters.

On June 10, 2009, this Court entered its ORDER LIMITING NOTICE in the Bankruptcy Case, permitting the Debtor to limit notice for certain pleadings to a limited notice list as set forth therein.

The Debtor has filed all Monthly Operating Reports and is current in its payments of the United States Trustee's fees. A copy of the Debtor's most recent Monthly Operating Report for the month ending April 2011 (the "April MOR") is attached hereto as **Exhibit "A"** and incorporated herein by reference.

The Bankruptcy Court has issued two (2) orders extending the time during which only the Debtor may file a plan and solicit acceptances. The Debtor has timely filed its Plan within the time established by the Court. Pursuant to the Bankruptcy Court's order entered on May 31, 2011, the exclusive period during which only the Debtor may solicit acceptances to the Plan, is through and including August 15, 2011.

### 4.3    Assets.

As discussed above, the Debtor is operating pursuant to an approved Cash Collateral Budget with the consent of LPA Properties and the Committee and the approval of the Bankruptcy Court. Cash in excess of budgeted amounts is held as cash collateral and used for working capital by the Debtor.

As of April 30, 2011, the Debtor's cash on hand was approximately $1.4 million. These

funds are held in an authorized debtor in possession bank account. The Debtor's tangible assets include inventory, work in process, artwork materials, office equipment and furniture, which the Debtor approximates at a book value of $6.5 million; however, unless the Plan is confirmed, the Debtor will not have a license allowing it to sell its inventory. The Plan will include a new license allowing the Debtor to benefit from the sale of both new and existing inventory. The Debtor estimates that it has a net of $3.5 million in outstanding accounts receivables. The Debtor also has deposits, tax refunds, insurance claims, royalty payments, payments pursuant to certain promissory notes, and judgments against third-parties (described below), which are of undetermined value. In addition, the Debtor is the owner of two subsidiaries, Pacific Metro International, LLC and Pacific Metro Retail, Inc., both of which the Reorganized Company will retain under the Plan.

The Company and/or its predecessors in interest, MAGI and TKC, have obtained judgments (collectively, the "Judgments") against certain parties in connection with various lawsuits pending since 2002, which remain unenforced and uncollected. The Judgments which are detailed on Exhibit "D" to the Plan, aggregate to approximately $7 million excluding interest. The Reorganized Company will enforce and collect on the Judgments to the extent, in the Reorganized Company's business judgment, they are collectible, and the proceeds will be used for business operations. The Debtor's projections for the Plan are not dependent on recoveries on the Judgments or other Retained Claims.

4.4    **Liabilities.**

The Debtor has thus far undertaken only a preliminary review of Claims, and while the Claims Bar Date has expired with respect to general pre-petition Claims (including those held by governmental units), all bar dates for Claims have not yet been established (e.g., for certain Rejection Claims and Administrative Claims). The April MOR estimates Allowed Claims as follows:

Secured Claims:                          $4.2 million;

Priority Claims (other than taxes): $49,000;

Priority Tax Claims:                     $128,000; and

/ / /

17    DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED JUNE 13, 2011

General Unsecured Claims:          $9.2 million, (excluding the Kinkade Pre-Petition Claims and the Windermere Pre-Petition Claims, payment upon which will be deferred pursuant to the Plan).

Unpaid fees of Professionals of the Debtor and the Committee, which constitute Administrative Claims, total an estimated $627,000 (see Section 5.1.2 below) through April 30, 2011. These Claims remain subject to Bankruptcy Court approval upon duly filed applications for compensation and after hearings on notice. The Kinkade-Windermere Post-Petition Claims which exceed $1.6 million also constitute Administrative Claims.

The April MOR estimates total liabilities at $23.1 million inclusive of the Windermere Pre-Petition Claims and the Kinkade Pre-Petition Claims. This estimate does not include Rejection Claims and Administrative Claims that may be filed following the filing of this Disclosure Statement and the Plan. If Claims filed by Creditors are allowed in amounts in excess of the Debtor's estimates (see discussion of particular Creditor groups below), the total liabilities may vary significantly.

### 4.4.1    Secured Claims.

The Debtor believes that there is only one valid Secured Claim which is the Secured Claim held by LPA Properties. As of the Petition Date, searches of the public records of the California Secretary of State offices revealed five (5) Creditors asserting liens on certain assets of the Debtor and/or its predecessors TKC and MAGI, each of which are discussed below. If necessary, the Debtor or Reorganized Company will file a complaint to determine the validity, priority or extent of any purported lien and/or to avoid each such lien asserted by a Creditor other than LPA Properties. Such a complaint would represent a Retained Claim as discussed at Article X of the Plan.

#### 4.4.1.1.    Bank of America, N.A. ("BofA").

BofA filed a blanket lien against the TKC on March 11, 2009, to reflect its security interests with respect to the Note and the Loan Agreement. BofA subsequently filed a UCC FINANCING STATEMENT AMENDMENT to amend the name of the debtor-entity to Pacific Metro, LLC. As discussed above, BofA's interest in the Note was acquired by LPA Properties on December 30, 2009, and such assignment is reflected by the lien assignment filed by LPA Properties as discussed below. Accordingly, the Debtor's books and records indicate no amount is owing to BofA. BofA

has not filed a proof of Claim in the Bankruptcy Case.

### 4.4.1.2. LPA Properties.

On January 5, 2010, LPA Properties filed a UCC FINANCING STATEMENT AMENDMENT evidencing the assignment of BofA's interest in the LPA Properties Pre-Petition Secured Credit Facility to LPA Properties. As discussed above, the balance on the Note as of the Petition Date is $4,168,850 which is deemed an Allowed Secured Claim by the Plan. In addition, the LPA Properties Claim includes all accrued post-petition interest under the LPA Properties Pre-Petition Secured Credit Facility, any amounts borrowed from LPA Properties pursuant to the LPA Properties Post-Effective Date Secured Credit Facility, and reasonable attorneys' fees pursuant to the LPA Properties Pre-Petition Secured Credit Facility, Section 506(b) of the Bankruptcy Code and the LPA Properties Post-Effective Date Secured Credit Facility.

### 4.4.1.3. IBM Credit LLC ("IBM Credit").

IBM Credit filed two (2) California Commercial Code financing statements on September 14, 2005 and June 27, 2009, respectively. Each such statement was filed as a precautionary filing under California Commercial Code Section 9-505 and identifies specific leased equipment of the Debtor as collateral. Previously, the Company and IBM Credit entered into a master lease and a number of lease supplements (each constituting a separate lease for equipment) whereby the Company leased computer equipment from IBM Credit which serve as the basis for its California Commercial Code filings.

Pursuant to the Plan, the Debtor will assume the lease agreements and corresponding supplements with IBM Credit. The Debtor contends that the lease supplements constitute true lease agreements between the parties and that IBM Credit does not hold any valid liens against the Debtor's assets. IBM Credit filed a proof of Claim in the aggregate amount of $4,773.51, with $3,957.91 asserted as priority and $815.60 asserted as general unsecured. IBM Credit's Claim does not indicate that it is secured.

### 4.4.1.4. CIT Technology Financing Services, Inc. ("CIT").

CIT filed a California Commercial Code financing statement against TKC on February 18, 2009 which indicates it was filed for information purposes only pursuant to a "true lease" and, as

collateral, specifies leased equipment but also includes "all other types of" equipment leased to the Debtor. Previously, the Company and CIT entered into several lease agreements whereby the Company leased office equipment, which serve as the basis for CIT's California Commercial Code filing.

As set forth above, the financing statement indicates (and the Debtor believes) that the lease agreements with CIT which are the subject of its financing statement are true lease agreements. The Debtor contends that CIT does not hold any valid liens against any of the Debtor's assets. Pursuant to the Plan, the Debtor will assume the lease agreements and corresponding supplements with CIT.

CIT filed two proofs of Claim based on certain equipment leases with the Debtor, asserting general Unsecured Claims in the respective amounts of $155,300.15 and $7,411.89. The Debtor is investigating the Claims asserted by CIT which it believes are excessive and will be disputed.

### 4.4.1.5. Caltronics Business Systems, Inc. ("Caltronics").

On June 28, 2001, Caltronics filed a financing statement against MAGI and on June 19, 2006, subsequently filed a continuation of such financing statement. Caltronics' filing likely is a protective lien based on its lease of office equipment to the Company. The Debtor contends that the lease agreement with Caltronics constitutes a true lease agreement and that Caltronics does not hold any valid liens against any of the Debtor's assets. Caltronics did not file a proof of Claim in the Bankruptcy Case.

### 4.4.1.6. Los Angeles County Treasurer and Tax Collector ("L.A. County").

The Los Angeles County Treasurer and Tax Collector filed a proof of Claim in the amount of $8,784.52 asserting a Secured Claim based on a lien for unpaid property taxes, allegedly accrued during the fiscal year 1993 through 1994 in Los Angeles County. The proof of Claim indicates that L.A. County's alleged lien extends to the Debtor's owned or acquired real property and personal property, but only within the County of Los Angeles. The Debtor does not presently have any property or operations in the County of Los Angeles. Moreover, the property referred to in this Claim is not and was not the Company's property, and therefore, the Debtor contends that L.A. County has misidentified the Company as a debtor subject to its lien. In any event, the Debtor is currently investigating this Claim and disputes this Claim.

Pacific\A65788\Pld\Plan QOF Chapter\June 2011\version
of 115

### 4.4.2 **The Debtor's Unsecured Debts.**

The Debtor estimates Allowed Unsecured Claims which comprise Classes 6 and 7, will approximate between $10 and $12 million. This estimate does not include all Claims arising from the rejection of executory contracts and unexpired leases where the bar date for filing a Rejection Claim has yet to expire or has not yet been established. Based on a preliminary analysis, the Debtor expects that such Rejection Claims will be nominal.

Based on a preliminary review of general Unsecured Claims filed against the Debtor, several are noted below where the asserted Claim varies materially from the amount the Debtor believes is owing. To the extent such Creditors do not agree to amend their Claims or the parties do not reach a resolution regarding such Claims otherwise, the Debtor has or intends to object to the asserted Claims prior to the Claims Objection Deadline.

### 4.4.2.1. **The White-Lighthouse Parties.**

The Debtor scheduled Lighthouse Galleries, LLC, David White and Nancy White (together, the "White-Lighthouse Parties") with a disputed, contingent and unliquidated debt in the amount of $1,414,213.20 based on an arbitration award received from the American Arbitration Association ("AAA") in connection with Arbitration Case No. 54 181 01012 02 (the "White-Lighthouse Action" as defined in the Plan). Subsequently, the White-Lighthouse Parties filed the White-Lighthouse Claim in the amount of $1,558,676.00.

The Company's predecessor MAGI initiated the White-Lighthouse Action by filing a claim against the White-Lighthouse Parties, and the White-Lighthouse Parties filed a counterclaim against MAGI and a cross-claim against certain of its principals and affiliates, including the Debtor's former Executive Vice President Richard F. Barnett ("Barnett"), all related to an alleged dealer agreement between MAGI and the White-Lighthouse Parties. AAA issued an INTERIM AWARD (the "Lighthouse Arbitration Award") in favor of the White-Lighthouse Parties on, *inter alia*, claims for Interference with a Contract or Advantageous Business Relationship or Expectancy, Silent Fraud, and Fraudulent Misrepresentation. Prior to the Petition Date, the Company appealed AAA's arbitration award to the United States District Court for the Eastern District of Michigan which vacated the Lighthouse Arbitration Award. In May 2010, the White-Lighthouse Parties appealed the

Case 10-55788    Doc# 362-5    Filed: 06/13/11    Entered: 06/13/11 17:57:13    Page 28 of 115

order vacating the AAA award to the United States Court of Appeals for the Sixth Circuit, where the matter remains pending.

The White-Lighthouse Claim alleges amounts for the Lighthouse Arbitration Award plus attorneys' fees and costs. Because the Lighthouse Arbitration Award was vacated, the Debtor disputes the White-Lighthouse Claim. Prior to the Effective Date, the Reorganized Debtor will file an objection to White-Lighthouse Claim. Pursuant to the Plan, upon the occurrence of the Effective Date, the Reorganized Debtor will stipulate to termination of the automatic stay, and the appeal may then proceed before the United States Court of Appeals for the Sixth Circuit.

### 4.4.2.2. The Hazelwood Parties.

Over the past eight (8) years, the Debtor has been a party to a number of lawsuits/arbitrations brought by approximately twenty-five (25) former dealers. The Debtor has successfully defended all but one of these actions. In Arbitration Case No. 54 181 01012 02 (the "Hazelwood Action"), a panel of the AAA entered an award in November 2006 in the approximate sum of $2,100,000 against the Company and Barnett, in favor of Karen Hazelwood, Jeffrey Spinello and Thomas Kinkade At The Downtown Mall, LLC, a Virginia Limited Liability Company (together, the "Hazelwood Parties"), based on a count of Fraud in the Inducement related to an alleged dealer agreement between TKC and the Hazelwood Parties. In 2007, the United States District Court for the Northern District of California (the "District Court") vacated the award of the AAA. On June 16, 2009, the United States Court of Appeals for the Ninth Circuit reversed the District Court and reinstated the arbitration award. The Debtor's writ of certiorari to the United States Supreme Court was denied, and on January 29, 2010, the District Court entered the Hazelwood Judgment against the Debtor and Barnett in the sum of $2,866,499.54.

The Hazelwood Parties filed a proof of Claim in connection with the Hazelwood Judgment designated as Claim number 64 by the Claims Agent. Pursuant to the Plan, the Hazelwood Parties' Unsecured Claim (i.e., the Hazelwood-Spinello Claim) is Allowed in the amount of $2,367,766.16; provided, however, that such Allowed Claim shall be reduced by amounts collected from any co-debtor not already reflected in the original proof of Claim. Barnett already has paid $500,000 (of which $88,000 was borrowed from the Debtor) of the Hazelwood Judgment to the Hazelwood

Parties.  In addition, the Yatooma Claim (discussed below) and a portion of Barnett's Claim (discussed below) also assert amounts based on the Hazelwood Judgment and, therefore, represent duplicative Claims based on the Hazelwood Judgment.  Accordingly, pending entry of a Final Order on the Debtor's objection to the Yatooma Claim, Distributions to the holder of the Allowed Hazelwood-Spinello Claim shall be made to the payee(s) as ordered by the Bankruptcy Court unless otherwise agreed in writing by the holder of the Hazelwood-Spinello Claim and the holder of the Yatooma Claim.

### 4.4.2.3.  Barnett's Claims.

Barnett's proof of Claim, designated as Claim number 67 by the Claims Agent, is described as follows:

a.    Barnett asserts an Unsecured Claim for contribution and indemnification in an unspecified and unliquidated amount (the "Barnett (White) Claim") "arising from or relating to all actions taken in the course and scope" of Barnett's duties under his employment agreement with the Company, including actions pertaining to the White-Lighthouse Action.  As discussed above, the White-Lighthouse Action remains pending on appeal, and the Debtor disputes the White-Lighthouse Claim.  The Debtor also disputes the Barnett (White) Claim and contends that Barnett is not entitled to indemnification as a matter of public policy and applicable law; however, to the extent, the Barnett (White) Claim is Allowed, it will receive the treatment provided under Class 6 of the Plan.

b.    Barnett also asserts an Unsecured Claim for contribution and indemnification in an unspecified amount (the "Barnett (Hazelwood) Claim") in connection with the Hazelwood Judgment, which includes $500,000 for amounts allegedly paid by Barnett towards the Hazelwood Judgment. As discussed above, the Claim of the Hazelwood Parties also is based on the Hazelwood Judgment.  Furthermore, the Yatooma Claim (discussed below) alleges that Norman Yatooma & Associates, P.C. ("Yatooma") who was counsel for the Hazelwood Parties in the Hazelwood Action, possesses a lien on and is entitled to any payment made to the Hazelwood Parties in connection with the Hazelwood Judgment.  Therefore, the Barnett (Hazelwood) Claim, the Yatooma Claim and the Hazelwood-Spinello Claim all are based on the Hazelwood Judgment.

Previously, Barnett entered into an agreement with the Hazelwood Parties regarding payment

on the Hazelwood Judgment. In connection with such agreement, the Company loaned to Barnett the amount of $88,000, which Barnett has not repaid. Consequently, to the extent the Barnett (Hazelwood) Claim is Allowed in any amount, the Debtor is entitled to a setoff in the amount of $88,000 plus interest. The Debtor disputes the Barnett (Hazelwood) Claim and contends that Barnett is not entitled to indemnification as a matter of public policy and applicable law; however, to the extent it is Allowed, the Barnett (Hazelwood) Claim will receive the treatment provided under Class 6 of the Plan.

c.   In addition, Barnett asserts a Priority Claim in the amount of $11,725.00 and an Unsecured Claim in the amount of $302,091.17 (collectively, the "Barnett Employment-Related Claim") based on Barnett's previous employment with the Company. Specifically, the Barnett Employment-Related Claim includes amounts for alleged accrued and unpaid "FTO" or flexible time off (i.e., vacation), alleged penalties and late charges pursuant to Labor Code Section 203, severance and "renumeration" for the Company's alleged failure to provide notice of termination. The Debtor contends that the Barnett Employment-Related Claim is excessive and disputes such Claim; however, to the extent it is Allowed, the Barnett Employment-Related Claim will receive the treatment provided under Class 6 of the Plan.

### 4.4.2.4.   Yatooma.

Yatooma filed two (2) duplicate proofs of Claim (designated as Claim numbers 79 and 80 by the Claims Agent) asserting an Unsecured Claim in the amount of $2,366,499.54 which together comprise the Yatooma Claim. Yatooma's duplicate Claims state that they are based on the Hazelwood Judgment in the Hazelwood Action and attach a "Notice and Filing of Attorney's Lien" by which Yatooma claims a lien for legal services on any amounts to be paid to the Hazelwood Parties in connection with the Hazelwood Action. The Debtor disputes the Yatooma Claim as the Debtor has no liability to Yatooma, and the holder of the Hazelwood-Spinello Claim has agreed to support the Debtor's objection to the Yatooma Claim. The Yatooma Claim has largely the same basis as the Claim of the Hazelwood Parties and the Barnett (Hazelwood) Claim. As set forth in Section V-D of the Plan, pending entry of a Final Order on the Debtor's objection to the Yatooma Claim, Distributions to the holder of the Allowed Hazelwood-Spinello Claim will be to the payee(s)

as ordered by the Bankruptcy Court unless otherwise agreed in writing by the holder of the Hazelwood-Spinello Claim and the holder of the Yatooma Claim.

### 4.4.2.5.  Claims of Former Management.

In addition to Barnett, several other former officers of the Company have filed proofs of Claim which assert priority and general Unsecured Claims in connection with their respective employment agreements with the Company (together with the Barnett Employment-Related Claim, these Claims are defined in the Plan as the "Timely Filed Former Management Claims").  Such Claims include the following: Claim of Craig Fleming in the total amount of $518,617.82, with $11,725.00 asserted as a Priority Claim and $506,892.82 asserted as a general Unsecured Claim (designated as Claim number 66 by the Claims Agent); Claim of Brian Mahoney, in the total amount of $172,349.91, with $11,725.00 asserted as a Priority Claim and $160,624.91 asserted as a general Unsecured Claim (designated as Claim number 71 by the Claims Agent); Claim of Heather Neal, in the total amount of $27,257.94, with $11,725.00 asserted as a Priority Claim and $15,532.94 asserted as a general Unsecured Claim (designated as Claim number 70 by the Claims Agent); and Claim of Neal Weinstein, in the total amount of $206,000.00, with $11,725.00 asserted as a Priority Claim and $194,275.00 asserted as a general Unsecured Claim (designated as Claim number 68 by the Claims Agent).

The Debtor is currently investigating and evaluating these Claims but believes that they are excessive and will be disputed.

### 4.4.2.6.  TBI Mission.

TBI Mission filed a proof of Claim (designated as Claim number 73 by the Claims Agent) asserting a general Unsecured Claim in the amount of $2,168,074.80 based on alleged lease termination damages arising from the Debtor's rejection of the TBI Mission Lease.  As discussed above, the 925 Lightpost Site is the Debtor's former premises under the TBI Mission Lease which, along with the Flextronics Sublease, the Debtor rejected during the Bankruptcy Case.  The Debtor disputes TBI Mission's Claim because the Claim does not account for certain mitigation of the alleged lease termination damages asserted, and the Debtor believes that the Claim should be Allowed only in a substantially reduced amount.  Unless the parties resolve this Claim otherwise, the

Reorganized Debtor will file an objection to TBI Mission's Claim. To the extent it becomes an Allowed Claim, the Claim of TBI Mission will be afforded treatment under Class 6 of the Plan.

The above is not a complete summary of all Disputed Claims. As already noted, the Debtor has not yet had an opportunity to review all Claims asserted against the Bankruptcy Estate. Thus, the fact that a Claim is not referred to above does not mean the Claim is not disputed or will not be subject to an objection. The total amount of all Allowed Claims will not be finally determined until all Claims bar dates have passed and all Claims objections have been resolved or otherwise adjudicated by the Bankruptcy Court.

## ARTICLE V.

## CLAIMS AND EQUITY INTERESTS AND TREATMENT UNDER THE PLAN.

The Claims against and Interests in the Debtor, and their treatment under the Plan are summarized below.

5.1 **Administrative Claims.**

### 5.1.1 **Description.**

Administrative Claims, generally, are claims that arise during the pendency of a Chapter 11 case and are entitled to priority in payment, pursuant to Section 507(a)(2) of the Bankruptcy Code. These include Claims for: (a) any actual and necessary costs and expenses of preserving the Bankruptcy Estate incurred on or after the Petition Date and through and including the Effective Date, (b) any cure amounts that must be paid in connection with the assumption of any executory contract or unexpired lease of the Debtor under Section 365 of the Bankruptcy Code, (c) fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and (d) compensation for legal or other services and reimbursement of expenses allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code or otherwise. Administrative Claims also include Claims asserted under Section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtor within twenty (20) days before the Petition Date in which the goods were sold to the Debtor in the ordinary course of business; however, no such Claims have been filed in the Bankruptcy Case.

### 5.1.2 **Administrative Claims – Estimate.**

The Debtor anticipates that the majority of Administrative Claims that will remain unpaid as

of the Effective Date will be the fees of the Debtor's Professionals and the Committee's Professionals, and the Kinkade-Windermere Post-Petition Claims which are comprised of (a) the Allowed Administrative Claim of Kinkade and/or Windermere in the amount of $1,376,505 as of April 30, 2011, plus amounts accrued on and after May 1, 2011, for accrued but unpaid post-petition licensing and royalty fees due and owing by the Debtor to Kinkade and/or Windermere; and (b) the Allowed Claim of Kinkade in the amount of $271,514.64 as of April 30, 2011, for indemnification based on post-petition payments to TBI-Mission West, LLC on the Kinkade Guaranty.

Set forth below are the accrued, unpaid fees and expenses for the Debtor's Professionals and the Committee's Professionals through April 30, 2011, and the *estimated* fees and expenses of such professionals through July 31, 2011[5]:

| Professional | Accrued fees & expenses for period through April 30, 2011 | Estimated fees & expenses for period from May 1, 2011 through July 31, 2011 |
|---|---|---|
| **Murray & Murray** (Debtor's bankruptcy counsel) | $290,126 | $300,000 |
| **Cooley LLP** (Counsel for the Committee) | $220,370 | $60,000 |
| **KPMG** (Financial advisor for the Committee) | $116,424 | $5,000 |
| **TOTAL:** | $626,920 | $365,000 |

Additional fees and expenses will be incurred by some or all of these professionals after the dates indicated. All professional fees through the Effective Date are subject to Court approval after a hearing on notice to Creditors. Additionally, the Debtor pays the fees and expenses of The Garden City Group, Inc., the Court-approved Claims Agent, on a monthly basis. The Debtor anticipates that the fees and expenses of the Claims Agent from May 2011 through July 2011, will approximate $9,000. These amounts are expected to be paid on or about the Effective Date.

Administrative Claims may also include a small amount of current expenses incurred in the ordinary course of the Debtor's operations which will remain unpaid on the Effective Date. The Reorganized Debtor will pay these expenses in the ordinary course of its business.

/ / /

---

[5] August 1, 2011 is the estimated Effective Date. The below estimates account for fees and expenses up through such date. However, because the actual amounts are dependent on the nature and range of services to be provided by professionals which are largely unknown at this time (e.g., addressing any objections to confirmation which may be filed) and because the Effective Date has not yet been established, the actual amounts may vary significantly.

Case: 10-55788  Doc# 262-5  Filed: 06/13/11  Entered: 06/13/11 17:07:10  Page 34 of 115

### 5.1.3     Administrative Claims – Treatment.

Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim (e.g., the Kinkade-Windermere Post-Petition Claims discussed below), each holder of an Allowed Administrative Claim will be paid in cash, in full upon the later of: (a) the Effective Date; (b) if such Claim is initially a Disputed Claim, if and when it becomes an Allowed Administrative Claim; and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtor's business, within such time as payment is due pursuant to the terms giving rise to such Claim or as otherwise authorized by the Bankruptcy Court.

The Kinkade-Windermere Post-Petition Claims and any Post-Petition Intercompany Claims are deemed Allowed by the Plan without the need to file a request for payment of an Administrative Claim prior to the Administrative Claims Bar Date. By agreement of such claimants, the Reorganized Company is not required to pay the Kinkade-Windermere Post-Petition Claims and the Post-Petition Intercompany Claims in cash on the Effective Date. Instead, the Allowed Kinkade-Windermere Post-Petition Claims and the Post-Petition Intercompany Claims will accrue interest at the Plan Interest Rate from and after the Effective Date until the date of payment, and will be paid by the Reorganized Company in one or more installments after the payment in full of, or full reservation for, Allowed or Disputed Claims in Classes 2, 3, 5 and 7. The timing of such payments will otherwise be in the discretion of the Reorganized Company; provided, however, that no such payments will be made if the Quarterly Funding Amount has become due and remains unpaid, and, if in the Reorganized Company's reasonable opinion, as a result of such payment, the Reorganized Company will not be able to fund the next Quarterly Funding Amount pursuant to the Plan.

### 5.1.4     Administrative Claims – Deadline for Requests for Payment.

Any request for allowance of an Administrative Claim other than Professional Fee Claims, the Kinkade-Windermere Post-Petition Claims and any Post-Petition Intercompany Claims (the latter two are deemed Allowed by the Plan), must be filed on or before the Administrative Claims Bar Date which is the date thirty (30) days following the Effective Date. If the holder of an Administrative Claim does not file and serve a request for payment of such Claim on or before the Administrative Claims Bar Date, the holder will be forever barred from asserting such Claim or

Case 10-55788   Doc# 362-5   Filed: 06/13/11   Entered: 06/13/11 17:00:13   Page 35 of 115

receiving any payment on account of such Claim. Any objection to the allowance of an Administrative Claim (excluding any Professional Fee Claims) shall be filed no later than the Administrative Claims Objection Deadline. If no objection to the applicable Administrative Claim is filed on or before that date, such Administrative Claim will be deemed Allowed as of that date. The foregoing is in full and final satisfaction of all Administrative Claims.

5.2 **Professional Fee Claims.**

    **5.2.1**    **Description.**

    Professional Fee Claims are Administrative Claims for the compensation and reimbursement of expenses asserted by a Professional employed in the Bankruptcy Case pursuant to Section 327 and 1103 of the Bankruptcy Code or an expense reimbursement claim by a Committee member, and incurred by such Professional or Committee member (to the extent Allowed under Section 328, 330, 331, or 503 of the Bankruptcy Code) through the Effective Date.

    **5.2.2**    **Professional Fee Claims – Treatment.**

    All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on Reorganized Company, the Committee, the United States Trustee and other parties as designated by the Bankruptcy Court or applicable rules no later than forty (40) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Bankruptcy Case, the Allowed Amounts of such Professional Fee Claims will be determined by the Bankruptcy Court and, once Allowed pursuant to entry of an order by the Bankruptcy Court, will be promptly paid by the Reorganized Company. Objections to Professional Fee Claims must be filed and served on the Reorganized Company, its counsel and the requesting party no later than seven (7) days prior to the hearing on the applications for compensation by the Professionals.

5.3 **Priority Tax Claims.**

    **5.3.1**    **Description.**

    Certain Claims by governmental units, primarily Priority Tax Claims, are entitled to priority over general Unsecured Claims pursuant to Section 507(a)(8) of the Bankruptcy Code. The Debtor's Schedule E identifies two scheduled debts of taxing authorities – one of the California State Board of

C:\...\Pacific\...\Pld\Plan\DS #362-5\DS (June 5 2011) v4.doc

Equalization (the "BOE") in the amount of $260,000, and one of the Tax Collector, Santa Clara County in the amount of $98,269.40, both of which were listed as disputed. On or about November 12, 2010, the BOE filed a proof of Claim in the total amount of $118,948.59, of which $68,760.70 is asserted as a Priority Claim and $50,187.89 is asserted as a general Unsecured Claim. No other Priority Tax Claims have been filed.[6]

### 5.3.2 Priority Tax Claims – Treatment.

Except to the extent that the holder of a particular Priority Tax Claim has agreed to a different treatment of such Claim, after payment in full of (a) all Allowed Secured Claims in Class 2, if any, or reservation otherwise for such Allowed Secured Claims, to the extent of the lien on the particular collateral underlying such lien, and (b) all Allowed Priority Claims, each holder of an Allowed Priority Tax Claim will receive directly from the Reorganized Company quarterly cash payments equal to the Allowed Amount of such Claim plus interest on such Allowed Claim at the rate of interest determined under applicable nonbankruptcy law pursuant to Section 511 of the Bankruptcy Code, from the Petition Date through the date of payment in full. Distributions on Allowed Priority Tax Claims will occur on the first Business Day following the expiration of each calendar quarter to coincide with the payments to the holders of Allowed Claims in Class 6. Allowed Priority Tax Claims will be paid in full by no later than five (5) years from the Petition Date. As an alternative to the foregoing treatment, the holder of an Allowed Priority Tax Claim may elect to receive within ninety (90) days following the Effective Date, directly from the Reorganized Company, a single cash payment representing thirty percent (30%) of its Allowed Priority Tax Claim in full and final satisfaction of its Allowed Priority Tax Claim. Such election must be made by the holder of a Priority Tax Claim and filed with the Bankruptcy Court and served on the Debtor and its counsel at the addresses indicated at Section XV-L of the Plan no later than the date of the Confirmation Hearing. The foregoing is in full and final satisfaction of all Priority Tax Claims.

///

---

[6] The County of Los Angeles Tax Collector filed a proof of Claim asserting a Secured Claim in the amount of $8,784.52 which, to the extent it is determined to be an Allowed Secured Claim, will be afforded treatment in Class 2. The Franchise Tax Board filed a proof of Claim based on penalties for the Debtor's alleged failure to file a tax return. Because this claim is asserted as a general Unsecured Claim, it is not included as a Tax Claim and will be afforded treatment under Class 6.

5.4 **Allowed LPA Properties Claim.**

    **5.4.1**     **Description (Class 1 Under the Plan).**

        Class 1 consists of the Allowed LPA Properties Claim. The LPA Properties Claim is deemed an Allowed Secured Claim by the Plan in the amount of $4,168,850, together with all accrued post-petition interest under the LPA Properties Pre-Petition Secured Credit Facility, in accordance with the LPA Properties Pre-Petition Secured Credit Facility and the Cash Collateral Order, together with any amounts borrowed from LPA Properties pursuant to the LPA Properties Post-Effective Date Secured Credit Facility, plus all reasonable attorneys' fees pursuant to the LPA Properties Pre-Petition Secured Credit Facility, Section 506(b) of the Bankruptcy Code, and the LPA Properties Post-Effective Date Secured Credit Facility.

    **5.4.2**     **Allowed LPA Properties Claim – Treatment.**

        Pursuant to Section 1129(b)(2)(A)(i) of the Bankruptcy Code, LPA Properties will retain all liens, security interests and other encumbrances affecting property of the Debtor or the Reorganized Company granted in favor of LPA Properties (or its predecessors) prior to the Effective Date, including those in the Cash Collateral Order, with respect to the LPA Properties Claim to the extent of the Allowed Secured Claim of LPA Properties.

        Pursuant to the agreement of LPA Properties, subject to Confirmation of the Plan and the Effective Date of the Plan, LPA Properties' first priority security interest in only the Plan Agent Collateral will be subordinate to the security interest granted to the Plan Agent for the benefit of the holders of Allowed Claims in Class 6 pursuant to Section VI-D of the Plan (discussed at Section 6.5 below). Such subordination is expressly limited only to LPA Properties' security interest in the Plan Agent Collateral and will not affect any of LPA Properties' other first priority security interests in the assets of the Debtor and the Reorganized Company or the LPA Properties Claim secured thereby.

        The LPA Properties Claim is deemed Allowed by the Plan. The Allowed Secured Claim of LPA Properties will be fully amortized over a period of five (5) years from the Effective Date of the Plan with interest to accrue from the Effective Date at the Plan Interest Rate. In the event of any borrowing under the LPA Properties Post-Effective Date Secured Credit Facility, the amount of the Allowed LPA Properties Claim and the amortization schedule will be modified to include such

additional sums owing to LPA Properties, provided that the period of payment of five (5) years from the Effective Date will remain unchanged. The Reorganized Company will pay LPA Properties amortized principal and accrued interest in quarterly cash payments with the first payment to be due on the first Business Day following the expiration of a full calendar quarter following the Effective Date, or as soon thereafter as practicable. Subsequent payments will be due on the first Business Day immediately following each calendar year quarter thereafter (i.e., payment for the third quarter will be due on October 1, payment for the fourth quarter will be due on January 1, payment for the first quarter will be due on April 1, payment for the second quarter will be due on July 1, etc.).

Notwithstanding anything in the Plan to the contrary, LPA Properties will not receive any quarterly Distribution on account of the LPA Properties Claim, and such Distribution will be deferred, if the Reorganized Company has not first fully funded and delivered to the Plan Agent any Quarterly Funding Amount as required by Section VI-E-2 of the Plan (such deferred Distribution is defined in the Plan as the "Deferred LPA Distribution"). A Deferred LPA Distribution will be paid by the Reorganized Company on the next quarterly payment date on which there are sufficient funds to pay the Deferred LPA Distribution; provided, however, that the Reorganized Company has first fully funded and delivered to the Plan Agent the Quarterly Funding Amount as required by Section VI-E-2 of the Plan (discussed below at Section 6.7.2). No Deferred LPA Distribution will extend the five (5) year amortization period of the LPA Properties Claim. Upon the full payment of the LPA Properties Claim and the termination of the LPA Properties Post-Effective Date Secured Credit Facility, any and all liens, security interests and other encumbrances affecting property of the Debtor or the Reorganized Company granted in favor of LPA Properties will be deemed discharged. The foregoing is in full and final satisfaction of the LPA Properties Claim.

CLASS 1 IS IMPAIRED, AND THE HOLDER OF ALLOWED CLAIMS IN CLASS 1 IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

/ / /

/ / /

/ / /

/ / /

5.5 **Other Secured Claims (other than LPA Properties).**

    5.5.1     **Description (Class 2 Under the Plan).**

Class 2 consists of any other holders of Secured Claims[7] (each of which will be in its own sub-class under Class 2), other than the Secured Claim in Class 1. As discussed above at Section 4.4.1, as of the Petition Date, several parties filed protective UCC-1 financing statements against the Debtor. The Debtor does not believe any of these parties hold valid liens against the property of the Estate. The Debtor presently is investigating the alleged lien asserted by L.A. County. To the extent that any remaining valid liens exist, the Debtor anticipates that it will contact each purported lien holder to obtain a consensual release or to resolve each matter otherwise. If necessary, the Debtor or Reorganized Company will file complaints to determine the validity, priority or extent of each such lien and/or to avoid each such lien. Each such complaint would represent a Retained Claim as set forth at Article X of the Plan.

With the exception of the LPA Properties Claim and the Disputed Claim of L.A. County, no proofs of Claim have been filed which assert secured status. In any event, all Class 2 Claims are subject to verification and, if appropriate, may be disputed by the Debtor.

    5.5.2     **Other Secured Claims – Treatment.**

The legal, equitable and contractual rights of holders of Allowed Class 2 Secured Claims, including the retention of any lien to the extent not avoidable, remains unaltered. Each holder of an Allowed Class 2 Secured Claim, to the extent there are any such Allowed Class 2 Secured Claims, will receive on the Effective Date, at the Reorganized Company's option: (a) cash in an amount equal to the Allowed Secured Claim; (b) the net proceeds from the sale of its collateral at the time of such sale or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and to the same extent, priority and validity of the lien securing such Allowed Claim; (c) the return of its collateral; or (d) such other less favorable treatment as may be agreed to by the Reorganized Company and the holder of such Allowed Secured Claim. Any Allowed Claim held by the holder of

---

[7] A Claim is a Secured Claim only to the extent of the value of the holder's interest in the Estate's interest in the collateral securing the Claim or to the extent of the amount subject to setoff, as applicable, as determined by the Bankruptcy Court under sections 506(a), 553, and/or 1129(b)(2)(A) of the Bankruptcy Code, as applicable.

such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated in Class 6.

CLASS 2 IS UNIMPAIRED, AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 2 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

5.6    **Priority Claims.**

      5.6.1    **Description (Class 3 under the Plan).**

Class 3 consists of Claims entitled to priority pursuant to Sections 507(a)(1) through (a)(7) of the Bankruptcy Code, with the exception of any Administrative Claims and Current Employee Vacation Claims.  The Debtor believes that Class 3 is comprised of certain Claims of employees or independent contractors, incurred in the months prior to the commencement of the Bankruptcy Case, which may be entitled to priority under Section 507(a)(4) of the Bankruptcy Code.  Pursuant to the Plan, Kinkade holds an Allowed Priority Claim in the amount of $769.23 which is included in Class 3.  The holders of Timely Filed Former Management Claims will also be afforded treatment in Class 3 to the extent of any Allowed priority amount of such Claims.

The Debtor's Schedules include employee Claims based on accrued vacation of approximately $105,000 as of the Petition Date.[8]  Priority Claims filed in the Bankruptcy Case approximate $76,000, the majority of which were filed by the Company's employees.

Pursuant to the Court's ORDER AUTHORIZING DEBTOR TO HONOR PRE-PETITION WAGES AND EMPLOYEE OBLIGATIONS entered on June 15, 2010 (the "Employee Wage Order"), the Court authorized the Debtor to pay outstanding pre-petition salaries, wages, and business expenses, and to honor paid time off and any other outstanding employee obligations.  Consequently, the Debtor allowed its employees to continue to use accrued vacation in the ordinary course of its business.  As such, those employees which currently are employed by the Debtor are afforded treatment under Class 4, Current Employee Vacation Claims.

In addition to employee Priority Claims, IBM Credit filed a proof of Claim asserting priority status in the amount of $3,957.91 which appears to be based on amounts incurred post-petition under

---

[8] Some of the holders of these scheduled debts may be Creditors holding Class 4 Current Employee Vacation Claims, discussed below.

an equipment lease. The Debtor contends that this Claim is improper and is not entitled to treatment as a Priority Claim. However, if IBM Credit's Claim is Allowed as a Priority Claim, then it will be afforded treatment in Class 3.

### 5.6.2     Priority Claims – Treatment.

Except to the extent that the holder of a particular Allowed Priority Claim has agreed to a less favorable treatment of such Claim, each holder of an Allowed Priority Claim will be paid in cash in full upon the later of: (a) the Effective Date; or (b) if such Claim is initially a Disputed Claim, when and if it becomes an Allowed Claim. To the extent the holder of an Allowed Priority Claim also holds an Allowed Claim in excess of the amount of its Allowed Priority Claim, such excess will be treated as an Unsecured Claim in Class 6. The foregoing is in full and final satisfaction of all Class 3 Priority Claims.

CLASS 3 IS UNIMPAIRED, AND THE HOLDERS OF ALLOWED PRIORITY CLAIMS IN CLASS 3 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

### 5.7    Class 4 (Current Employee Vacation Claims).

### 5.7.1     Description (Class 4 under the Plan).

Class 4 consists of the Current Employee Vacation Claims which are Claims held by current employees of the Debtor for vacation or paid time off, accrued before or after the Petition Date but unpaid as of the Effective Date. Current Employee Vacation Claims do not include the Timely Filed Former Management Claims (which are afforded treatment in Class 6 discussed below).

As discussed above, the Employee Wage Order authorized the Debtor to honor vacation and other outstanding employee obligations up to the priority amount of $11,725 per employee. Accordingly, employees who remained with the Debtor have used vacation or paid time off, and the Debtor has honored it in the ordinary course. The Debtor estimates that the total of accrued vacation and/or paid time off of current employees amounts to $40,000.

### 5.7.2     Current Employee Vacation Claims – Treatment.

The Reorganized Company shall, on the Effective Date, or as soon thereafter as practicable, credit each holder of an Allowed Current Employee Vacation Claim with accrued vacation in an

amount equal to the Allowed Current Employee Vacation Claim. After the Effective Date, a holder of an Allowed Current Employee Vacation Claim will be entitled to use the vacation credited to such holder under Section V-B of the Plan in the ordinary course of business and in a manner consistent with the employment policies of the Reorganized Company and will have all of the rights provided by applicable law with respect to accrued vacation. Persons whose employment with the Debtor is terminated will receive at termination payment in full of the remaining amount owing on the Allowed Current Employee Vacation Claim. Payment upon termination will include the full amount owing to the particular employee, regardless of whether the balance owing is a Priority Claim or a general Unsecured Claim. This could allow a terminated employee to receive payment on a general Unsecured Claim sooner than other general unsecured Creditors. However, any amount owing is anticipated by the Debtor to be inconsequential.

CLASS 4 IS IMPAIRED, AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 4 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

5.8    **Administrative Convenience Claims.**

   **5.8.1    Description (Class 5 Under the Plan).**

Class 5 consists of Timely Filed Unsecured Claims of $2,000 or less whose holders elect on their Ballot to accept treatment pursuant to Class 5 under the Plan, and Timely Filed Unsecured Claims of greater than $2,000 whose holders elect on their Ballot to accept treatment pursuant to Class 5 under the Plan and agree to reduce their respective Allowed Unsecured Claims to $2,000.

A preliminary review of the Debtor's books and records and the filed Claims in the Bankruptcy Case indicate that the total number of Claims in the amount of $2,000 or less is approximately 80, and the aggregate amount of such Claims is approximately $50,000. Consequently, the estimated net Distribution thereon is estimated to be a maximum of $37,500 (i.e., approximately 75% of the aggregate), absent objections to such Claims. The cash required for Distribution to Class 5 may be higher based on Creditors with Claims in excess of $2,000 who elect treatment in Class 5.

   **5.8.2    Administrative Convenience Claims – Treatment**

As soon as reasonably practicable following the expiration of the Administrative Claims Bar

Date, each holder of a Class 5 Allowed Administrative Convenience Claim will receive directly from the Reorganized Company a single cash payment in the amount of 75% of its Allowed Claim, not to exceed $1,500, which payment will be in full and final satisfaction of each respective Class 5 Claim.  If at the time Distributions are made to Class 5, a holder of a Class 5 Claim is a Disputed Claim, payment on the Claim will be deferred pending resolution of the objection to the Claim as discussed at Section 6.19.8 below.

CLASS 5 IS IMPAIRED; HOWEVER, CREDITORS WHO ELECT TREATMENT IN CLASS 5 ARE DEEMED TO ACCEPT THE PLAN.

5.9    **Timely Filed Unsecured Claims (Excluding Creditors Electing Administrative Convenience Option Provided by Class 5 and Early Cash-Out Option Provided by Class 7).**

### 5.9.1    Description (Class 6 under the Plan).

Class 6 consists of Timely Filed Unsecured Claims not included or provided for in any other Class, including all Rejection Claims and all Unsecured Claims of vendors and trade Creditors for goods delivered or services provided to the Debtor prior to the Petition Date, and excludes Claims whose holders elect treatment under Classes 5 or 7.  A holder of an Allowed Class 6 Timely Filed Unsecured Claim will receive the treatment provided in Class 6 described below unless such holder elects to receive the treatment provided in Class 5 described above or Class 7 described further below.  The total amount of Timely Filed Unsecured Claims, excluding the Kinkade Pre-Petition Claims and the Windermere Pre-Petition Claims, listed in the Debtor's Schedules is approximately $8 million.  The total amount of general Unsecured Claims filed by the Claims Bar Date is approximately $21 million, although this amount includes duplicate Claims and Claims which the Debtor believes are either invalid or overstated (see discussion at Section 4.4.2 above).  The Debtor believes the total amount of Allowed Timely Filed Unsecured Claims in Class 6 will, after all objections have been resolved, approximate between $10 to $12 million.

### 5.9.2    Timely Filed Unsecured Claims Excluding Creditors Electing Administrative Convenience Option and Early Cash-Out Option – Treatment.

A holder of an Allowed Class 6 Timely Filed Unsecured Claim will be paid in full, in equal quarterly installments, as practicable, by the Plan Agent over a period of six (6) years.  In addition,

Case 10-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11 18:07:19    Page 44 of 115
Pacific\AB567188\Pld\Plan\DS\Disclosure-5\11\wl

each holder of an Allowed Class 6 Claim will receive with each quarterly Distribution by the Plan Agent interest at the Plan Interest Rate on such Allowed Claim from the Effective Date through the date of payment in full. As defined in the Plan, the Plan Interest Rate will be the three (3) month London Interbank Offered Rate ("LIBOR") plus a fixed margin or "spread," which shall be the difference between LIBOR in effect as of the Effective Date and four percent (4%). The Plan Interest Rate will be initially determined as of the Effective Date and then adjusted each calendar quarter following the Effective Date to a rate equal to LIBOR in effect on the fifteenth (15th) calendar day prior to each calendar quarter plus the initial spread set on the Effective Date.

Distributions will occur on the first Business Day following the expiration of each calendar quarter, or as soon thereafter as reasonably practicable, in the amount specified in the Quarterly Distribution Report (i.e., the report provided by the Reorganized Company to the Plan Agent on a quarterly basis, as defined in the Plan). The first Distribution will occur following the expiration of a full calendar quarter following the Effective Date (i.e., the first Distribution will not occur earlier than ninety (90) days following the Effective Date).

The Hazelwood-Spinello Claim is Allowed by the Plan and afforded treatment under Class 6; provided, however, that such Allowed Claim shall be reduced by amounts collected from any co-debtor not already reflected in the original proof of Claim (designated as Claim number 64 by the Claims Agent). With respect to Distributions to the holder of the Allowed Hazelwood-Spinello Claim, payment(s) by the Plan Agent will be made to the payee(s) as ordered by the Bankruptcy Court unless otherwise agreed in writing by the holder of the Hazelwood-Spinello Claim and the holder of the Yatooma Claim. Prior to the Effective Date, the Debtor will file an objection seeking to disallow the Yatooma Claim in its entirety. The holder of the Hazelwood-Spinello Claim has agreed to support the Debtor's objection to the Yatooma Claim.

As of the Effective Date, the Reorganized Company stipulates to relief from the automatic stay to allow the White-Lighthouse Action to proceed before the United States Court of Appeals for the Sixth Circuit.

No payments will be made to the holders of Allowed Class 6 Timely Filed Unsecured Claims prior to the Administrative Claims Bar Date or the Rejection Claims Bar Date. The foregoing is in

full and final satisfaction of all Class 6 Claims.

CLASS 6 IS IMPAIRED, AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 6 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

5.10 **Class 7 Timely Filed Unsecured Claims (Creditors Electing Early Cash-Out Option).**

    **5.10.1**    **Description (Class 7 under the Plan).**

Class 7 consists of Unsecured Claims whose holders expressly elect treatment under Class 7 on their Ballots.

    **5.10.2**    **Class 7 Timely Filed Unsecured Claims (Creditors Electing Early Cash-Out Option).**

As an alternative to the treatment provided to Class 6 Timely Filed Unsecured Claims, a Creditor holding a Class 6 Unsecured Claim may elect to receive, within ninety (90) days following the Effective Date, or as soon thereafter as reasonably practicable, a single cash payment from the Reorganized Company representing thirty percent (30%) of its Allowed Claim in full and final satisfaction of its Allowed Claim. Due to the early cash-out afforded Creditors electing treatment in Class 7, no post-petition interest will be included. Except as provided at Section VII-G of the Plan (discussed at Section 6.18.7 below) which allows for holders of Rejection Claims to elect treatment in Class 7, the election to be included in Class 7 shall be made by marking the appropriate box on the Ballot. An election by a Class 6 Creditor to have its Allowed Claim treated in Class 7 shall constitute an acceptance of the Plan. If at the time Distributions are made to Class 7, a Class 7 Claim is a Disputed Claim, payment on the Claim will be deferred pending resolution of the objection to the Claim as described at Section 6.19.8 below.

No payments will be made to the holders of Allowed Class 7 Timely Filed Unsecured Claims prior to the Administrative Claims Bar Date. The foregoing is in full and final satisfaction of all Class 7 Claims.

CLASS 7 IS IMPAIRED; HOWEVER, CREDITORS WHO ELECT TREATMENT IN CLASS 7 ARE DEEMED TO ACCEPT THE PLAN.

/ / /

/ / /

5.11 **Allowed Kinkade Pre-Petition Claims, Allowed Windermere Pre-Petition Claims and Allowed Pre-Petition Intercompany Claims.**

    5.11.1    **Description (Class 8 under the Plan).**

Class 8 consists of the Allowed Kinkade Pre-Petition Claims, the Allowed Windermere Pre-Petition Claims and the Allowed Pre-Petition Intercompany Claims as set forth below.

<u>Kinkade:</u> (a) the Allowed Priority Claim of Kinkade in the amount of $769.23 for unpaid wages; (b) the Allowed Claim of Kinkade in the amount of $1,089,265.34 on account of an unsecured promissory note dated January 29, 2004 in the principal amount of $1 million, plus accrued interest to the Petition Date; and (c) the Allowed Claim of Thomas Kinkade dba TK Fine Art scheduled in the amount of $401,552.75.

<u>Windermere:</u> (a) The Allowed Claim of Windermere in the amount of $6,744,707 for unpaid pre-petition royalties and related charges; and (b) the Allowed Claim of Windermere scheduled in the amount of $425,000.

In addition to the foregoing, Pre-Petition Intercompany Claims include: (a) the scheduled debt of Nanette Kinkade in the amount of $192.31; and (b) Claims against the Debtor pursuant to a certain sharing agreement by and among the Debtor and Lightpost, Windermere and Morning Glory.

Class 8 does not include the LPA Properties Claim, the Kinkade-Windermere Post-Petition Claims, and the amount of any Priority Claim in Class 3. All Claims in Class 8 are deemed Allowed by the Plan; however, the holders of Claims in Class 8 have agreed to defer payment on such Claims on the terms set forth below.

    5.11.2    **Allowed Kinkade Pre-Petition Claims, Allowed Windermere Pre-Petition Claims and Allowed Pre-Petition Intercompany Claims – Treatment.**

The Kinkade Pre-Petition Claims, the Windermere Pre-Petition Claims and any Pre-Petition Intercompany Claims are deemed Allowed by the Plan. The Allowed Kinkade Pre-Petition Claims, the Allowed Windermere Pre-Petition Claims and any Pre-Petition Intercompany Claims will receive the following treatment: At such time as all Class 1, 2, 3, 5, 6 and 7 Claims and Allowed Priority Tax Claims have been paid (or reserved for) in full with interest as provided in the Plan, each holder of an Allowed Class 8 Claim shall be paid in full, in cash, in a single lump sum

payment, including accrued interest at the Plan Interest Rate on such Allowed Claim from the Effective Date through the date of payment. The foregoing is in full and final satisfaction of all Class 8 Claims.

CLASS 8 IS IMPAIRED, AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 8 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

5.12    **Interests (Ownership of Interests in the Debtor).**

    **5.12.1    Description (Class 9 under the Plan).**

Class 9 includes Windermere who is the sole holder of an Interest in the Debtor and therefore is the sole member of Class 9.

    **5.12.2    Holder of Interests (Ownership of Interests in the Debtor) – Treatment.**

The Interest of Windermere is deemed an Allowed Interest by the Plan and is unaltered.

CLASS 9 IS UNIMPAIRED AND THE HOLDER OF ALLOWED INTERESTS IN CLASS 9 IS CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

**ARTICLE VI.**

**IMPLEMENTATION OF THE PLAN.**

6.1    **Company Roadmap.**

To secure the survival of the Company and ensure viability in the future, the Debtor will exit Chapter 11 as follows:

    a.    As further discussed at Section 6.7.1 below, to fund the payments contemplated by the Plan, the Reorganized Company will use cash on hand and revenue from its continuing business operations and will have access to the LPA Properties Post-Effective Date Secured Credit Facility. Kinkade's continued involvement with the Reorganized Company is essential to the successful implementation and performance of the Plan. Without Kinkade's continued involvement, the Reorganized Company would have no use of intellectual property with which to create and sell product, and would not be able to continue business operations and generate revenue to make payments under the Plan. Accordingly, the most important feature of the Plan is the New License Agreement between the Reorganized Company and Windermere to become

effective as of the Effective Date (see discussion at Section 6.3 below).   With the New License Agreement, the Reorganized Company will continue its historical business of publishing limited and open edition paper and canvas prints of Kinkade's artwork.  The Reorganized Company will market, promote, distribute, and sell the prints through approximately 650 independently owned and operated retail locations that are currently wholesale customers of the Debtor's products.  The Reorganized Company also will sell product through (i) retail sites owned by the Debtor's subsidiary, Pacific Metro Retail, Inc. (currently located at Ketchikan, Alaska, Fort Worth, Texas and Carmel, California), (ii) the Reorganized Company's website, (iii) ShopNBC, QVC and other direct to consumer media, and (iv) special accounts and specialized distribution channels (e.g., sales on cruise ships).

          b.      For several months prior to the commencement of the Bankruptcy Case and since the Petition Date, the Debtor has taken a number of actions to reduce its cost structure.  The Debtor has outsourced production of some of its products to less expensive production sources, and it has relocated its own production facilities and reduced the size of its non-production facilities to better align its cost structure with forecasted revenues.  In addition, the Debtor eliminated a layer of senior management, reduced employee headcount, and consolidated roles and responsibilities across the organization.  With these actions, the Debtor's monthly breakeven point has been reduced from approximately $1.7 million (in the fourth quarter of 2009) to approximately $850,000 currently.

        In the nine (9) months since August 2010, the Debtor realized the following operating profits:

| | |
|---|---:|
| August  2010 | $   164,000 |
| September 2010 | $   110,000 |
| October 2010 | $   214,000 |
| November 2010 | $   367,000 |
| December 2010 | $   225,000 |
| January 2011 | $     13,000 |
| February 2011 | $  (257,000) |
| March 2011 | $     37,000 |
| April 2011 | $   313,000 |

        Although the Reorganized Company will continue to explore opportunities for further

outsourcing, employee headcount reduction and facilities space reduction, the successful implementation of the Plan is not contingent on the availability or implementation of such opportunities.

        c.     The Debtor has been in business for over fifteen (15) years and has operated with its current business model for at least the last nine (9) years, as revised and improved over the last nine (9) months. Accordingly, except for the cost reduction efforts which the Debtor has achieved over the last year, no further changes to the Reorganized Company's business are required for successful implementation of the Plan. That is, although the Reorganized Company may continue to improve operations, seek to introduce new products or a diversification of product offerings, seek new business partners, or diversify its current distribution channel, those initiatives are not required for successful implementation of the Plan. In that sense, the implementation of the Plan only requires securing a new license for Kinkade's artwork from Windermere, Kinkade's continued involvement with the Reorganized Company, and prudent management of the Debtor's current business. The agreement by Kinkade and Windermere to defer significant pre- and post-petition payments pursuant to the Plan is also a significant component of the Plan to allow Creditors to be paid in full sooner than would occur in the absence of such deferrals.

        d.     Based on the projected image release schedule of approximately eight (8) images per year, and the other assumptions contained in the projections set forth in **Exhibit "C"** hereto (the "Projections"), the Reorganized Company estimates that it will generate $14.0 million in net revenues and $1.2 million in after tax profits in 2011. The Projections assume that each new image released will generate between $200,000 and $800,000 (depending on image content), which is consistent with historical sales. The Projections assume a modest growth in revenue of 5.9%, 2.5%, 3%, 3% and 3% in 2012, 2013, 2014, 2015 and 2016, respectively. Accordingly, the Projections show profitability of $2.4 million (2012), $2.5 million (2013), $2.7 million (2014), $2.9 million (2015) and $3.2 million (2016). Assuming all Allowed Unsecured Claims equal $10 million, the required quarterly payments under the Plan would be between $420,000 and $490,000. If revenue and after tax profits are consistent with the Projections, the Reorganized Company will be able to make such payments and have available working capital necessary to fund operations. The

th
Pacific\A0067188\Doc#362-5\Pld\Plan.DS...June 2011\vrd/date
43   DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION DATED JUNE 13, 2011

Projections and the assumptions on which they are based are discussed in greater detail below at Article XVIII.

6.2 **Operations of Reorganized Company.**

Upon the Effective Date of the Plan, the Debtor will become the Reorganized Company. The Reorganized Company will continue to operate its business in the ordinary course and may obtain credit, issue member interests, incur debt, grant security interests and liens, and otherwise acquire and dispose of assets pursuant to applicable corporate law, except as prohibited by the LPA Properties New Loan And Security Documents, the Security Agreement and the Plan. The Reorganized Company will be free of any restriction imposed by the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules or the Local Rules, other than the obligations set forth in the Plan.

On and after the Effective Date, the Reorganized Company may continue to sell Inventory in the ordinary course of business.

Commencing following the expiration of a full calendar month after the Effective Date and each month thereafter until the holders of Allowed Claims in Class 6 have been paid in full pursuant to the Plan, the Reorganized Company will provide a Monthly Inventory Report to the Plan Agent so that such report is actually received by the Plan Agent no later than fifteen (15) calendar days following the end of the prior month.

The Plan provides for the Reorganized Company to share the proceeds from the sale of its Existing Inventory to fund Distributions to Plan Agent Account Distribution Beneficiaries subsequent to the occurrence of an Inventory Sale Trigger Event which is (until such time as the holders of Allowed Unsecured Claims in Class 6 have been paid in full with interest as provided in the Plan) the sale of more than $7.5 million of Existing Inventory. In the event an Inventory Sale Trigger Event occurs, no later than thirty (30) days after the close of the month in which such Inventory Sale Trigger Event occurs, the Reorganized Company will deliver to the Plan Agent: (a) written notification that an Inventory Sale Trigger Event has occurred, together with a calculation of how such Inventory Sale Trigger Event was determined; and (b) the Inventory Proceeds. Inventory Proceeds will be deposited in the Plan Agent Account for Distribution to the Plan Agent Account

Distribution Beneficiaries in accordance with the Plan.  Any such deposit will not affect the quarterly funding obligation of the Reorganized Company under the Plan.  The payment to the Plan Agent of any Inventory Proceeds will be in addition to the Reorganized Company's continuing obligations to deliver to the Plan Agent all other payments provided for in the Plan in an amount up to, but not exceeding, the amount necessary to provide payment in full of all Allowed Unsecured Claims, plus interest at the Plan Interest Rate and the Plan Agent's expenses.

6.3     **New License Agreement.**

On the Effective Date, the Reorganized Company and Windermere will enter into the New License Agreement.  The Reorganized Company's right to use the intellectual property of Windermere (and any assignee) will be subject in all respects to the terms and conditions of the New License Agreement.

The material terms of the New License Agreement are summarized on **Exhibit "B"** attached hereto and incorporated herein by reference, but are qualified in their entirety by the actual terms of the New License Agreement itself.

Concurrently with the execution of the New License Agreement, Windermere will enter into a new license with Kinkade, ensuring that Windermere has the rights necessary to perform the New License Agreement.  The New License Agreement will include provision for a limited license to the Plan Agent pursuant to Section VI-D of the Plan.

6.4     **Replacement of the LPA Properties Pre-Petition Secured Credit Facility.**

As of the Effective Date, as between LPA Properties and the Debtor, the LPA Properties Pre-Petition Secured Credit Facility and the Cash Collateral Order will be replaced in their entirety, superseded and henceforth governed by the LPA Properties New Loan And Security Documents. The purpose of the LPA Properties New Loan And Security Documents is to replace the terms that governed the LPA Properties Pre-Petition Secured Credit Facility to avoid the Debtor triggering a default thereunder on the Effective Date.  For the avoidance of doubt, although the documents governing the Debtor's pre-petition debt are changing, the underlying debt amount remains the same and is payable as part of the LPA Properties Claim.

The LPA Properties New Loan And Security Documents differ from the LPA Properties Pre-

Petition Secured Credit Facility in a number of respects, including the following terms: (1) payment of interest and principal is amortized over a five (5)-year period, with such five (5)-year period commencing on the Effective Date and with payments to occur quarterly; (2) interest accrues at the Plan Interest Rate; and (3) LPA Properties' first priority security interest in the Plan Agent Collateral, but not any other part of LPA Properties' collateral, is subordinated to the security interest granted to the Plan Agent pursuant to the Plan as described below at Section 6.5. Pursuant to the LPA Properties New Loan And Security Documents, any and all "Defaults" and/or "Events of Default," as such terms are defined in the LPA Properties Pre-Petition Secured Credit Facility, breaches and/or violation of any provisions of the LPA Properties Pre-Petition Secured Credit Facility that arose, occurred or accrued with regard to the Debtor under the LPA Properties Pre-Petition Secured Credit Facility prior to the Effective Date are waived in their entirety by LPA Properties, its successors and assigns. Following the Effective Date, unless there is a default under the Plan, LPA Properties shall not take any action to enforce any of the remaining terms of the LPA Pre-Petition Secured Credit Facility as to the Reorganized Company until such time as the Allowed Unsecured Claims are paid in full or as otherwise provided for under the Plan or agreed to by the parties.

6.5 **Grant of Security Interest in Inventory to Plan Agent for the Benefit of Holders of Allowed Unsecured Claims; Limited License to Liquidate Inventory.**

To secure the Reorganized Company's performance of the Plan, as of the Effective Date, the Reorganized Company will execute the Security Agreement granting a senior security interest in the Plan Agent Collateral to the Plan Agent, subject to the Reorganized Company's use in the ordinary course of business in the absence of a default in payments to holders of Allowed Unsecured Claims in Class 6 under the Plan. Among other terms and conditions agreed to by the Debtor and the Committee, the Security Agreement will provide the Plan Agent with (1) the right to all certificates of limitation associated with the limited edition pieces in the Inventory and auto pen rights to sell limited editions; provided, however, that the auto pen may only be used as specified in the certificate; and any right given to sell the Inventory will be subject to compliance with all certificates of limitation and all limited edition laws; and (2) an irrevocable license to sell the Inventory in the

event of a termination of the Plan (i.e., conversion to Chapter 7) or a breach of the Plan that is not cured following the expiration of ten (10) Business Days from the date written notice of the alleged breach is provided to the Notice Parties; provided, however, that such license will be limited to the then existing physical Inventory [i.e., no additional Inventory will be created thereafter (even if the certificates of limitation permit additional prints to be reproduced and sold), and in the event of a default under the Plan, the Reorganized Company and any parent, subsidiary or other affiliate shall have no continuing obligation to create new Inventory].  Any dispute regarding an alleged breach or the alleged cure thereof will be determined by the Bankruptcy Court on not less than ten (10) days' written notice to the Notice Parties.

The lien held by LPA Properties on the Plan Agent Collateral on account of the LPA Properties Pre-Petition Secured Credit Facility and the LPA Properties Post-Effective Date Secured Credit Facility will be subordinate to the lien on the Plan Agent Collateral granted to the Plan Agent pursuant to the Plan and the LPA Properties New Loan And Security Documents.  LPA Properties will retain its first priority lien on all of its other collateral to secure the LPA Properties Claim.  The Plan Agent will be authorized to file a UCC-1 financing statement or other evidence of the lien as may be reasonably requested by the Plan Agent; provided, however, that no itemized list of the Inventory will be published.  Upon the payment in full of all Allowed Claims in Classes 5, 6 and 7, any and all liens, security interests and other encumbrances affecting property of the Debtor or the Reorganized Company granted to the Plan Agent by the Plan will be deemed discharged.  The Reorganized Company will be authorized to file one or more termination statements to evidence extinguishment of the lien.

The Reorganized Company, at its sole expense, will obtain and maintain in full force at all times during which the Plan is in effect, Inventory Insurance covering the Inventory in amounts not less than 100% of the full replacement value of the Inventory.  The Inventory Insurance will (i) be issued by a carrier or carriers licensed to do business in the State of California and having a Best's Rating of not less than "A-" and a Best's Financial Size Category Rating of at least "X," as set forth in the most current addition of "Best's Insurance Reports," (ii) provide that the same may not be canceled or materially amended except on thirty (30) days' prior written notice to the Plan Agent

(except for nonpayment of premiums, in which event ten (10) days' notice of cancellation shall be required), and (iii) name the Plan Agent as an additional insured. The Reorganized Company will deliver to the Plan Agent a certificate or certificates of insurance evidencing the required Inventory Insurance. The Reorganized Company may change carriers in the ordinary course of business provided the coverage is comparable to or better than the coverage provided under the policies in effect on the Effective Date.

6.6 **Financial Information.**

The Debtor's monthly operating reports containing financial information are on file with the Bankruptcy Court and will be provided to Creditors and other parties in interest upon request. The Debtor will continue to file monthly operating reports with the Bankruptcy Court through the date of Court approval of the Plan. The Debtor's April MOR is **Exhibit "A"** hereto.

6.7 **Distributions.**

6.7.1 **Funding of the Plan.**

Funds to make the payments contemplated in the Plan will be derived from the following sources:

a. <u>Cash and Business Operations</u>. The Reorganized Company will use cash on hand and cash generated from the operations of the Reorganized Company to perform its obligations under the Plan.

b. <u>LPA Properties Post-Effective Date Secured Credit Facility</u>. Pursuant to the terms of the LPA Properties New Loan And Security Documents, LPA Properties will provide a credit facility to the Reorganized Company to provide the Reorganized Company with cash that may be needed to fund the Plan and business operations. The LPA Properties Post-Effective Date Secured Credit Facility will be in the form of the LPA Properties New Loan And Security Documents, the material terms of which are set forth in the term sheet attached as Exhibit "A" to the Plan. The LPA Properties New Loan And Security Documents provide, among other things, the following provisions: (1) on and after the Effective Date, LPA Properties will make available under a revolving credit facility to the Reorganized Company, up to $3,000,000 (including both principal and interest), which can be borrowed on an as needed basis based on the conditions provided in the

LPA Properties New Loan And Security Documents; (2) payment of principal and interest will be amortized over a five (5) year period, with such five (5) year period commencing on the Effective Date, with payments to occur quarterly as provided in Section V-A of the Plan; (3) interest will accrue at the Plan Interest Rate; (4) LPA Properties' first priority lien will be secured by all of the same collateral as the LPA Properties Pre-Petition Secured Credit Facility and such security is, and will continue to be, effective, fully perfected and unassailable without any new security agreement, UCC-1 filing or other instrument or action of any kind by the Debtor or LPA Properties; provided, however, that LPA Properties' lien on the Plan Agent Collateral will be subordinate to the security interest granted by the Reorganized Company to the Plan Agent (as described at Section 6.5 above) and the LPA Properties New Loan And Security Documents; and (5) any amounts borrowed from LPA Properties pursuant to the LPA Properties Post-Effective Date Secured Credit Facility will be added to the LPA Properties Claim and be treated as a Class 1 Claim.

For avoidance of doubt, the maximum borrowing amount of $3 million on the LPA Properties Post-Effective Date Secured Credit Facility will not serve as a cap or otherwise limit the right of the Reorganized Company to seek additional financing, whether from LPA Properties or other sources following Confirmation of the Plan, subject to Section VI-A of the Plan.

### 6.7.2    Funding of the Plan Agent Account.

The funding obligation of the Reorganized Company as described in Sections 6.7.2.1 and 6.7.2.2 below are collectively herein referred to (and defined in the Plan) as the "Quarterly Funding Amount."

### 6.7.2.1.    Initial Funding into Plan Agent Account.

The Reorganized Company will fund the Plan Agent Account to fund Distributions to the Plan Agent Account Distribution Beneficiaries as follows: (i) on or before the Effective Date, the sum of $750,000 cash; (ii) at least three (3) Business Days prior to the second full calendar quarter after the Effective Date, the sum of $250,000 cash; (iii) at least three (3) Business Days prior to the third full calendar quarter after the Effective Date, the sum of $500,000 cash; and (iv) at least three (3) Business Days prior to the fourth full calendar quarter after the Effective Date, the sum of $500,000 cash (collectively, the "Initial Funding" as defined in the Plan). Notwithstanding the

foregoing, if the Quarterly Distribution Report reflects a sum due to the holders of Allowed Claims and the undisputed portion of Disputed Claims in Class 6 that is greater than the amount funded by the Reorganized Company for that quarter, and the Plan Agent does not otherwise have enough funds in the Plan Agent Account to fund the quarterly Distribution due, the Reorganized Company will fund the excess required so that the Plan Agent can make the full quarterly Distribution due.

### 6.7.2.2. Subsequent Funding of Plan Agent Account.

At least three (3) Business Days prior to the fifth full calendar quarter after the Effective Date, and at least three (3) Business Days prior to the start of each quarter thereafter, the Reorganized Company will fund the Plan Agent Account in the amount reported in the Quarterly Distribution Report. Any excess funds held by the Plan Agent at the time of the first quarter following the Initial Funding will be used by the Plan Agent to offset the Reorganized Company's further funding obligations until depleted.

For any given calendar quarter in which earnings before deducting interest, taxes, depreciation and amortization (EBITDA) for such quarter exceeds by twenty percent (20%) or more the EBITDA for such quarter contained in the Projections, within forty-five (45) days following the end of such quarter, the Reorganized Company will deposit such excess amounts into the Plan Agent Account; provided, however, that any such excess amounts deposited into the Plan Agent Account will reduce the Reorganized Company's next Quarterly Funding Amount required under the Plan by the amount of the excess amount funded. For example, if the Reorganized Company transfers $100,000 in excess amounts to the Plan Agent, then the Reorganized Company's next Quarterly Funding Amount shall be reduced by $100,000.

The Quarterly Funding Amount will be adjusted for the final quarter (i.e., the 25th full calendar quarter following the Effective Date) in the amount required to allow the Plan Agent to make a final Distribution to all Allowed Unsecured Claims held by the Plan Agent Account Distribution Beneficiaries, plus interest at the Plan Interest Rate. To the extent any Claim by a Plan Agent Account Distribution Beneficiary remains disputed at such time, the Reorganized Company will fund the Plan Agent Account with the Allowed Amount of such Claim (together with accrued interest calculated at the Plan Interest Rate) within ten (10) Business Days of such Claim having

been Allowed.

Any dispute regarding the Quarterly Funding Amount will be resolved by the Bankruptcy Court on not less than ten (10) days' notice to the Notice Parties.

### 6.7.3 Plan Agent.

Pursuant to the Plan, the Plan Agent will be Diablo Management Group, Inc. Murray & Murray, the Debtor's bankruptcy counsel, has previously represented Diablo Management Group, Inc. and/or its chairman and founder Richard Couch, and currently represents and has previously represented entities in which they currently act and/or have previously acted as an officer, director, bankruptcy trustee, responsible person, consultant, assignee for the benefit of creditors and/or person in control, in matters wholly unrelated to this Bankruptcy Case.

The duties and obligations of the Plan Agent, and the terms and conditions of the employment of the Plan Agent, will be as set forth in the Plan Agent Agreement; provided, however, that if there are any inconsistencies between the Plan Agent Agreement and the Plan, the terms of the Plan shall control. The Plan Agent will have the power and authority to carry out its duties and functions under the Plan and the Plan Agent Agreement. The Plan Agent will be paid reasonable compensation by the Reorganized Company pursuant to the terms of the Plan Agent Agreement.

The Plan Agent shall make Distributions to the Plan Agent Account Distribution Beneficiaries in accordance with the terms of the Plan and the Plan Agent Agreement. The first Quarterly Distribution Report will be delivered by the Reorganized Company to the Plan Agent not later than ten (10) Business Days prior to the expiration of the first full calendar quarter following the Effective Date. Each subsequent Quarterly Distribution Report will be delivered to the Plan Agent not later than ten (10) Business Days prior to the expiration of each subsequent calendar quarter. In the event of an Inventory Sale Trigger Event, the Reorganized Company will include in the Quarterly Distribution Report for the next quarterly payment due to the Plan Agent Account Distribution Beneficiaries pursuant to the Plan, an additional column to identify the pro rata amount to be paid to each Plan Agent Account Distribution Beneficiary from the Inventory Proceeds, which will be in addition to the quarterly amount due under the Plan.

With the exception of the funding requirements expressly set forth in the Plan, the

Reorganized Company shall have no obligations to ensure payment of Distributions to the Plan Agent Account Distribution Beneficiaries, and the Plan Agent shall have sole responsibility to ensure that Distributions are timely made to the Plan Agent Account Distribution Beneficiaries. Any errors or delays by the Plan Agent shall not constitute a default by the Reorganized Company under the Plan. The Plan Agent shall hold all funds in the Plan Agent Account. All amounts paid by the Reorganized Company to the Plan Agent, including the Initial Funding, the Quarterly Funding Amount, and Inventory Proceeds, shall be used by the Plan Agent for the sole purpose of paying Allowed Claims pursuant to the amount specified in the Quarterly Distribution Report. Unless and until there is a default by the Reorganized Company under the Plan, none of the foregoing amounts may be retained by the Plan Agent for the purpose of funding anticipated litigation against the Debtor, the Reorganized Company, any affiliates of the Debtor and the Reorganized Company (including LPA Properties), Kinkade, or any of the Debtor's and the Reorganized Company's principals, lenders, agents, attorneys, professionals, management, owners, successors, or assigns.

### 6.7.4    Distributions.

All payments and Distributions provided by the Plan will be made directly by the Debtor or the Reorganized Company except for Distributions to the Plan Agent Account Distribution Beneficiaries who will receive Distributions from the Plan Agent as provided by the Plan.

### 6.7.5    Distribution Account.

If the Disbursing Agent is a Person other than the Reorganized Company (i.e., if a successor is appointed pursuant to Section VI-I of the Plan), the Disbursing Agent will hold any funds transmitted to it in a segregated interest bearing trust account for the benefit of holders of Allowed Claims.

### 6.7.6    Distribution Addresses; Undeliverable Distributions.

Unless a Creditor has provided the Reorganized Company with written notice of a different address, Distributions will be sent to Creditors at the address set forth in the proofs of Claim filed with the Claims Agent. If no proof of Claim is filed with respect to a particular Claim, the Distribution will be mailed to the address set forth in the Schedules filed by the Debtor. If any Creditor's Distribution is returned as undeliverable, no further Distributions to such Creditor will be

made unless and until the Reorganized Company is notified of such Creditor's then current address, at which time all required Distributions will be made to such Creditor. Undeliverable Distributions will be held by the Disbursing Agent or the Plan Agent, as applicable, until such Distributions are claimed; provided, however, that all claims for undeliverable Distributions must be made within ninety (90) days following a Distribution. After such date, all unclaimed Distributions will revert to the Reorganized Company (and the Plan Agent will return any such funds to the Reorganized Company within ten (10) Business Days thereof), and the Claim of any Creditor or successor to such Creditor with respect to such Distribution will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

### 6.7.7 <u>Withholding Taxes.</u>

Pursuant to Section 346(h) of the Bankruptcy Code, the Disbursing Agent and Plan Agent, as applicable, will deduct any federal, state or local withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate. The Disbursing Agent and the Plan Agent will be permitted to withhold a Distribution to any Creditor who has not provided information requested by the Disbursing Agent or the Plan Agent for the purpose of fulfilling its obligations hereunder. The Disbursing Agent and the Plan Agent will comply with all reporting obligations imposed on it by any governmental unit with respect to withholding and related taxes.

### 6.7.8 <u>Fractional Amounts.</u>

Notwithstanding anything contained herein to the contrary, neither the Reorganized Company nor the Plan Agent shall be required to make Distributions of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### 6.7.9 <u>De Minimis Distributions.</u>

Notwithstanding any other provision of the Plan, Distributions of less than $50.00 need not be made on account of any Allowed Claim; provided, however, that Distributions that would otherwise be made but for this provision will carry over to the next Distribution Date until the cumulative amount to which any holder of an Allowed Claim is entitled to is more than $50.00, at

which time the cumulative amount of such Distributions will be paid to such holder.

### 6.7.10    Time Bar to Cash Payments.

Checks issued on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Plan Agent or the Reorganized Company, as applicable, by the holder of the Allowed Claim to whom such check was originally issued. Any request for re-issuance in respect of such voided check shall be made on or before ninety (90) days after the date of the issuance of such check. After such date, all Claims with respect to any voided checks will be discharged and forever barred, and such funds will revert to the Reorganized Company.

### 6.7.11    Modification of Payment Terms.

At any time after the Effective Date, (a) the Reorganized Company may modify the treatment of any Class of Allowed Claims in a manner that is more favorable than provided by the Plan (e.g., the Reorganized Company may make more frequent payments to a Class or pay, or cause to be paid, all Classes sooner than contemplated by the Plan), provided that such treatment does not adversely impact the obligations of the Reorganized Company under the Plan; and (b) the Reorganized Company may modify the treatment of any Allowed Claim in any manner adverse to the holder of such Claim with the prior written consent of the holder whose Allowed Claim is being adversely effected. Notwithstanding the foregoing or anything in the Plan to the contrary, until such time as the holders of Claims in Class 6 and Tax Claims have been paid in full, with interest, as provided in the Plan, the Reorganized Company will not, under any circumstance, modify or alter the treatment of any Person or Entity in Classes 1, 2, 3, 4 or 8 in any manner that is more favorable than provided by the Plan.

## 6.8    Corporate Matters.

### 6.8.1    Articles of Organization/Operating Agreement.

As of the Effective Date and without any further action by the manager or member(s) of the Reorganized Company, the Debtor's Articles of Organization and Operating Agreement shall constitute the Articles of Organization and Operating Agreement of the Reorganized Company; provided, however, that, if required, such Articles of Organization and Operating Agreement shall be

amended as of the Effective Date to comply with the requirements of Section 1123(a)(6) of the Bankruptcy Code which requires, among other things, the inclusion in the Reorganized Company's charter of a prohibition of the issuance of non-voting securities and the distribution of voting power equitably among the classes of voting securities. After the Effective Date, the Reorganized Company may amend and restate its Articles of Organization and Operating Agreement as permitted by applicable law without further Bankruptcy Court approval.

### 6.8.2     Reorganized Company's Managers.

On the Effective Date and without any further action by the manager or member(s) of the Reorganized Company, the managers of the Reorganized Company will be Robert Murray, Frank Teruel and John Hasting. After the Effective Date, the Reorganized Company shall be entitled to hire, dismiss, appoint and replace its managers as permitted by the Articles of Organization and Operating Agreement of the Reorganized Company and applicable law without further Bankruptcy Court approval.

### 6.8.3     Authority of Reorganized Company.

On and after the Effective Date, the Reorganized Company will be appointed Estate representative and Disbursing Agent pursuant to the Bankruptcy Code and applicable Bankruptcy Rules. Except as provided below or by the Plan, the Reorganized Company, and by and through its managers and any designee(s), will be solely responsible for and have authority to: (a) make all Distributions required to be made by the Reorganized Company on or after the Effective Date to holders of Allowed Claims, excluding only those Distributions to be made by the Plan Agent to the Plan Agent Account Distribution Beneficiaries; (b) settle, resolve and object to Claims; (c) excluding only the Tolled Claims to be held by the Plan Agent pursuant to Section X-C of the Plan as described below at Section 7.3, commence suit on the Retained Claims, or, in its sole discretion, refer any Retained Claims against the holders of Timely Filed Former Management Claims to the Plan Agent; (d) pay all fees due under 28 U.S.C. § 1930; (e) file any post-confirmation reports required by the Plan or the Bankruptcy Court; (f) retain, employ and utilize such Professionals as may be necessary without further approval of the Bankruptcy Court; (g) sell or dispose of assets; (h) abandon property of the Estate that is determined to be burdensome or of inconsequential value; (i)

do all things necessary and appropriate to fulfill the duties and obligations of the Reorganized Company under the Plan and to fully administer the Bankruptcy Estate as required by the Plan, the Order of Confirmation, the Bankruptcy Code and the Bankruptcy Rules; and (j) move for the entry of a Final Decree and prepare and file any pleadings as may be required by the Bankruptcy Court in connection with the Final Decree and the closing of the Bankruptcy Case.

In addition, on the Effective Date, the Reorganized Company will be substituted as successor to the Debtor and its Estate in all actions, contested matters and adversary proceedings pending or thereafter commenced in the Bankruptcy Court with respect to Disputed Claims. The Reorganized Company will have no obligation to pursue any affirmative claims on behalf of the Debtor or its Estate, and any such claims (other than the Tolled Claims) may be abandoned or waived at the sole discretion of the Reorganized Company.

### 6.9    **Responsible Person.**

As set forth above, Robert Murray was appointed as the Responsible Person for the Debtor. Mr. Murray will remain the Responsible Person to administer the Plan. On the Effective Date, the Responsible Person or other Person authorized by the Reorganized Company shall be fully empowered to execute all documents, agreements and instruments implementing the Plan without further order of the Bankruptcy Court or further action by the managers or member(s) of the Reorganized Company. Any such document, agreement or instrument executed and delivered by the Responsible Person (or other Person authorized by the Reorganized Company) shall be conclusively deemed duly executed by the Reorganized Company without need for further corporate action or order of the Bankruptcy Court. After the Effective Date, the Responsible Person shall be entitled to act as the Estate representative for purposes of implementing and administering the Plan without need for further corporate action or order of the Bankruptcy Court.

Until the Bankruptcy Case is closed, the Responsible Person may resign at any time, or may be removed for cause upon motion by any party in interest to the Bankruptcy Court on not less than twenty-one (21) days' notice to the Notice Parties. In the event the Responsible Person voluntarily resigns prior to the date the Bankruptcy Case is closed, a new Responsible Person will be nominated by the existing Responsible Person or the Reorganized Company's managers with notice to be

provided pursuant to the Notice Procedure.  If pursuant to a timely-filed motion or request for hearing pursuant to the Notice procedure, the Bankruptcy Court enters a Final Order prior to the date the Bankruptcy Case is closed removing the Responsible Person, a new Responsible Person will be appointed by the Bankruptcy Court upon nomination by any party in interest, including the Reorganized Company, following notice to the Notice Parties.  If replaced as the Responsible Person, such Person shall turnover all of his or her books and records to the new Responsible Person. Any successor Responsible Person will be entitled to receive reasonable compensation.

### 6.10 **Employees.**

Presently, the Debtor has a staff of twenty-four (24) full-time employees across sales, customer service, assembly, and highlighting functions.  The Debtor has no employment agreements with any personnel, and all employment is "at will" employment.  The Debtor typically pays its employees on a bi-monthly basis, and it distributes payroll through checks.  Pursuant to the Plan, compensation will continue to be made to all employees at their regular, pre-petition salary rates.[9] Additionally, the Reorganized Company will continue to honor accrued paid time off in the ordinary course of business as provided above (see treatment of Class 4 at Section 5.7 above).  The Reorganized Company will honor all Benefit Plans in effect as of the Effective Date of the Plan, subject to the rights of the Reorganized Company to modify its Benefit Plans from time to time pursuant to applicable nonbankruptcy law as set forth at Section VI-K of the Plan.

### 6.11 **Disbursing Agent.**

The Disbursing Agent will be the Reorganized Company for all Distributions other than for Distributions to be made to the Plan Agent Account Distribution Beneficiaries by the Plan Agent pursuant to the Plan.  The Reorganized Company may appoint a successor Disbursing Agent at any time upon providing fifteen (15) days' notice to the Notice Parties.  In the absence of a timely objection by a Notice Party to the proposed Disbursing Agent within such fifteen (15) day period, the Reorganized Company may proceed with the appointment of the proposed Disbursing Agent. Any timely objection to the appointment of a Disbursing Agent shall be set for hearing before the Bankruptcy Court on no less than twenty-one (21) days' notice to the Notice Parties.  Any successor

---

[9] Some of the Debtor's employees have also filed Claims, including Priority Claims, in the Bankruptcy Case.

Disbursing Agent will be entitled to receive reasonable compensation. Unless otherwise ordered by the Bankruptcy Court, the Disbursing Agent will serve without a guaranty or fiduciary bond.

6.12 **Tax Returns, Payments and Refunds.**

The Reorganized Company shall file or cause to be filed any and all delinquent and final tax returns and pay any and all taxes owed by the Debtor and the Reorganized Company on a timely basis (other than taxes provided for under the Plan). The Reorganized Company reserves all rights to amend prior tax returns of the Debtor and to pursue and collect all potential tax refunds, to claim losses and to take such other actions to the fullest extent allowed by law to recover value.

6.13 **Post-Confirmation Employment of Personnel.**

The Reorganized Company and any Disbursing Agent may employ or contract with Persons and other Entities to perform, or advise and assist them in the performance of, their respective obligations under the Plan. The Reorganized Company may continue to employ the Debtor's Professionals for the purposes for which they were employed before the Confirmation Date, and for such additional purposes as the Reorganized Company may request, and the Reorganized Company may employ such other Professionals as may be necessary to perform its responsibilities under the Plan. The Plan Agent may employ Professionals pursuant to the terms of the Plan Agent Agreement; provided, however, that the Plan Agent may not employ any Professional currently or previously employed in the Bankruptcy Case.

6.14 **Post-Confirmation Compensation and Reimbursement of Plan Agent and Other Professionals.**

The Plan Agent, any Professionals employed by the Plan Agent pursuant to the terms of the Plan Agent Agreement, and all Professionals employed by the Reorganized Company after the Confirmation Date will be entitled to payment of their reasonable post-Effective Date fees and reimbursement of expenses on a monthly basis, subject to the following:

　　　　a. Until the Bankruptcy Case is closed, each party requesting payment of such compensation shall serve a detailed statement of requested fees and expenses on the Notice Parties.

　　　　b. Any Notice Party or other party in interest may object to any portion of the requested fees and expenses. Any objection to the payment of fees or reimbursement of expenses

shall be in writing (and sufficiently detailed to allow the party whose compensation is subject to the objection an opportunity to respond, and ultimately to allow the Bankruptcy Court to rule on such objection) and served on the Notice Parties and the party whose compensation is subject to the objection. Such an objection must be served within fifteen (15) days after service of the detailed statement.

c. If there is no objection to a party's requested fees and expenses within such fifteen (15) day period, the Reorganized Company shall promptly pay the requested amount in full. If an objection to a portion of the fees or expenses requested is timely served, the Reorganized Company shall promptly pay the undisputed portion of such fees and expenses.

d. To the extent that an objection is timely served, the Responsible Person shall reserve monies in the amount of the disputed fees and expenses pending resolution of said objection.

e. Any objection to a request will be resolved by either: (a) written agreement between the party requesting such fees and expenses and the objecting party; or (b) resolution of the disputed amount by the Bankruptcy Court pursuant to a Final Order. Resolution by the Bankruptcy Court shall be requested by motion filed and served on the Notice Parties in accordance with the Bankruptcy Rules and the Local Rules on not less than twenty-one (21) days' notice. Such motion may be filed by either the requesting party or the objecting party. Any opposition to the motion shall be filed and served no later than seven (7) days prior to the hearing.

f. The Plan Agent and its Professionals will not otherwise be required to file applications for Bankruptcy Court approval of post-Confirmation fees and expenses.

g. Following the closing of the Bankruptcy Case, (a) the Plan Agent and its Professionals will be entitled to payment pursuant to the terms of the Plan Agent Agreement; and (b) the Debtor's Professionals will be entitled to payment in the ordinary course upon the submission of an invoice to the Reorganized Company; provided, however, that any disputes will be determined by the Bankruptcy Court upon reopening the Bankruptcy Case.

6.15 **Post-Confirmation Notice.**

Whenever the Plan requires a Person to provide notice pursuant to the Notice Procedure, such Person seeking the particular relief shall be required to serve a written notice on the Notice

Parties (see Section VI-O of the Plan). Creditors wishing to be included as a Notice Party after the Confirmation Hearing must file with the Bankruptcy Court and serve on the Debtor or Reorganized Company and its counsel at the addresses provided at Section XV-L of the Plan, a notice requesting to be added as a Notice Party; provided, however, that any Creditor whose Claim has been paid in full will no longer be a Notice Party. Such Person will be authorized to take the action proposed to be taken in such notice upon the expiration of the period specified in the Plan for such notice unless, before the expiration of the specified notice period, a recipient Notice Party, or a party in interest, has filed an objection to such proposed action with the Bankruptcy Court and scheduled a hearing on such objection within thirty (30) days after the filing of such objection and upon not less than twenty-one (21) days' notice to all Notice Parties. If any such objection is filed, the Person seeking the particular relief shall not take the proposed action unless the Bankruptcy Court approves such action or the objecting party withdraws the objection. Service by electronic filing pursuant to Local Rule 9013-3 shall be adequate for all notices and other pleadings filed with the Bankruptcy Court.

6.16 **Committee.**

On the Effective Date, the Committee will be dissolved and the members thereof shall be discharged from all further authority, duties, responsibilities and obligations related to or arising from and in connection with the Bankruptcy Case, and the retention or employment of the Committee's Professionals and other agents, other than the Plan Agent, shall terminate other than for purposes of filing and prosecuting applications for final allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

6.17 **Post-Confirmation Fees, Reports and Final Decree.**

    6.17.1 **U.S. Trustee Fees.**

Not later than thirty (30) days after the end of each calendar quarter that ends after the Effective Date (including any portion thereof), the Reorganized Company shall pay to the United States Trustee, pursuant to 28 U.S.C. § 1930(a)(6), the quarterly fee for such quarter until the Bankruptcy Case is converted or dismissed, or the Bankruptcy Court enters a Final Decree.

    6.17.2 **Post-Confirmation Reports.**

Not later than thirty (30) days after the end of each calendar quarter which ends after the

Effective Date, the Reorganized Company will file a quarterly post-Confirmation status report in substantially the form provided by the United States Trustee and serve a copy of such report on the Plan Agent. Further reports will be filed thirty (30) days after the end of each calendar quarter thereafter until the entry of the Final Decree, unless otherwise ordered by the Bankruptcy Court.

### 6.17.3    Final Decree.

At such time as all motions, contested matters and adversary proceedings have been finally resolved and the Bankruptcy Case is in a condition to be closed, the Reorganized Company shall file an application for the entry of a Final Decree to close the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code and Rule 3022 of the Bankruptcy Rules. Entry of a Final Decree may be sought by the Reorganized Company notwithstanding that all payments required by the Plan have not been completed provided the Bankruptcy Case is determined by the Bankruptcy Court to be fully administered; provided further, that the Bankruptcy Court retains jurisdiction to hear all matters involving the further administration of the Plan until all holders of Allowed Claims have been paid in full or as otherwise agreed to or provided for under the Plan. The Reorganized Company shall serve the application for the entry of a Final Decree on the Notice Parties. Pursuant to Local Rule, such application will be considered by the Bankruptcy Court without a hearing unless within fourteen (14) days after the date of service of the notice, a party in interest files and serves a request for hearing.

### 6.18    Executory Contracts and Unexpired Leases.

#### 6.18.1    Introduction.

In addition to its real property leases discussed at Section 4.2.7 above, the Company has equipment leases and many ongoing contracts referred to as executory contracts under the Bankruptcy Code. The Bankruptcy Code allows a debtor to assume or reject executory contracts and unexpired leases. Pursuant to the Plan, the bulk of the Company's executory contracts, including all dealer agreements, will be assumed, meaning that the contracts will remain in full force and effect.

Certain executory contracts to be assumed are with an affiliate of the Debtor. For example, the Debtor and/or Windermere have licensed the intellectual property of a number of affinity partners that allow the Debtor to incorporate such intellectual property into published images.

The Company is also a party to a sharing agreement with Lightpost whereby Lightpost acts a service bureau for all legal, finance, information technology, and administrative functions to all group companies. The Debtor will perform this sharing agreement throughout its Bankruptcy Case.

### 6.18.2    Treatment of Executory Contracts and Unexpired Leases.

The Debtor reserves the right to move the Bankruptcy Court prior to the Confirmation Hearing for authority to assume, assume and assign, or reject, pursuant to Section 365 of the Bankruptcy Code, any and all contracts that are executory and leases that are unexpired. Additionally, although the Debtor is unaware of any Excluded Contracts (i.e., any executory contracts or unexpired leases that are not listed on Exhibit "B" or Exhibit "C" to the Plan as of the conclusion of the Confirmation Hearing), the Reorganized Company will retain the right to reject any such Excluded Contracts at any time following the Effective Date.  Following written notice to the affected party, the Reorganized Company may reject any Excluded Contract without further order of the Bankruptcy Court (with the affected party to the Excluded Contract having thirty (30) days after notice of rejection and notice of the Rejection Claims Bar Date to file a Rejection Claim, if any).

### 6.18.3    Assumption of Executory Contracts and Unexpired Leases.

Each contract and/or unexpired lease listed on Exhibit "B" to the Plan will be assumed by the Reorganized Company on the Effective Date to the extent each such contract and/or lease is an executory contract and/or unexpired lease.

All executory contracts and unexpired leases assumed prior to Confirmation or pursuant to the Plan, and not otherwise rejected pursuant to the Plan, will remain in full force and effect, be unimpaired by the Plan except as specifically modified by the Plan and the Order of Confirmation, and be binding on the parties thereto.

### 6.18.4    Adding and Removing.

The provisions of Article VII of the Plan which pertain to executory contracts and unexpired leases may be amended with appropriate notice to those parties in interest directly affected, at any time prior to the conclusion of the hearing on Confirmation of the Plan, to add or remove executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected pursuant to the

Plan.

### 6.18.5     Defaults.

Unless other treatment is agreed to between the parties to each assumed contract or lease, if there has been a default in an assumed executory contract or unexpired lease other than the kind specified in Section 365(b)(2) of the Bankruptcy Code, the Debtor or the Reorganized Company, as applicable, will, on or before the Effective Date: (a) cure, or provide adequate assurance that they will promptly cure, any such default; (b) compensate, or provide adequate assurance that they will promptly compensate, the other party to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (c) provide adequate assurance of future performance under such contract or lease.

### 6.18.6     Rejection of Executory Contracts and Unexpired Leases.

Without admitting the validity of any other executory contracts and unexpired leases, all executory contracts and unexpired leases of the Debtor that are listed on Exhibit "C" to the Plan will be rejected by the Debtor as of the Effective Date. Confirmation of the Plan shall be deemed to constitute Bankruptcy Court approval of such rejection.

### 6.18.7     Rejection Claims.

A "Rejection Claim" is a general Unsecured Claim arising from the Debtor's rejection of an executory contract or unexpired lease pursuant to the Plan or pursuant to an order of the Bankruptcy Court. Rejection Claims are classified as Class 6 Claims. The holder of a Rejection Claim shall file with the Bankruptcy Court, and serve on counsel for the Reorganized Company, a proof of Claim relative to such Rejection Claim on or before the Rejection Claims Bar Date or be forever barred from asserting any such Claim or receiving any payment or other Distribution on account of such Claim. With respect to any Rejection Claim that is timely filed after Confirmation, the holder of such Rejection Claim may elect treatment in Class 7 of the Plan by filing such election with the Bankruptcy Court with service on the Reorganized Company and its counsel at the addresses provided at Section XV-L of the Plan no later than the Rejection Claims Bar Date, unless such date is extended by written agreement of the Reorganized Company.

///

6.19 **Proofs of Claim; Objections.**

### 6.19.1 **Time for Filing Proofs of Claim.**

Proofs of Claim, when required, must be filed with the Bankruptcy Court no later than the applicable Claims Bar Date (which for most pre-petition Claims was September 28, 2010 and for governmental units was November 29, 2010).

However, Bankruptcy Rule 3001(b) provides that it is not necessary for a Creditor to file a proof of Claim if its Claim has been listed in the Debtor's Schedules filed with the Bankruptcy Court pursuant to Section 521(a)(1) of the Bankruptcy Code and Rule 1007(a)(3) of the Bankruptcy Rules, and is not listed as disputed, contingent, unliquidated or unknown as to amount.

The Interest Holder is not required to file any proof of Interest because the Plan provides that the holder of Interests in the Debtor will retain its Interest.

### 6.19.2 **Ownership and Transfers of Claims.**

For purposes of any Distribution under the Plan, neither the Reorganized Company nor the Plan Agent will have any obligation to recognize any transfer of Claims occurring thirty (30) days or more after the Effective Date. The Plan Agent, the Reorganized Company, the Disbursing Agent, the Responsible Person, and their Professionals (as applicable) will be entitled to recognize and deal for all purposes with only those claimholders of record stated on the claims docket maintained by the Claims Agent, and if none, on the Debtor's Schedules.

**ANY PARTY WHO ACQUIRES A CLAIM AGAINST THE REORGANIZED COMPANY THIRTY (30) CALENDAR DAYS OR MORE AFTER THE EFFECTIVE DATE MUST ARRANGE WITH THE TRANSFEROR UPON ACQUISITION OF THE CLAIM, TO RECEIVE DISTRIBUTIONS TO WHICH THE TRANSFEREE MAY BE ENTITLED. NONE OF THE REORGANIZED COMPANY, THE DISBURSING AGENT OR THE PLAN AGENT WILL BE REQUIRED TO TRACK CHANGES IN OWNERSHIP OF CLAIMS THIRTY (30) CALENDAR DAYS OR MORE AFTER THE EFFECTIVE DATE**

### 6.19.3 **Amendments to Claims.**

Except as provided by the Plan or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law, proofs of Claim may not be amended later than the applicable

Claims Bar Date except for amendments to proofs of Claim to decrease the amount or priority thereof; provided, however, that the foregoing deadline shall not afford a claimant a right to amend a Claim that, pursuant to applicable law, is not subject to amendment.

### 6.19.4 <u>Time for Filing Objections.</u>

An objection to a Claim must be filed no later than the Claims Objection Deadline which is the date ninety (90) days after the Effective Date; provided, however, that the Claims Objection Deadline may be extended by the Bankruptcy Court for cause upon a noticed motion of the Reorganized Company to all Notice Parties on not less than ten (10) days' written notice. An objection to an Administrative Claim other than a Professional Fee Claim shall be filed no later than the Administrative Claims Objection Deadline which is the date thirty (30) days after the after the Administrative Claims Bar Date or such later date as may be established by the Bankruptcy Court.

### 6.19.5 <u>Who May File Objections to Claims.</u>

Any party in interest may file an objection to a Claim or Administrative Claim. The Debtor and the Reorganized Company will have the responsibility to review all proofs of Claim filed against the Debtor, to file objections as appropriate and to resolve Disputed Claims. Only with respect to the Timely Filed Former Management Claims, the Reorganized Company may, in its sole discretion, refer any objections to such Claims (in addition to any Retained Claims against the holders of Timely Filed Former Management Claims) to the Plan Agent.

### 6.19.6 <u>Disallowance of Claims.</u>

#### 6.19.6.1. LATE FILED CLAIMS FILED BEFORE THE EFFECTIVE DATE.

ANY PROOF OF CLAIM ON FILE PRIOR TO THE EFFECTIVE DATE (INCLUDING ANY AMENDMENTS) THAT THE DEBTOR ASSERTS IS NOT TIMELY FILED SHALL BE SUBJECT TO AN OBJECTION TO CLAIM BY THE DEBTOR OR THE REORGANIZED COMPANY.

#### 6.19.6.2. LATE FILED CLAIMS FILED AFTER THE EFFECTIVE DATE.

EXCEPT AS PROVIDED BY SECTION VIII-C OF THE PLAN OR OTHERWISE AGREED TO BY THE DEBTOR OR THE REORGANIZED COMPANY IN WRITING,

FOLLOWING THE EFFECTIVE DATE, ANY AND ALL PROOFS OF CLAIM (INCLUDING ANY AMENDMENTS) FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED WITHOUT ANY FURTHER NOTICE OR ACTION, OR ORDER OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.

### 6.19.7    Disputed Claims.

Upon receipt of notice that a Disputed Claim has been Allowed in whole or in part, on or before the next scheduled quarterly Distribution Date for such Claim, the Disbursing Agent or the Plan Agent (whoever is responsible for payment pursuant to the Plan) will Distribute a cash payment to the holder of such Claim representing such Creditor's pro rata Distribution amount, plus interest at the Plan Interest Rate, to bring such Creditor current with payments made to other Creditors in the same Class.  In other words and by way of example only, if the Reorganized Company files an objection to the Claim of a Creditor in Class 6 and such Claim is ultimately Allowed after three (3) quarterly payments have been made to the holders of Allowed Claims in Class 6, the Plan Agent in this example would be required to make a Distribution to such Creditor in a pro rata amount of the Allowed Claim such that the Creditor receives the equivalent of three (3) quarterly payments together with accrued interest at the Plan Interest Rate.  The holders of Disputed Claims that become Allowed Claims will receive simple interest pursuant to the Plan at the Plan Interest Rate.

### 6.19.8    Distributions.

Notwithstanding any provision of the Plan specifying a date for payments or Distributions of consideration, payments and Distributions with respect to any Claim that on such date is disputed, contingent, unliquidated or unknown as to amount, will not be made until a Final Order with respect to an objection, estimation or valuation of such Claim is entered by the Bankruptcy Court, or an agreement is reached between the parties, whereupon appropriate Distributions will be made promptly in accordance with the preceding Section.  Notwithstanding the foregoing, any undisputed portion of a Disputed Claim will receive a Distribution on the undisputed portion of the Claim at the same time as Allowed Claims in the same Class pursuant to the Plan.

### 6.19.9   Termination of Claims Agent.

The Reorganized Company may move the Court for an order relieving the Claims Agent of its duties in the Bankruptcy Case at any time following the Claims Objection Deadline, pursuant to the Notice Procedure.

## ARTICLE VII.

### RESERVATION OF RIGHTS AND PRESERVATION OF CLAIMS; RELEASE OF AVOIDANCE ACTIONS; TOLLING AGREEMENT.

### 7.1   Preservation of Claims and Rights.

Except as otherwise provided by the Plan, the Debtor reserves the right to pursue all claims against third parties as provided in Article X of the Plan, including the Retained Claims identified in Exhibit "D" to the Plan.

### 7.2   Release of Avoidance Actions (Excluding Tolled Claims).

The Plan provides for the payment in full of all Allowed Claims.  Accordingly, the Plan (at its Section X-B) provides for the release, wavier and abandonment as of the Effective Date of the Plan, of all affirmative Avoidance Actions other than the Tolled Claims which are covered by Section X-C of the Plan (and discussed at Section 7.3 below); provided, however, that the Reorganized Company shall retain any defenses to Claims under of the Bankruptcy Code.

### 7.3   Extension of Tolling Agreement; Forbearance of Pursuing Tolled Claims; Termination of Tolling Agreement.

Section X-C of the Plan provides for modification of the Tolling Agreement without further order of the Bankruptcy Court or action by either the Committee or the Kinkade Parties as follows: (A) the Tolled Period will be extended to the occurrence of the Tolled Claims Release Event (as defined in the Plan and discussed below); and (B) the Plan Agent will be deemed the successor to the Committee under the Tolling Agreement.  The Plan Agent will assume any and all rights, powers, Claims, causes of action and standing to the same extent, but not greater than, any rights, powers, Claims, causes of action and standing of the Committee.

For purposes of the Plan, a Tolled Claims Release Event will occur on the date that the Reorganized Company has paid or funded pursuant to the Plan cash payments in the aggregate of fifty percent (50%) of all Allowed Unsecured Claims and fifty percent (50%) of any Claims then

remaining in dispute, including interest accrued to that date pursuant to the Plan; provided, however, that the aggregate amount of all Allowed Unsecured Claims will not include the holders of Claims in Class 8 (but will include the holders of Claims in Classes 3, 5, 6 and 7); and provided further that during the first twenty-four (24) months following the Effective Date, only 50% of the Allowed Claims in Class 7 will be included for purposes of determining if a Tolled Claims Release Event has occurred, and after twenty-four (24) months, 100% of the Allowed Claims in Class 7 will be included. If any Unsecured Claim(s) held by the Plan Agent Account Distribution Beneficiaries remain unresolved, then at the Reorganized Company's option, the Reorganized Company may deposit funds (the "Reserve Deposit" as defined in the Plan) with the Plan Agent necessary to trigger the Tolled Claims Release Event while Disputed Claims are still pending.

The Reserve Deposit will be in an amount equal to fifty percent (50%) of the total aggregate amount of unresolved Disputed Unsecured Claims in all Classes except for Claims in Class 8, plus interest that (x) has accrued since the Effective Date pursuant to the Plan, and (y) is projected to accrue over the remainder of the Plan term calculated using the Plan Interest Rate then in effect at that time.

In the event the Reorganized Company elects to transfer to the Plan Agent the Reserve Deposit, the Reserve Deposit will be applied by the Plan Agent as follows:

(a) If a Disputed Claim is later Allowed or otherwise resolved resulting in an Allowed Claim (a "Resolved Claim"), the Reserve Deposit will be used to pay fifty percent (50%) of the Allowed Amount of the Resolved Claim, plus interest at the Plan Interest Rate accrued to the Distribution Date for such Claim (a "Resolved Claim Payment"), along with any additional amounts required to bring the payments to such Creditor current with other Allowed Claims pursuant to the Plan. If the Reserve Deposit attributable to a Resolved Claim exceeds the amount necessary to make the corresponding Resolved Claim Payment (the "Excess Deposit"), the Excess Deposit may be retained by the Plan Agent to be used for the next quarterly Distribution as provided by the Plan (and such pre-funding will relieve the Reorganized Company from the obligation to transfer to the Plan Agent the next Quarterly Funding Amount by such amount); provided, however, that the Plan Agent may only retain up to the amount of the Quarterly Funding Amount for such quarter and any excess

shall be promptly returned to the Reorganized Company; and

(b)     If a Disputed Claim is later disallowed, withdrawn or otherwise conclusively determined not to be entitled to a Distribution under the Plan, the Reserve Deposit for such Claim may be retained by the Plan Agent to be used for the next quarterly Distribution as provided by the Plan (and such pre-funding will relieve the Reorganized Company from the obligation to transfer to the Plan Agent the next Quarterly Funding Amount in such amount); provided, however, that the Plan Agent may only retain up to the amount of the Quarterly Funding Amount for such quarter and any excess shall be promptly returned to the Reorganized Company.

The Tolling Agreement is deemed modified by the Plan to enjoin, stay and prohibit the filing of any action to recover the Tolled Claims against the Debtor, the Reorganized Company or the Estate by either the Committee or the Plan Agent.  If prior to the Tolled Claims Release Event, there is a material default under the Plan which the Reorganized Company does not cure within a period of twenty (20) days after receipt of written notice of such default from any party in interest affected by such alleged default, the injunction, stay and prohibition of the filing of any action to recover the Tolled Claims will be lifted; provided, however, that in the event of a dispute as to whether a material default has occurred or whether the Reorganized Company has cured such default, no action may be taken with respect to the Tolled Claims until entry of a Final Order on such dispute.  All reservations of rights in the Tolling Agreement will apply.

Any dispute over whether there has been a material default under the Plan, or whether the Debtor or Reorganized Company has cured the alleged default, will be determined by the Bankruptcy Court on not less than ten (10) days' written notice to the Notice Parties.  In the event of such a dispute, the Tolling Agreement and the Tolled Period will remain in place and effective until such time as the dispute is resolved by a Final Order; provided, however, that if there is a dispute as to whether the Reorganized Company has paid or reserved for fifty percent (50%) in Unsecured Claims, as long as the Reorganized Company has paid the full amount the Plan Agent contends is required to meet the fifty percent (50%) threshold (subject to the Reorganized Company's right to obtain any excess upon an order of the Bankruptcy Court adjudicating the dispute), neither the Tolling Agreement nor the Tolled Period will be extended.

Case: 10-55788    Doc# 362-5    Filed: 06/13/11    Entered: 06/13/11 17:10    Page 76
of 115

At such time as the Reorganized Company believes that the Tolled Claims Release Event has occurred, the Reorganized Company will provide written notice to the Plan Agent, together with the Reorganized Company's calculation of the occurrence (the "Release Event Notice"). The Plan Agent will have twenty (20) days from the date of the Release Event Notice (the "Release Event Objection Period") to dispute that the Tolled Claims Release Event has occurred. In the absence of any opposition by the Plan Agent to the Release Event Notice within the Release Event Objection Period, the Tolled Claims Release Event will be deemed to have occurred, without further action or notice by the Reorganized Company or order of the Bankruptcy Court. If the Plan Agent disputes the Release Event Notice, the Plan Agent shall notify the Reorganized Company in writing of such dispute within the Release Event Objection Period. In the event that the Plan Agent and Reorganized Company are unable to resolve such dispute, either the Reorganized Company or the Plan Agent may set the matter for hearing before the Bankruptcy Court on ten (10) days' notice to the Notice Parties (provided that if the Court cannot accommodate a hearing within such ten (10) days, the hearing will be held on the earliest available calendar thereafter). Upon determination of the dispute by the Bankruptcy Court, the Tolled Claims Release Event will be deemed to occur as provided by order of the Bankruptcy Court.

Upon the occurrence of the Tolled Claims Release Event, the Tolling Agreement will be terminated and the Tolled Claims against the Debtor and the Reorganized Company will be automatically and conclusively deemed waived, released, and discharged by the Bankruptcy Estate and the Plan Agent.

## ARTICLE VIII.

### REQUEST FOR CONFIRMATION.

If any Class of Claims does not accept the Plan, the Debtor may elect to seek Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code. Confirmation under Section 1129(b) can, in appropriate circumstances, take place notwithstanding the rejection of, or objection to, the Plan by Creditors.

The Debtor, as the proponent of the Plan, requests Confirmation of the Plan. In the event any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory

majorities provided in Section 1126(c) of the Bankruptcy Code, the Debtor requests that the Bankruptcy Court confirm the Plan in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

## ARTICLE IX.

## RETENTION OF JURISDICTION.

Article XII of the Plan provides that the Bankruptcy Court shall retain and have all authority and jurisdiction as is allowed under the Bankruptcy Code and other applicable law to enforce the provisions, purposes, and intent of the Plan.

## ARTICLE X.

## EFFECT OF CONFIRMATION.

As of the Confirmation Date, the effect of Confirmation of the Plan shall be as provided in Section 1141 of the Bankruptcy Code, and as follows:

10.1    **Binding Effect of Plan.**

The provisions of the confirmed Plan will bind the Debtor, the Reorganized Company, any Entity acquiring property under or otherwise accepting the benefits of the Plan, and every Creditor and Interest Holder, whether or not such Creditor or Interest Holder has filed a proof of Claim or Interest in the Bankruptcy Case, whether or not the Claim or Interest of such Creditor or Interest Holder is Impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan.

10.2    **Revesting.**

Subject to the provisions of the Plan and the Order of Confirmation, the property of the Debtor and the Bankruptcy Estate shall vest in the Reorganized Company on the Effective Date.  As of the Effective Date, all such property shall be free and clear of any and all liens, encumbrances, Claims and Interests of Creditors and Interest Holders except as otherwise provided in the Plan.  For the avoidance of doubt, LPA Properties' security interests and liens are not released by the Plan and remain in full force and effect notwithstanding Confirmation of the Plan.  Revesting does not modify the nature of any contracts assumed by the Debtor.  Notwithstanding anything in Section 1141(d)(1)(B) of the Bankruptcy Code, Interests shall be retained as set forth in the Plan.

10.3 **Discharge.**

Except as otherwise provided in the Plan or the Order of Confirmation, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims, including any interest accrued thereon from and after the Petition Date, against the Debtor, the Reorganized Company, the Bankruptcy Estate, or any assets or property of the Debtor, the Reorganized Company and the Bankruptcy Estate. Except as provided in the Plan or the Order of Confirmation, pursuant to Section 1141(d) of the Bankruptcy Code, Confirmation forever discharges the Debtor and the Reorganized Company from any and all Claims and all debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of Claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim based on such debt has accepted the Plan.

10.4 **Certain Judgments Null and Void.**

Any judgment obtained against the Debtor after the Petition Date in any court other than the Bankruptcy Court shall be null and void as a determination of the liability of the Debtor with respect to any debt discharged.

10.5 **Exculpation.**

Pursuant to the Plan, none of the Debtor, the Reorganized Company, the Responsible Person, the Committee, the members of the Committee (solely in their capacity as such) and their respective officers, directors, members, managers, employees, advisors, attorneys, agents, or direct and indirect affiliates will have or will incur any liability to any holder of a Claim or Interest, or any other party in interest, or any of their respective members or former members, agents, employees, representative, financial advisors, attorneys or affiliates or any of their predecessors, successors, or assigns, for any act or omission in connection with, relating to, or arising out of, the Bankruptcy Case, the negotiation and pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan excluding the obligations of the Debtor or the Reorganized Company under the Plan and any acts or omissions of any Person covered by this

Section constituting willful misconduct or gross negligence, and in all respects such Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

10.6   **Injunction.**

**Under the Plan, as of the Confirmation Date, all Persons or Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined from commencing or continuing any action, the employment of process, or other action, to collect, recover or offset any such Claim or debt as a liability of the Debtor or the Reorganized Company to the fullest extent permitted by Bankruptcy Code Section 524.**

10.7   **Preservation of Insurance.**

The Debtor's discharge and release from Claims as provided in the Plan, except as necessary to be consistent with the Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person.

10.8   **Reservation of Powers.**

Nothing in the Plan will be deemed to constitute a waiver of any powers held by the Debtor as a debtor in possession under the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.  The Reorganized Company will retain all powers granted by the Bankruptcy Code, the Bankruptcy Rules and the Local Rules to a trustee or debtor in possession, including those with respect to the recovery of property and objections to, and/or subordination of, Claims and Interests.

**ARTICLE XI.**

**CONDITIONS PRECEDENT.**

**11.1**   **The following are conditions precedent to Confirmation of the Plan:**

(i)    The following Persons shall have voted to accept the Plan: (1) the holder of the White-Lighthouse Claim; and (2) the holder of the Hazelwood-Spinello Claim;

(ii)   A Final Order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court; and

(iii)  The Order of Confirmation is entered in a form and in substance reasonably satisfactory to the Debtor.

**11.2** **Each of the following is a condition to the Effective Date:**

    (i)    No timely notice of appeal to the Order of Confirmation shall have been filed pursuant to Rule 8002 of the Bankruptcy Rules or, if a timely notice of appeal is filed, then no stay of the Effective Date pending appeal is obtained by the appealing party pursuant to Rule 8005 of the Bankruptcy Rules;

    (ii)    The Order of Confirmation shall provide that, among other things, the Debtor or Reorganized Company, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including entering into, implementing and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan, or effectuate, advance or further the purposes thereof;

    (iii)    The New License Agreement shall be in form and substance satisfactory to Windermere and the Debtor, and Windermere shall have executed and delivered the New License Agreement;

    (iv)    The Security Agreement shall be in form and substance reasonably satisfactory to the Debtor and the Committee;

    (v)    The Plan Agent Agreement shall be in form and substance reasonably satisfactory to the Debtor, the Committee and the Plan Agent;

    (vi)    A writing providing LPA Properties' agreement to provide the Reorganized Company with the LPA Post-Effective Date Credit Facility pursuant to the terms of the LPA Properties New Loan And Security Documents shall be in form and substance reasonably satisfactory to the Debtor and the Committee;

    (vii)    A writing by the Kinkade Parties (other than the Debtor which is bound by the Plan) to extend the Tolling Agreement as provided at Section X-C of the Plan and acknowledging and agreeing to be bound by the relevant Plan provisions shall be in form and substance reasonably satisfactory to the Debtor and the Committee;

    (viii)    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

    (ix)    The Reorganized Company shall have sufficient cash (from all available sources): (A) on the Effective Date to make the Distributions required by the Plan to be made on the Effective Date; and (B) on the Distribution Date to make the Distribution required by the Plan to Creditors electing treatment in Class 7.

**11.3** **Waiver of Conditions.**

    The conditions set forth above may be waived in whole or in part without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan, underline solely by the following party or parties and without the need of a waiver by any other party: (a) the Debtor, with respect to any and all of the conditions set forth in Section 11.1(i) and Sections 11.2(i), (ii), (iii) and (viii); (b) the Debtor and the Committee, with respect to any and all of the

conditions set forth in Sections 11.2(iv), (v), (vi) and (vii); and (c) the Committee, with respect to the condition set forth in Section 11.2(ix).

## ARTICLE XII.

## OTHER PLAN PROVISIONS.

Article XV of the Plan sets forth a number of additional provisions that govern the Plan. These provisions cover topics such as modification of the Plan, where to send notices to the Debtor or the Reorganized Company and other terms.

## ARTICLE XIII.

## RISK FACTORS.

Holders of Claims against the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated herein by reference), prior to voting to accept or reject the Plan. If any of the risk factors discussed below materialize, thereby hindering the Debtor's or Reorganized Company's ability to successfully reorganize and/or consummate the Plan, the Debtor and/or Reorganized Company may pursue other alternatives such as a liquidation or further reorganization under the Bankruptcy Code or applicable state law. This could result in distributions to Creditors which are less than the Distributions provided under the Plan; however, in any such instance, distributions still would likely exceed payment to Creditors in a Chapter 7 scenario where there would be no license to liquidate the Company's inventory. The below risk factors should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.

13.1 **Certain Bankruptcy Considerations.**

Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court or any court hearing an appeal from the Confirmation Order will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. In addition, although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no

absolute assurance in this regard.

13.2    **Potential Effects of a Prolonged Chapter 11 Proceeding.**

A prolonged Chapter 11 proceeding could adversely affect the Debtor's relationship with its customers, suppliers and employees, which in turn could adversely affect the Debtor's competitive position, financial condition and results of operations. A weakening of the Debtor's financial condition and results of operations could adversely affect the Debtor's ability to implement the Plan.

13.3    **Risks Relating to the Projections.**

The management of the Debtor has prepared the Projections, attached hereto as **Exhibit "C"** and incorporated herein by reference, which provide financial information with key assumptions, in connection with the development of the Plan, to present the projected effects of the Plan and the transactions contemplated thereby. The Projections assume that the Plan and the transactions contemplated thereby will be implemented in accordance with their respective terms, and are based on numerous other assumptions and estimates. The assumptions and estimates underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those projected. Accordingly, the Projections are not necessarily indicative of the future financial condition or results of operations of the Reorganized Company, which may vary significantly from those set forth in the Projections. The Projections are discussed in greater detail below at Article XVIII.

13.4    **Claims Estimates and Distributions Risks.**

The Administrative Claims Bar Date and Rejection Claims Bar Date will occur after Confirmation, and the Allowed amount of such Claims may increase the total liabilities of the Reorganized Company.

Moreover, the Debtor's estimates of Allowed Claims and the consummation of the Plan are based on numerous uncertain considerations which will necessarily be affected by, amongst other things, the outcome of objections to Claims and the cost and expenses of such actions. For example, if the Reorganized Company is unsuccessful in its objections to Disputed Claims and contingent Claims that are asserted against the Debtor, the total liabilities will be significantly greater than

estimated, and any extended litigation involving the Reorganized Company may potentially affect Distributions to holders of Allowed Claims.

Creditors in Class 5 may, as a result of their election to receive treatment under Class 5, ultimately receive less than they otherwise would if they did not so elect and were afforded treatment under Class 6. Conversely, Creditors in Class 6 who are eligible to receive treatment under Class 5 but decline such election, may, as a result of their election to remain in Class 6, ultimately receive less and/or receive Distributions significantly later than they otherwise would if they were afforded treatment under Class 6. These risks similarly apply to those Creditors who elect to receive treatment under Class 7 rather than remaining in Class 6 and vice versa.

13.5    **Competitive Conditions.**

The art publishing industry is an intensely competitive market. The market is highly fragmented, and increasingly, low-cost competitors are entering the U.S. market from China and other countries. Some of the Debtor's current competitors, in addition to many potential competitors, may have substantially greater financial, marketing and technology resources. If the Debtor is unable to successfully implement to Plan, it may not be able to continue to compete with these competitors.

In recent years, as a result of the weakened economy and changes in technology, consumer preferences, and retail markets, amongst other factors, many long-term competitors in the art publishing industry have ceased doing business or are currently in serious financial condition. The Debtor is not immune to the same factors that have negatively impacted many of its competitors.

Additionally, the Debtor's and the Reorganized Company's customers may also continue to hold negative perceptions of the Chapter 11 process and choose to utilize products from providers perceived to be more solvent or better positioned financially. There can be no assurance that the Debtor and/or the Reorganized Company will be able to compete successfully against either current or potential competitors or that competition will not have a material adverse effect on the business, consolidated results of operations, and financial condition.

13.6    **Reduced Revenues and General Economic Risks.**

Sales of the Company's products have dropped considerably each year since 2003 resulting

in a dramatic decrease in the Company's revenues from sales of its products. In addition, some dealers and end-user customers may have declined to sell or purchase Debtor's products due to its Chapter 11 status. The Debtor's revenue may not recover to pre-2003 levels even after the Reorganized Company emerges from Chapter 11.

13.7 **Economic Downturn.**

During the past five (5) years or more, the art publishing, home décor and gift and collectibles markets have experienced a significant economic downturn. During this period, spending by many of the Debtor's past, current and potential customers has decreased significantly. If spending on art declines further, the Debtor or the Reorganized Company could fail.

13.8 **Dependence on Dealer Network.**

A significant portion of the Debtor's revenue comes from the Debtor's dealer network. The Debtor's dealer network itself has suffered economic difficulty over the last five (5) years or more. If the dealer network's health continues to erode or does not improve, the Debtor or the Reorganized Company could fail.

13.9 **Risks of Inability to Expand its Sales and Distribution Channels.**

The Debtor cannot be certain that it will be able to reach agreement with additional distribution partners on a timely basis or at all, or that these channel distribution partners will devote adequate resources to marketing, selling and supporting its products. The Chapter 11 process may negatively affect the Debtor's and/or the Reorganized Company's ability to enter into new arrangements or expand existing arrangements with channel distribution partners.

13.10 **Risks of Delays or Difficulties in Product Development.**

The Debtor and/or the Reorganized Company may experience delays or difficulties in product development. These delays or difficulties may result in the cancellation of planned development projects or increase the Debtor's and/or the Reorganized Company's development costs and could have a material and adverse effect on their business, consolidated results of operations, and financial condition.

13.11 **Risks of Implementing Outsourcing Plan.**

A significant part of the success of the Plan will be the cost-reduction benefits realized as a

result of the outsourcing of a significant portion of the Debtor's and/or the Reorganized Company's manufacturing operations.  There is no assurance that the Debtor and/or the Reorganized Company will be able to successfully implement the outsourcing of their manufacturing operations, or do so in a timely or cost-effective basis.  In addition, transfer of manufacturing operations to outsourcing partners may adversely affect quality and delivery of product to the Debtor's and/or the Reorganized Company's customers.  The Debtor's and/or the Reorganized Company's inability to effect a successful outsourcing of their manufacturing operations could cause the Debtor or the Reorganized Company to fail or severely adversely affect the successful implementation of the Plan, and could have a material and adverse effect on its business, consolidated results of operations, and financial condition.

### 13.12  **Risks Related to Dependence on One Artist.**

If the New License Agreement with Windermere for Kinkade's artwork is terminated, or if Kinkade is unable or unwilling to produce new artwork for any reason, the loss of Kinkade's services would have a material adverse effect on the Debtor's and/or the Reorganized Company's business, operating results, financial position and cash flow.  Life and disability insurance covering Kinkade in the amount of approximately $60 million and $30 million, respectively, is currently maintained by the Debtor; however, there is no assurance that the Debtor and/or Reorganized Debtor will maintain these policies; however, the Debtor and/or the Reorganized Company will use its best reasonable commercial efforts to continue these policies.  The available remedies in the event of a breach of the New License Agreement by Windermere are limited to monetary damages because the license is a personal service contract.  In certain circumstances, Windermere has the right to terminate the Debtor's and/or the Reorganized Company's rights to certain images.  Upon any loss of Kinkade's services, the Debtor and/or the Reorganized Company may seek to develop relationships with other artists and offer products based on their work.  In addition, the Debtor is, and the Reorganized Company will be, highly dependent on continued consumer satisfaction with Kinkade and the brand, and consumer demand for products based on the artwork of Kinkade.  Consumer dissatisfaction with Kinkade or the brand could result in a decline in sales of Kinkade products or a failure of such products to gain consumer acceptance in new market channels, which could have a material adverse

effect on the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow.

13.13  **Risks Associated with Expansion of Current Distribution Channels.**

The Debtor's business plan strategy includes expansion of its current distribution channels. The Debtor's and the Reorganized Company's ability to maintain and increase revenues will depend, in part, on the effectiveness of this strategy and the market's continued acceptance of Kinkade art and products related to the brand. The Debtor and the Reorganized Company will direct capital and personnel resources toward enhancing retail support services to licensed gallery owners and licensees, improving manufacturing systems and streamlining systems and procedures. The expansion of distribution channels is dependent on a number of factors, including the Debtor's and the Reorganized Company's ability to identify appropriate business partners and to reconcile new distribution channels with the Debtor's current distribution channels. There can be no assurance that the Debtor and/or the Reorganized Company will be able to successfully expand its distribution channels or that such new channels will become effective dealers for its products.

13.14  **Risks Associated with Expansion into New Distribution Channels.**

The Debtor's business plan strategy also includes expansion into new distribution channels. The Debtor's and the Reorganized Company's ability to maintain or increase revenues will depend, in large part, on the effectiveness of this strategy and the market's acceptance of Kinkade art and products featuring the Kinkade brand. The Debtor's and the Reorganized Company's expansion into new distribution channels is dependent on a number of factors including the Debtor's and the Reorganized Company's ability to identify suitable partners that will enhance the Kinkade brand and the integration of new distribution channels with the Debtor's existing dealer network and distribution channels. The Debtor intends to avoid conflict among the dealer network and distribution channels through product, image, territory, market and demographic differentiation. However, actual or perceived conflicts among the dealer network and distribution channels could materially adversely impact the Debtor's expansion plans, the Debtor's overall strategy, and the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow, and may significantly reduce revenue from the Debtor's existing established dealer network

and distribution channels.

13.15 **Risks Related To Introduction of New Product Lines.**

A significant element of the Debtor's business strategy is to expand the Kinkade brand into new product lines. Historically, a substantial portion of the revenue from Kinkade products was generated from the sale of limited edition and open edition wall art products and, to a lesser extent, the sale of other home decorative accessories and gift products. As new products are developed by the Debtor and the Reorganized Company and their licensees, there can be no assurance that these new products will be successfully marketed or that any of the new product lines will gain market acceptance. The inability to market new products could result in lower than anticipated revenue for such products and adversely affect the image and value of the Kinkade brand.

13.16 **Difficulties Managing Expansion.**

The Debtor's strategy for developing new products and expanding into new distribution channels could place a significant strain on management and operations. Expansion requires the need to address changing operational demands and to implement and develop systems and procedures to appropriately deal with those changes. There can be no assurance that the Debtor and/or the Reorganized Company will be able to address all increased demands. In addition, the Debtor and/or the Reorganized Company may need to increase labor staffing or implement other efficiencies to satisfy any significant future increase in product revenue. The failure to increase operational and manufacturing capacity in a timely and effective manner, while maintaining rigid product quality and customer service standards, could result in a failure to meet demand on a timely basis. The Debtor's and/or the Reorganized Company's inability to increase manufacturing capacity would have a material adverse effect on the business and results of operations. Failure by the Debtor and/or the Reorganized Company to continue to upgrade operating and financial control systems and address operational inefficiencies could have a material adverse effect on the Debtor and/or the Reorganized Company, and the results of their operations. There can be no assurance that such systems and controls will be adequate to sustain and effectively monitor future growth. Moreover, in the event any overproduction results from expansion activities, the oversupply of product could, among other things, reduce the perceived value and collectability of products, resulting in reduced

demand for products, and, particularly, highly popular limited editions. Any reductions in revenue or margins resulting from a decrease in demand could have a material adverse effect on the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flows.

13.17 **Risks Related to Dependence On Consumer Preferences.**

Revenue from existing and new products depends significantly on continued consumer demand for the Kinkade brand and product. Demand for products may be affected by consumer preferences which are subject to frequent and unanticipated changes. The Debtor is dependent on its ability to continue to produce appealing and popular Kinkade art-based products that anticipate, gauge and respond in a timely manner to changing consumer demands and preferences. Failure by the Debtor and/or the Reorganized Company to anticipate and respond to changes in consumer preferences could lead to, among other things, lower revenue, excess inventories, diminished consumer loyalty and lower margins, all of which would have a material adverse effect on the Debtor's and/or the Reorganized Company's business and results of operations. There can be no assurance that the current level of demand for products based on Kinkade's artwork will be sustained or grow. Any decline in the demand for such products or failure of demand to grow would have a material adverse effect on the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow.

13.18 **Risks Related to Product Revenue Derived Through Third Parties.**

Retail product sales, as well as communications with the end customer, are primarily executed by independent dealers, including Thomas Kinkade Signature Gallery owners whose stores may bear the Kinkade name and licensees who license the trademark and brand. The Debtor has entered into licensing agreements with Signature Gallery owners and other licensees granting them limited use of the Kinkade name. However, the failure of these dealers or licensees to properly represent the Debtor's products could damage its reputation or the reputation of Kinkade and adversely affect the Debtor's and/or the Reorganized Company's ability to build the Kinkade brand, resulting in a material adverse effect on the business, consolidated financial position, operating results and cash flows of the Debtor and/or the Reorganized Company. Although the Debtor conducts its business through an independently owned and operated dealer network, state business

opportunity and franchise laws may impact its relationships with its dealers. Certain of the Debtor's dealers and licensees may sell products that may compete with the Debtor's products. While the Debtor encourages its dealers and licensees to focus on products through market and support programs, such dealers and licensees may give priority to products of competitors. As discussed below, poor economic conditions could adversely affect independent dealers and licensees which, in turn could adversely affect the Debtor and/or the Reorganized Company.

### 13.19 **Changes in Economic Conditions and Consumer Spending Could Adversely Impact Revenue.**

Over the past several years several Thomas Kinkade Signature Galleries and other art galleries that were customers of the Company closed and/or filed for bankruptcy protection. A poor economic climate, as experienced during the last several years, could result in an acceleration of such bankruptcies or store closings. Continued bankruptcies or store closings of such galleries could materially adversely affect the Debtor's and/or the Reorganized Company's revenues, business, financial position, operating results and cash flow. Galleries and licensees may experience financial difficulties, which could adversely impact the Debtor's and/or the Reorganized Company's collection of accounts receivables. The Debtor regularly reviews, and the Reorganized Company will continue to review, the credit-worthiness of its dealers to determine an appropriate allowance for doubtful accounts.

In addition, the art publishing, home decorative accessories, collectibles and gift product industries are subject to cyclical variations. Purchases of these products are discretionary for consumers and, therefore, such purchases tend to decline during periods of recession in the national or regional economies and may also decline at other times. Moreover, purchases of these products may be subject to seasonal cycles. The Debtor's and/or the Reorganized Company's success depends, in part, on a number of economic factors relating to discretionary consumer spending, including employment rates, business conditions, future economic prospects, interest rates and tax rates. Moreover, the Debtor's business is sensitive to consumer spending patterns and preferences. Shifts in consumer discretionary spending away from art, home decorative accessories, collectibles or gift products, as well as general declines in consumer spending, could have a material adverse

effect on the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow.

13.20  **Risks Due to Reliance on Third Parties.**

The Company utilizes third parties to manufacture certain products and supply certain materials and components for use in the manufacturing processes. Reliance on third party manufacturers involves a number of risks, including the lack of control over the manufacturing process and the potential absence or unavailability of adequate capacity. The failure of any of these third party manufacturers to produce products that meet rigid specifications or to timely deliver products could result in lower revenue or otherwise adversely affect consumer perceptions of the Debtor's and/or the Reorganized Company's brands and products. Poor consumer perception could have a material adverse effect on the business, consolidated financial position, operating results and cash flows of the Debtor and/or the Reorganized Company.

In addition, third party vendors also supply the paper, canvas, paint, frames and other raw materials and components used in the canvas lithograph production process. The failure of any of these third party vendors to produce products that meet the Debtor's rigid specifications could result in lower revenue or otherwise adversely affect consumer perceptions of the Kinkade brand and products. Although the Debtor maintains relationships with several suppliers, in the past, shortages of raw materials and components have been problematic. Any significant shortage could lead to cancellations of customer orders or delays in placement of orders. There can be no assurance that the Debtor and/or the Reorganized Company will not encounter shortages in the future, and any prolonged shortage of paper, canvas, paint, frames or other materials could have a material adverse effect on the Debtor's and/or the Reorganized Company's business, consolidated financial position, operating results and cash flows.

13.21  **Pending or Future Litigation.**

From time to time, the Company has been involved in various legal proceedings arising from the normal course of its business activities. Included among such legal proceedings are lawsuits, claims and other proceedings against the Company and its affiliates by dealers and gallery owners. Such matters generally arise out of contractual, dealer and other relationships with the Company, and

involve or may involve compensatory, punitive, antitrust or other damage claims or demands for restitution, rescission, damages or equitable relief. Generally, the Company also has had claims against these dealers or gallery owners, primarily for non-payment of trade accounts payable to the Company incurred by the dealer or gallery owner from the purchase of reproductions and other products. Although the Debtor does not currently expect any adverse outcomes in these litigation matters to have a material adverse impact, due to the inherently uncertain nature of litigation, the Debtor and/or the Reorganized Company may be unable to successfully defend itself in these litigation matters, and their results of operations, cash flows or financial position could be materially adversely affected as a result. As discussed above, the White-Lighthouse Action is currently on appeal, and the Debtor has no liability under such action. However, if the Debtor does not successfully defend the appeal, the Reorganized Company could have an obligation of approximately $1.6 million. That amount would be added to the Debtor's body of Claims and would increase the quarterly amount that the Reorganized Company would be obligated to pay under the Plan.

### 13.22 **Seasonality in Product Sales.**

The Company's business has experienced, and is expected to continue to experience, seasonal fluctuations in revenue. Its revenue historically has been highest in the fourth calendar quarter and lower in the first, second and third calendar quarters. The Debtor believes that the seasonal effect is due to customer buying patterns, particularly with respect to holiday purchases, and is typical of the art, home décor accessories, collectibles and gift product industries. The Debtor expects these seasonal trends to continue in the foreseeable future.

### 13.23 **Fluctuation in Operating Results.**

The Debtor's quarterly operating results have fluctuated significantly in the past and may continue to fluctuate as a result of numerous factors, including: (1) change in demand for the art of Kinkade and the Debtor's and/or the Reorganized Company's products (including new product categories and series); (2) the Debtor's and/or the Reorganized Company's ability to achieve its expansion plans; (3) the timing, mix and number of new product releases; (4) the continued success of the Signature Gallery program and current channels of distribution; (5) the Debtor's and/or the

Reorganized Company's successful entrance into new, and expansion of existing, distribution channels, both foreign and domestic; (6) continued implementation of manufacturing outsourcing and efficiencies; (7) timing of product deliveries; (8) the ability to absorb other operating costs; and (9) conflict among distribution channels.

In addition, since a significant portion of the Debtor's net revenue is generated from orders received in the quarter, revenue in any quarter is substantially dependent on orders booked in that quarter. Results of operations may also fluctuate based on extraordinary events. Accordingly, the results of operations in any quarter will not necessarily be indicative of the results that may be achieved for a full fiscal year or any other quarter.

13.24 **The Debtor Faces Significant Competition.**

The art publishing, home décor and gift and collectibles industries are highly fragmented and competitive. Participants in these industries compete generally on the basis of product and brand appeal, quality, price and service. The Company's product lines compete with products marketed by numerous regional, national and foreign companies that are distributed through a variety of retail formats including department stores, mass merchants, art and gift galleries and frame shops, bookstores, mall-based specialty retailers, direct response marketing programs, catalogs, and furniture and home décor stores. The number of marketers and retail outlets selling home decorative accessories, collectibles and gift products has increased in recent years, and the entry of these companies, together with the lack of significant barriers to entry, may result in increased competition. The Debtor intends to expand exclusive branded galleries in new geographic markets, and such galleries may encounter competitive challenges that the Company has not previously experienced. Such competition could have a material adverse effect on the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow. Some competitors have better resources, including name recognition, capital resources, more diversified product offerings and broader distribution channels than the Debtor. The Debtor's and the Reorganized Company's success is highly dependent on its ability to produce a wide variety of products with a broad range of customer appeal and provide ready consumer access to such products.

/ / /

**13.25  Reliance on Intellectual Property Rights and Risk of Infringement and Unauthorized Sales.**

The Debtor relies on a combination of contractual rights, trademarks, trade secrets, and copyrights to establish and protect proprietary rights in its products and brand.  Steps taken by the Debtor and/or the Reorganized Company to protect its products and brand may not deter their misuse or theft.  The Debtor is aware of a number of unauthorized sales and uses of its products and brand.  The growth of the Internet has made the unauthorized sale, reproduction, advertising and distribution of the Debtor's intellectual property and products easier, and has made it more difficult for the Debtor to protect its rights.  Litigation may be necessary to enforce and protect the Debtor's and/or the Reorganized Company's intellectual property rights.  Such litigation could be expensive and divert management's attention away from the operation of the business.  In addition, unauthorized sales over the Internet or otherwise could reduce sales by authorized sellers and therefore adversely impact the Debtor's and/or the Reorganized Company's revenues.

**13.26  Affinity Program Risks.**

A significant part of the Debtor's business plan strategy is to enter into relationships with well-known partners who license their intellectual property to the Company for use in its products. There is no assurance that the Debtor will continue to attract such partners.  The Debtor and/or the Reorganized Company's failure to continue to attract such business partners may have a material adverse effect on the Debtor's and/or the Reorganized Company's business, consolidated financial position, operating results and cash flows.

**13.27  Return Privileges.**

Certain of the Debtor's customers have return privileges, allowing such customers to return product purchased from the Debtor for any reason.  Historically, returns by these customers have been insignificant.  However, if returns from these customers should exceed historic levels, such returns could materially adversely affect the Debtor's and/or the Reorganized Company's business, financial position, operating results and cash flow.

**13.28  Critical Personnel May Be Difficult to Attract, Assimilate and Retain.**

The Debtor is dependent on the efforts of executive officers and other key personnel, as well

as its ability to continue to attract and retain qualified personnel in the future. The loss of certain executive officers and key personnel or inability to attract and retain qualified personnel in the future could have a material adverse effect on the Debtor's and/or the Reorganized Company's business and results of operations.

13.29 **Risks Associated With Current Real Property Lease.**

As of the date of this Disclosure Statement, the Debtor has approximately one (1) month remaining on a one (1)-year lease for its headquarters and manufacturing location (i.e., the TBI Madrone Lease). In addition, the landlord has the right to terminate the lease on sixty (60) days' notice to the Debtor or the Reorganized Company. If the landlord exercises its right of termination or the Reorganized Company does not renew the lease, the Debtor or the Reorganized Company will face increased costs associated with moving the Company and its manufacturing operations and with the distractions of its employees and management. In addition, there is no assurance that the Debtor or the Reorganized Company will be able to obtain new leased space on the same or more favorable terms.

13.30 **Collection Risks.**

The Debtor and/or the Reorganized Company may experience increasing difficulty collecting outstanding accounts receivable. As a result of certain factors, including, among other things, economic conditions and the impact of the Bankruptcy Case, obligors under the Debtor's accounts receivable may be unable or unwilling to pay the Debtor and/or the Reorganized Company for products and services that they have provided and on which the outstanding accounts receivable have been generated.

## ARTICLE XIV.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

14.1 **Introduction.**

The implementation of the Plan may have federal, state, and local tax consequences to the Debtor and the Debtor's Creditors and Interest Holder. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

1    summary contained herein is provided for informational purposes only.

2            The discussion below summarizes only certain of the federal income tax consequences

3    associated with the Plan's implementation.  This discussion does not attempt to comment on all

4    aspects of the federal income tax consequences associated with the Plan, nor does it attempt to

5    consider various facts or limitations applicable to any particular Creditor or Interest Holder that may

6    modify or alter the consequences described herein.  A Creditor or Interest Holder may find that the

7    tax consequences of the Plan to such Creditor or Interest Holder differ materially from the tax

8    consequences discussed below because of such Creditor's or Interest Holder's unique facts and

9    circumstances.  This discussion does not address state, local, or foreign tax consequences, or the

10   consequences of any federal tax other than the federal income tax.

11           The following discussion is based on the provisions of the Internal Revenue Code of 1986, as

12   amended (the "Internal Revenue Code"), the regulations promulgated thereunder, existing judicial

13   decisions, and administrative rulings.  In light of the rapidly-changing nature of tax law, no

14   assurance can be given that legislative, judicial, or administrative changes will not be forthcoming

15   that would affect the accuracy of the discussion below.  Any such changes could be material and

16   could be retroactive with respect to the transactions entered into or completed prior to the enactment

17   or promulgation thereof.  The tax consequences of certain aspects of the Plan are uncertain due to

18   the lack of applicable legal authority and may be subject to judicial or administrative interpretations

19   that differ from the discussion below.

20           CREDITORS AND THE INTEREST HOLDER ARE ADVISED TO CONSULT WITH

21   THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND

22   TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

23   FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.  THIS SUMMARY IS

24   NOT INTENDED TO BE WRITTEN OR USED, AND CANNOT BE USED BY ANY

25   TAXPAYER, FOR THE PURPOSE OF AVOIDING TAXES AND/OR PENALTIES THAT MAY

26   BE IMPOSED ON SUCH TAXPAYER.

27   / / /

28   / / /

14.2    **Federal Income Tax Consequences.**

    14.2.1    **Carryover and Availability of Net Operating Losses.**

        14.2.1.1.    **General Discussion.**

The Debtor is part of a consolidated group for Federal income tax reporting. This consolidated group has approximately $20 million of "Tax Deferred Assets," or net operating losses ("NOLs") on its books, for its share of NOLs that may be used by the parent of the consolidated group (the "Parent").

The NOL amounts of the Parent are subject to review and significant adjustment upon audit by the IRS. In addition, the foregoing estimates of the Parent's NOLs are subject to legal and factual uncertainty. The tax attribute reduction rules of Internal Revenue Code Section 108 will have the effect of reducing the Parent's NOLs. The extent to which the Parent's NOLs will be available to shelter post-Effective Date income of the Debtor or other members of the consolidated group from federal income tax currently is unclear. Creditors and other parties in interest are cautioned against assuming that such NOLs will be available to any extent for such purpose.

BECAUSE THE NOLs ARE ASSETS OF THE PARENT AND NOT THE DEBTOR, THE DEBTOR MAY NOT RECOGNIZE ANY TAX OR ECONOMIC BENEFIT EVEN IF THE PARENT CAN UTILIZE ITS NOLs BASED IN THE DEBTOR'S OR THE CONSOLIDATED GROUP'S FINANCIAL PERFORMANCE.

        14.2.1.2.    **Internal Revenue Code Section 382.**

Internal Revenue Code Section 382 places potentially severe limitations on the use of a corporation's NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock. The Debtor does not believe that an "ownership change" will occur with respect to the Debtor or the Parent pursuant to the implementation of the Plan. However, there can be no assurance that the IRS will not determine that an "ownership change" has not taken place upon implementation of the Plan. Accordingly, the limitations and restrictions of Internal Revenue Code Section 382 may apply as a result of Plan transactions.

Under certain circumstances, tax losses recognized after the ownership change date are treated as pre-ownership change losses and are subject to the annual limitation. This rule can apply

Case 10-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11, Page 97 of 115

if the Debtor (or Parent) has a "net unrealized built-in loss" exceeding a statutorily-defined threshold with respect to its assets immediately before the ownership change. The Debtor has not yet determined whether it or the Parent has a net unrealized built-in loss that would subject it to the application of this rule.

Any shift (deemed or actual) in the ownership of stock of the Debtor or the Parent, directly or by attribution, outside the scope of the Plan may trigger the application of Section 382 and other provisions of the Internal Revenue Code, which may affect the availability of the Debtor's or Parent's NOLs. Because the federal income tax consequences of any such shift would depend on the particular facts and circumstances at such time and the application of complex legislation and regulations, the Debtor expresses no views as to the effect of any transactions outside the scope of the Plan or the survival of any NOL or other carryovers.

### 14.2.2 Reduction of the Debtor's Indebtedness.

The Debtor does not believe that the amount of Debtor's aggregate outstanding indebtedness will be reduced substantially as a result of the Plan's implementation, but there may be some reduction of indebtedness (any amount of potential discharged indebtedness for federal income tax purposes will be referred to herein as a "Debt Discharge Amount"). In general, the Internal Revenue Code provides that a taxpayer that realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any consideration given for such discharge. No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

If a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to a plan approved by the court, such discharge of indebtedness is specifically excluded from gross income.

Accordingly, the Debtor will not be required to include in income any Debt Discharge Amount as a result of Plan transactions. The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded from income. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the

taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits, and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income. As discussed above, the tax attribute reduction rules may eliminate some of the Parent's NOLs and other tax attributes. Additionally, these rules may require the Debtor to reduce its adjusted tax basis in property.

Any Claim against the Debtor (except a claim that would give rise to a deduction if paid) that is discharged by payment to a Creditor of cash and/or property will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of the payment made in cancellation thereof.

The Debtor's Debt Discharge Amount may be increased to the extent that unsecured Creditors holding unscheduled Claims fail to timely file a proof of Claim and have their Claims discharged on the Confirmation Date pursuant to Bankruptcy Code Section 1141.

14.3    **Tax Consequences to Creditors.**

The tax consequences of the Plan's implementation to a Creditor will depend on whether the Creditor's present debt claim constitutes a "security" of the Debtor for federal income tax purposes and the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income on the cash or accrual method, whether the Creditor receives consideration in more than one tax year of the Creditor, and whether all the consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction. The tax consequences upon the receipt of cash are discussed below under "Receipt of Interest."

### 14.3.1    Claims Constituting Tax Securities.

The determination whether a Claim of any particular Creditor constitutes a "security" for federal income tax purposes is based on the facts and circumstances surrounding the origin and nature of the Claim and its maturity date. Generally, Claims arising out of the extension of trade credit have been held not to be "securities" for federal income tax purposes (collectively, "Tax Securities" or individually, a "Tax Security"). Instruments with a term of five (5) years or less rarely

qualify as Tax Securities.  On the other hand, bonds or debentures with an original term in excess of ten (10) years have generally been held to be Tax Securities.

The Debtor is not aware of any Claim against it that would constitute a Tax Security. However, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN THIS REGARD.  Special rules apply with respect to Tax Securities (including, among others, Internal Revenue Code Section 354) which are not discussed in this Disclosure Statement.

### 14.3.2    Claims Not Constituting Tax Securities.

#### 14.3.2.1.    Gain/Loss on Exchange.

A Creditor whose existing Claims do not constitute Tax Securities of the Debtor (such as most or all trade Claims) will recognize gain or loss on the actual or constructive exchange of such Creditor's existing Claims (other than Claims for accrued interest) for cash and any other consideration received equal to the difference between (i) the "amount realized" in respect of such Claims and (ii) the Creditor's tax basis in such Claims.  The "amount realized" will be equal to the sum of the cash and (i) as to a cash-basis taxpayer, the fair market value of all other consideration received, and (ii) as to an accrual-basis taxpayer, the face amount of any new debt instruments and fair market value of the other consideration received, less any amounts allocable to interest, unstated interest, or original issue discount.

#### 14.3.2.2.    Tax Basis and Holding Period of Items Received.

The aggregate tax basis in the items received by a Creditor will equal the amount realized in respect of such items (other than amounts allocable to any accrued interest).  The holding period for items received in the exchange will begin on the day following the exchange.

### 14.3.3    Receipt of Interest.

Income attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital assets in its hands.

A Creditor who, under its accounting method, was not previously required to include in income accrued but unpaid interest attributable to existing Claims, and who exchanges its interest Claim for cash or other property pursuant to the Plan, will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of

whether that Creditor realizes an overall gain or loss as a result of the exchange of its existing Claims. A Creditor who had previously included in income accrued but unpaid interest attributable to its existing Claims will recognize a loss to the extent such accrued but unpaid interest is not satisfied in full. For purposes of the above discussion, "accrued" interest means interest that was accrued while the underlying Claim was held by the Creditor. The extent to which consideration distributable under the Plan is allocable to such interest is uncertain.

### 14.3.4 Withholding.

The Debtor will withhold any amounts required by law from payments made to Creditors. This may require payments by certain Creditors of the required withholding tax on the non-cash consideration issuable under the Plan, if any. In addition, Creditors may be required to provide general tax information to the Debtor.

**ARTICLE XV.**

**VOTING PROCEDURES AND REQUIREMENTS.**

**15.1 Creditors and Interest Holders Entitled to Vote.**

Only Impaired (as that term is defined in Section 1124 of the Bankruptcy Code) Classes under the Plan are entitled to vote on the Plan.

**15.2 Definition of Impairment.**

Section 1124 of the Bankruptcy Code provides in part as follows:

> . . . a class of claims or equity interests is Impaired under a plan unless, with respect to each claim or equity interest of such class, the plan-
>
> (1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of its claim or interest after the occurrence of a default:
>
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;

th W:\P4\De-Crow88\Pld\Disc#5\DS-262.mc 94 DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

Case 10-55788 Doc# 262-5 Filed: 06/13/11 Entered: 06/13/11 13:13:50 Page 101 of 115

(C)   compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law;

(D)   if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E)   does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### 15.3   **Classes Impaired Under the Plan.**

Classes 1, 4, 6 and 8[10] are Impaired by the Plan and entitled to vote.  No other Classes are Impaired under the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, a Class that is not Impaired under the Plan, and each holder of a Claim or Interest of such Class, are conclusively presumed to have accepted the Plan, and solicitation of acceptances with respect to such Class from the holders of Claims or Interests of such class is not required.  Therefore, Creditors from Classes 2 and 3, and the holder of Interests in Class 9 do not need to return a Ballot.

### 15.4   **Vote Required for Class Acceptance.**

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims of that class which actually cast ballots for acceptance or rejection of the Plan, i.e., acceptance takes place only if two-thirds (2/3) in amount and a majority in number of the Creditors voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by the holders of two-thirds (2/3) in amount of the allowed interests of that class which actually cast ballots for acceptance or rejection of the plan, i.e., acceptance in a class of interests takes place only if the holders of two-thirds (2/3) in the amount of the allowed interests in the class cast their ballots in favor of acceptance.  As discussed above, the Plan does not impair the rights of the holder of Allowed Interests, and Class 9 is conclusively presumed to have accepted the Plan.

---

[10] Holders of Claims electing treatment in Class 5 or Class 7 are also Impaired but are deemed to accept the Plan.

15.5    **Procedures.**

With the Plan and Disclosure Statement, Creditors will receive a Ballot and instructions for voting on the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent to you with this Disclosure Statement and the Plan. Creditors in Class 6 who wish to receive treatment under Class 5 must indicate their election to be in Class 5 where indicated on the Ballot, or they will receive treatment in Class 6. Creditors in Class 6 who wish to receive treatment under Class 7 must indicate their election to be in Class 7 where indicated on the Ballot, or they will receive treatment in Class 6.

A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection. Pursuant to a motion by a Creditor, the Bankruptcy Court may temporarily allow a Disputed Claim to which an objection has been filed for purposes of voting on the Plan. Therefore, although holders of Disputed Claims to which an objection has been filed will receive Ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such Claims for purposes of voting on the Plan.

If a party in interest is a member of more than one Class, it will receive a Ballot for each Class. IF YOU ARE A MEMBER OF MORE THAN ONE CLASS, YOU MUST FILL OUT AND RETURN ALL BALLOTS SENT TO YOU FOR YOUR VOTE TO COUNT IN EACH CLASS. CREDITORS WISHING TO VOTE ON THE PLAN MUST COMPLETE THE BALLOT PROVIDED AND RETURN IT NO LATER THAN JULY 11, 2011 TO:

Murray & Murray
A Professional Corporation
Attn: Thomas T. Hwang
19400 Stevens Creek Boulevard, Suite 200
Cupertino, California 95014-2548
Email: thwang@murraylaw.com

IF YOUR BALLOT IS NOT RETURNED BY JULY 11, 2011 (the "VOTING DEADLINE"), IT MAY NOT BE CONSIDERED. BALLOTS WHICH ARE RETURNED BUT NOT PROPERLY EXECUTED WILL NOT BE CONSIDERED. BALLOTS WHICH ARE EXECUTED BUT WHICH FAIL TO INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL BE CONSIDERED AS ACCEPTING THE PLAN.

# ARTICLE XVI.

## CONFIRMATION PROCEDURES; OBJECTIONS TO CONFIRMATION.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

16.1 **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation (approval) of the Plan (the "Confirmation Hearing"). The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any postponement thereof. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. Any objection to Confirmation must be made in writing and filed with the Bankruptcy Court and served on the following parties, together with a certificate of service, no later than July 11, 2011:

John Walshe Murray
Doris A. Kaelin
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000 and (408) 907-9200
Facsimile: (650) 852-9244
Email:jwmurray@murraylaw.com
Email: dkaelin@murraylaw.com

and

Keith McDaniels
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2080
Facsimile: (415) 693-2222
Email: kmcdaniels@cooley.com

and

/ / /

/ / /

/ / /

97   DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

Craig H. Millet
Kenneth A. Glowacki Jr.
GIBSON DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7757
Facsimile: (213) 229-6757
Email: cmillet@gibsondunn.com
Email: kglowacki@gibsondunn.com

and

Office of the United States Trustee
United States Department of Justice
Attn.: John Wesolowski
280 S. First Street, #268
San Jose, CA 95113
Telephone: (408) 535-5525
Facsimile: (408) 535-5532
Email: john.wesolowski@usdoj.gov

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## 16.2 Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court must confirm the Plan if it determines that all of the requirements of Section 1129 of the Bankruptcy Code have been satisfied. Applicable requirements are as follows:

(1)     The Plan complies with the applicable provisions of the Bankruptcy Code;

(2)     The Debtor has complied with the applicable provisions of the Bankruptcy Code;

(3)     The Plan has been proposed in good faith and not by any means forbidden by law;

(4)     Any payment made or to be made by the Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been approved by, or is subject to the approval of, the Court as reasonable;

(5)     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the

98     DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

interests of holders of Claims and Interests and with public policy; and the Debtor has disclosed the identity of any insider that will be employed or retained by the Reorganized Company, and the nature of any compensation for such insider;

(6) With respect to each Class of Impaired Claims or Interests, each holder of a Claim or Interest of such Class either (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code;

(7) Subject to the "cramdown" provisions of the Bankruptcy Code discussed in Section 16.4 below, each Class of Claims or Interests has accepted the Plan;

(8) Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that incurred, Allowed Administrative Claims will be paid in full on the Effective Date of the Plan and that Allowed Priority Tax Claims will be paid in full over a period not longer than five (5) years from the Petition Date;

(9) If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

(10) Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(11) All fees payable under Section 1930 of title 28, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan; and

(12) All transfers of property of the Plan are to be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

16.3 **Compliance with Confirmation Requirements.**

The Debtor believes that all of the foregoing requirements have been or will be met prior to

the Confirmation Hearing. Specifically, the Debtor believes: (1) the Plan is in the best interests of Creditors, in that holders of all Allowed Claims will receive payments under the Plan having a present value as of the Effective Date of the Plan in amounts not less than the amounts likely to be received if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code; and (2) the Plan will be accepted by sufficient votes in each Impaired Class or may be confirmed under the cramdown standards of Section 1129(b) of the Bankruptcy Code even if sufficient votes are not received.

16.4 **Cramdown.**

In the event that any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the proponent if, as to each Impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." Generally, a plan of reorganization "does not discriminate unfairly" against a class if the plan allocates value to that class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor. "Fair and equitable" has different meanings for the holders of secured and unsecured claims, and for holders of interests.

With respect to a secured claim, "fair and equitable" means either: (a) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens; (b) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds are treated in accordance with clauses (a) or (c) hereof; or (c) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either: (a) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan. For example, while Class 6 under the Plan is Impaired, holders of Allowed Unsecured Claims in Class 6 will receive payment in the full amount of their Allowed

Case 10-55788   Doc# 262-5   Filed: 06/13/11   Entered: 06/13/11 13:30:09   Page 107 of 115
DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

Claims plus interest, under the Plan. Therefore, the Plan is fair and equitable with respect to Allowed Unsecured Claims in Class 6.

With respect to a class of interests, "fair and equitable" means either: (a) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

In the event that one or more Classes of Impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims.

## ARTICLE XVII.

## BEST INTERESTS TEST.

The Bankruptcy Court must independently determine that the Plan is in the best interest of all Classes of Creditors and Interests. The "best interest" test requires that a plan provide to each dissenting member of each Impaired Class a recovery that has a present value at least equal to the present value of the distribution which each such Creditor or Interest holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

### 17.1 **Liquidation Under Chapter 7.**

In performing this analysis, the Bankruptcy Court must determine the amount that would be generated from a Chapter 7 liquidation of the Debtor's assets after deducting the costs of liquidation.

As a general matter, because the Debtor's management is knowledgeable about the Debtor's products, operations and history, among other things, a reorganization pursuant to the Plan will enable the Debtor to proficiently administer the Plan and maximize value for its Creditors in the most cost-effective and sensible manner.

On the other hand, a Chapter 7 Trustee's costs in liquidating the Bankruptcy Estate would include the Trustee's commissions, the Trustee's expenses, fees for counsel and other professionals

Case 10-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11    Page 108 of 115
DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

retained by the Trustee, and additional Administrative Claims.  In addition to liquidating the Debtor's assets, the Trustee would also need to decide whether to litigate certain claims and investigate other possible litigation matters. Generally, no distribution is made in a Chapter 7 case until all assets of the bankruptcy estate and all claims have been liquidated, a process that often can take many months and sometimes years.  This delay could further impair the value of any distribution made to holders of Claims in a Chapter 7 liquidation.  As detailed herein, due to the complexity of the Bankruptcy Case, the existence of at least one legal proceeding that is currently pending that the Trustee would likely be required to defend through final determination, the complexity and necessity of the New License Agreement, and the nature of the Debtor's inventory which incorporates copyrights and trademarks that may not be available for use by the Bankruptcy Estate, the delay and expense required by a Trustee in a Chapter 7 liquidation is estimated to be substantial.

As the successor to Bank of America, N.A. on the Note, LPA Properties has a lien on all of the Debtor's assets securing amounts owing of approximately $4.2 million, plus accrued interest. Unless the Chapter 7 trustee brought and prevailed in litigation to subordinate LPA Properties' secured claim, LPA Properties would be entitled to be repaid first from its collateral.  Conversely, the Plan provides (a) for the subordination of LPA Properties' lien (as to the Plan Agent Collateral) to the security interested granted to the Plan Agent for the benefit of the holders of Allowed Claims in Class 6, and (b) for the note to be paid over five (5) years.

Absent the willing participation of Kinkade, it is impossible to reorganize the Debtor. However, in addition to the commitment of Kinkade to the Debtor through the New License Agreement, the Plan provides for other considerable contributions from the Debtor's affiliates, including the LPA Properties Post-Effective Date Secured Credit Facility of up to $3 million and the deferral of payment on certain Claims of Windermere and Kinkade in excess of $8.5 million until after full payment to the holders of Allowed Unsecured Claims and Priority Claims.  These contributions would not occur in a Chapter 7 liquidation.  Instead, there would be no financial endowment to benefit the Estate, and all Creditors holding non-Priority, Allowed Unsecured Claims (including the substantial Claims of Windermere and Kinkade) would likely share equally in a

G:\P4DOCS\KIN\Pld\DS\DS.DOC

further diluted distribution (if any).

On the contrary, barring unforeseen Claims, Confirmation of the Plan will enable the Reorganized Company to continue to utilize the intellectual property that was previously licensed to it, monetize the existing inventory in a manner designed to maximize its value, obtain new and valuable intellectual property, have access to credit to fund operations and distributions, and continue operations to generate an income stream likely to repay Claims in accordance with the Plan. The Debtor believes this will result in the highest and best recovery for Creditors.

Currently, the White-Lighthouse Action is pending before the Sixth Circuit Court of Appeals. In a Chapter 7, the Chapter 7 Trustee would likely need to defend this matter until its final resolution. If the Chapter 7 Trustee chooses not to defend the action or chooses to defend it and is unsuccessful, the Debtor could be liable for $1,600,000 or more in damages. If the Chapter 7 Trustee chooses to defend the action, the matter could take significant time to reach a final resolution, with considerable cost to the Bankruptcy Estate even if the Chapter 7 Trustee is successful. In addition, there are various claims and judgments which the Debtor possesses (including, for example, the Judgments) that the Chapter 7 Trustee could elect to pursue or enforce. The Debtor already is in the best position to determine which claims or Judgments are worthwhile to pursue or enforce. However, a Chapter 7 Trustee would need to investigate and evaluate all such matters and could then choose to litigate them, further increasing the cost to the Bankruptcy Estate and causing further delay, and thereby further impairing the value of any Distribution to Creditors.

The Debtor currently possesses inventory, but it is doubtful whether a Chapter 7 Trustee would have the right to dispose of such inventory because the inventory incorporates intellectual property that the Debtor and/or the Bankruptcy Estate may no longer have the right to use. Therefore, in a liquidation scenario, the inventory may have little or no value. The Company's 2007 license agreement has expired by its terms, and the Debtor is in material breach of the 1997 license agreement for failure to pay royalties. The pre-petition balance due to Windermere for royalties exceeds $6 million. Upon expiration of the license agreements, the Debtor has a limited right to sell off its inventory for ninety (90) days post expiration, provided that it is not in breach, that it has not intentionally over-manufactured products to create inventory to be sold in a sell-off, and that it

Case 2:10-bk-55788    Doc# 262-5    Filed: 06/13/11    Entered: 06/13/11    Page 110
of 115

provides Windermere with a right of first refusal to purchase the inventory at its cost to manufacture. However, if the Debtor is in breach of the license agreement at expiration or termination, then the Debtor has no right to sell off inventory, and it must destroy the inventory or return it to the licensor. Windermere has the right to injunctive relief to enforce the terms of the license agreements.

In a Chapter 7 scenario, the Chapter 7 Trustee would likely need to engage in litigation to determine the rights, if any, of the Debtor and/or the Bankruptcy Estate to such inventory. Litigation would cause further expense and delay, and accordingly, diminish the value of any distribution made to Creditors in a Chapter 7 liquidation. Even if it is determined that the Debtor may sell off its inventory, the terms of the license agreement require that the sell-off occur within a 90-day period, thereby forcing a rapid sale resulting in a reduction in the amount that may be recovered. Windermere may also repurchase the inventory at its manufacture cost. Finally, the inventory is also subject to a lien in favor of LPA Properties. In contrast, under the Plan, the Plan Agent would receive a senior security interest in the Reorganized Company's right, title and interest in Inventory, and, moreover, an irrevocable license to sell the physical Inventory in the event of a breach or termination of the Plan.

The Debtor believes that Creditors will fare much better if the Debtor is permitted to continue its restructured operations, monetize existing inventory in a manner designed to maximize its value, and sell product incorporating new intellectual property, all as contemplated by the Plan.

17.2 **Liquidation Analysis.**

A liquidation analysis based on the estimates and figures set forth herein, comparing the "best case," "worst case" and Chapter 7 liquidation scenarios is attached hereto as **Exhibit "D"** and incorporated herein by reference (the "Liquidation Analysis"). The figures therein are estimates only, and the actual numbers underlying the assumptions may be higher or lower and could be considerably higher or lower, and therefore, the ultimate Distribution could fall significantly outside of the estimated range. As set forth in the Liquidation Analysis, Distributions to unsecured Creditors in a Chapter 7 scenario are likely to be **$0.00**.

The Debtor has not concluded its review of Claims and anticipates that objections to Disputed Claims will be filed, the outcomes of which will affect the ultimate pool of Allowed

Claims.  In addition, pursuant to the Plan, the Debtor will reject certain executory contracts, and therefore, all Rejection Claims are undetermined at this time.  As discussed above and set forth in Article XIII above, there are numerous other contingencies and risk factors that will ultimately affect the outcome of this Bankruptcy Case.[11]

## ARTICLE XVIII.

### FEASIBILITY.

The Plan contemplates the reorganization of the Debtor's finances and the implementation of a new business strategy, which in turn will generate proceeds to fund the Plan.  The Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or the Reorganized Company unless such liquidation or reorganization is contemplated by the Plan itself.

As discussed herein, the Plan provides for Distributions to Creditors from cash on hand, as well as from cash flow from revenue from future operations and, to the extent necessary, from borrowed amounts under the LPA Properties Post-Effective Date Secured Credit Facility.  Aside from amounts borrowed under the LPA Properties Post-Effective Date Secured Credit Facility, if any, the Debtor does not need to borrow funds to implement the Plan.  The Debtor has cash on hand, currently in the amount of $1.4 million as of April 30, 2011, which will be sufficient to pay all Allowed Claims under Class 3 and Class 5 of the Plan.[12]  The remaining payments and funding obligations under the Plan are required to be made quarterly or as otherwise set forth in the Plan (see Articles III, IV and V, and Section VI-E of the Plan).  As part of the Plan, the Debtor has secured the New License Agreement for six (6) years which will permit it to continue its historical business during the period that distributions are to be made under the Plan, including releasing at least eight (8) new images per year.  Under the Plan, the Debtor estimates that Distributions may equal

---

[11] The attached Liquidation Analysis assumes that, because no current license is in place with Windermere and Windermere is owed over $6 million in pre-petition royalties, a Chapter 7 trustee will be unable to liquidate the Debtor's existing inventory.  As a result, and as set forth in the Liquidation Analysis, Distributions to unsecured Creditors in a Chapter 7 scenario are likely to be zero.  However, even in the unlikely event that a Chapter 7 Trustee is successful in establishing that it has the right to liquidate existing inventory, the ultimate Distribution, if any, to Creditors holding non-priority Unsecured Claims still would be negligible.

[12] While the cash on hand will fluctuate up to the Effective Date, the Debtor's projections indicate sufficient cash to fund the Effective Date payments.  To the extent of any shortfall, the LPA Properties Post-Effective Date Secured Credit Facility is available as provided by the Plan.

Case 10-55788    Doc#262-5    Filed: 06/13/11    Entered: 06/13/11 15:14:53    Page 112 of 115

105  DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION (DATED JUNE 13, 2011)

$420,000 - $490,000 per quarter.

As discussed above, the Projections attached hereto as **Exhibit "C"** are based on numerous key assumptions and estimates (detailed below), and therefore are not necessarily indicative of the future financial condition or results of operations of the Reorganized Company, which may vary significantly.

The Projections were prepared based on the following revenue assumptions: (i) the Reorganized Company will release eight (8) new images per year (including four (4) "affinity" releases), and continue to provide limited and open edition prints of images that the Debtor has historically offered; (ii) each "affinity" release (i.e., an image that incorporates elements which a particular affinity group may value (e.g., sport themed)) will generate approximately $800,000 in revenue, with 85% of lifetime revenue generated in the first six (6) months after the release; (iii) each other release will generate approximately $200,000 in revenue with 85% of lifetime revenue generated in the first six (6) months after the release; (iv) the Reorganized Company's television account(s) will generate approximately $2.5 million in 2011; (v) other television and direct-to-consumer television sales will generate $2 million in 2011; (vi) sales through the Reorganized Company's website will be approximately $1.2 million in 2011; (vii) releases of Robert Girrard (a pen-name used by Kinkade to release art that more closely resembles the Impressionists) will aggregate to approximately $50,000 per year (based on two (2) releases per year); (viii) previously released product will account for 35% of the Reorganized Company's revenue; and (ix) the Reorganized Company will grow revenue at 5.9%, 2.5%, 3%, 3% and 3% in 2012, 2013, 2014, 2015 and 2016, respectively. These numbers are consistent with historical performance and, in some cases, may be conservative as follows: (i) the Company has released at least eight (8) new releases per year for the last eight (8) years; (ii) from 2008-2009, each affinity and traditional release has generated approximately $2.1 million and $370,000, respectively; (iii) television sales for 2008-2009 were approximately $2.3 million, and this figure resulted after an absence of several years from such sales channel; (v) in earlier years, sales from television channels of distribution exceeded $5 million; and (vi) sales through the Company's website for 2008-2009 were approximately $1.4 million.

The Projections also show expenses considerably less than historical expenses. The Debtor

has completed cost-reduction efforts. For example, within the last year, the Debtor has reduced its head count and associated costs from 66 employees with an annual base salary cost of approximately $3.7 million on January 1, 2010, to 24 employees with an annual cost of approximately $1.2 million on February 28, 2011 and has reduced rent and associated costs from $179,000 per month to $42,000 per month. The initial results of such cost reduction efforts have resulted in the profitability of the Debtor for the months of August through December 2010. The Debtor's monthly breakeven point has been reduced from approximately $1.7 million in the fourth quarter of 2009 to approximately $850,000 currently. In preparing the Projections, the Debtor has "baselined" its quarterly operating expenses at fourth quarter 2010 levels and assumed a 1.5% per quarter increase in operating expenses to support the revenue plan. The operating expense increases relate primarily to sales and marketing activities. Additionally, the Debtor has assumed a gross margin of 58%, compared to an average of approximately 50% for 2010, driven primarily by efficiencies realized from the outsourcing of some of the Debtor's manufacturing processes, as well as recent concessions and favorable pricing from its supply chain partners. The remaining significant margin enhancers relate to packaging, freight, and stretcher bar costs, each of which the Debtor believes can be reduced by approximately 30%.

With these assumptions, and the other assumptions contained therein, the Projections show $14.0 million in net revenues and $1.2 million in after-tax profit in 2011, and profitability of $2.4, $2.5, $2.7, $2.9 and $3.2 million in 2012, 2013, 2014, 2015 and 2016, respectively. The Projections show that quarterly free cash balances exceed $200,000 after payments of approximately $500,000 per quarter to Creditors throughout the term of the Plan. Accordingly, if the Reorganized Company's performance conforms to the Projections, the Reorganized Company will have sufficient cash to make all required payments and meet all funding obligations under the Plan, and have working capital necessary to fund its operations.

## ARTICLE XIX.

## POST-CONFIRMATION MANAGEMENT.

As discussed at Section 6.10 above, Robert Murray will be the Responsible Person of the Reorganized Company. Mr. Murray previously was the Vice President and Secretary of the

Company from 2002 through 2006.  Presently, in addition to being the Court-appointed Responsible Person for the Debtor, Mr. Murray is the General Counsel and Executive Vice President of the Debtor's ultimate parent company, Lightpost, as well as the Debtor's in-house counsel.  Mr. Murray does not receive compensation from the Debtor.

Frank Teruel has provided executive officer services to the Company from 2008 through the present.  Mr. Teruel also is the Chief Operating Officer of Lightpost.  Mr. Teruel does not receive compensation from the Debtor.

John Hasting was retained by the Debtor in 2010 to provide executive officer and management services to the Debtor.  Mr. Hasting is the Chief Executive Officer of Lightpost.  Mr. Hasting does not receive compensation from the Debtor.

Post-Confirmation, Mr. Murray, Mr. Teruel and Mr. Hasting together will service as General Managers of the Reorganized Company.  None of these individuals will receive compensation from the Reorganized Company.  Pursuant to a sharing agreement with some of its affiliates whereby the parties share certain resources and provide certain services to each other (including the services provided by Messrs. Hasting, Teruel and Murray), the Debtor does provide payments to Lightpost.

Dated: June 13, 2011

**PACIFIC METRO, LLC**
A California Limited Liability Company,
fka The Thomas Kinkade Company, LLC,
fka Media Arts Group, Inc.


By: */s/ Robert Murray*
      Robert Murray
      Court-Appointed Responsible Person


**MURRAY & MURRAY**
A Professional Corporation

By: */s/ John Walshe Murray*
      John Walshe Murray
      Attorneys for Debtor